Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                  NORTHERN DISTRICT OF MISSISSIPPI
 2                      ABERDEEN DIVISION

 3
    TATIANA (TANYA) SHERMAN                    PLAINTIFF
 4
    VS.                        NO. 1:21-CV-190-GHD-DAS
 5
    ITAWAMBA COMMUNITY COLLEGE;
 6  JOE LOWDER; TZER NAN WATERS;
    AND DR. JAY ALLEN                         DEFENDANTS
 7

 8

 9
    *******************************************************
10
          DEPOSITION OF TATIANA (TANYA) SHERMAN
11
    *******************************************************
12

13

14
          TAKEN AT THE INSTANCE OF THE DEFENDANTS
15      IN THE LAW OFFICES OF PHELPS DUNBAR, LLP,
           105 EAST MAIN STREET SECOND FLOOR,
16                  TUPELO, MISSISSIPPI,
        ON DECEMBER 12, 2022, BEGINNING AT 10:32 A.M.
17

18

19
                APPEARANCES NOTED HEREIN
20

21

22  Reported by:  REGINA D. RUSSELL, RPR, CCR 1110

23  _____

                  ADVANCED COURT REPORTING
24                    P.O. BOX 761
                  TUPELO, MS 38802-0761
25                    (662) 690-1500
```

EXHIBIT "C"

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 2

1    APPEARANCES:

2    For the Plaintiff:

3
          RON L. WOODRUFF, ESQUIRE
4         Waide & Associates, P.A.
          Post Office Box 1357
5         Tupelo, MS  38802
          (662) 842-7324
6         (rlw@waidelaw.com)

7
     For the Defendants Itawamba Community College,
8    Tzer Nan Waters and Dr. Jay Allen:
9         BENJAMIN E. GRIFFITH, ESQUIRE
          Griffith Law Firm
10        Post Office Box 2248
          Oxford, MS  38655
11        (662) 238-7727
          (ben@glawms.com)
12
13   For the Defendant Itawamba Community College:
14        MARK N. HALBERT, ESQUIRE
          Phelps Dunbar, LLP
15        105 East Main Street
          Suite 201
16        Tupelo, MS  38804
          (662) 842-7907
17        (mark.halbert@phelps.com)
18
     For the Defendant Joe Lowder:
19
          DANIEL SPARKS, ESQUIRE
20        Sparks Law Firm
          Post Office Box 2610
21        Oxford, MS  38655
          (662) 234-4600
22        (daniel@sparkslawpllc.com)
23
     Also Present:
24
          JOE LOWDER
25

ADVANCED COURT REPORTING
662-690-1500

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

```
                        TABLE OF CONTENTS


WITNESS                                           PAGE
TATIANA (TANYA) SHERMAN
     Examination by Mr. Griffith............    6
     Examination by Mr. Sparks..............   112
     Examination by Mr. Woodruff...........    226
     Examination by Mr. Griffith...........    240
     Examination by Mr. Sparks.............    245
     Examination by Mr. Woodruff...........    246


EXHIBIT NO.           DESCRIPTION            PAGE
     1   Performance Improvement Plan dated
            3-8-19..........................   110

     2   ICC Employee Performance Evaluation
            Form from July 2017-January 2019.  110
     3   Letter from Shawn Mackey, Sr., to
            Dr. Joe Lowder dated 9-22-20.....  205

     4   E-mail chain......................    221

     5   Job Description...................    229

     6   Response to Performance Evaluation
            dated 4-5-19...................    232
     7   Letter from Tatiana Sherman to Tim
            Senter dated 9-5-19.............   234

     8   Performance Improvement Plan Review
            dated 12-18-19..................   234
     9   Memo from TZ Waters to Tim Senter
            dated 3-4-20....................   235
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 4

```
 1    EXHIBIT NO.          DESCRIPTION                PAGE

 2       10    Letter from Jay Allen to Tatiana
                   Sherman dated 5-24-21...........    238
 3
         11    Letter from Mary Ford to Jim Waide
 4                 dated 4-14-22...................    239

 5       12    Letter from Jim Waide to Jay Allen,
                   et al, dated 9-24-19...........    246
 6
```

```
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 5

                              STIPULATIONS

1.    It is hereby stipulated by and between counsel
      that the deposition of TATIANA (TANYA) SHERMAN
      may be taken on behalf of the Defendants at the
      time and place set forth herein and be reported
      by Regina D. Russell, RPR, CCR 1110.

2.    That all objections as to the notice of the time
      and place of the taking of this deposition are
      hereby waived.

3.    That all objections except as to the form of the
      questions are reserved until the time of the
      trial.

4.    That the reading of the testimony to or by the
      witness and signing thereof by the witness
      are not hereby expressly waived.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1          TATIANA (TANYA) SHERMAN, after

2   being duly sworn, testified as follows:

3               MR. GRIFFITH:  Counsel, is it

4   agreeable that we use the usual stipulations?

5               MR. WOODRUFF:  Absolutely.

6                   EXAMINATION

7   BY MR. GRIFFITH:

8       Q.   Ms. Sherman, my name is Ben Griffith.

9   We've just met when you came in for your deposition

10  this morning, and it's a pleasure to meet you for the

11  first time.  My questions that I ask you today are

12  going to be relating to your time with ICC.

13      A.   Uh-huh (Indicating yes).

14      Q.   And relating to allegations and various

15  documents, including a Complaint and Amended

16  Complaint that you filed in federal court.  First of

17  all, if you don't understand my question, if my

18  question appears to be garbled, and it can be.  I

19  mean, I could ask a question that just simply is too

20  vague or is not specific enough, just ask me and let

21  me know that you don't understand and I'll rephrase

22  it.  Is that okay?

23      A.   Yes.

24      Q.   If you have questions about the meaning of

25  my question, there's a word that you're not sure of,

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 7

```
 1    please direct them to me --
 2         A.   Okay.
 3         Q.   -- and I'll do my very best to clarify.  If
 4    you can do this, and I don't think we'll have a
 5    problem with it, wait for the question to be asked.
 6    And then once that question has been completed, then
 7    the court reporter can take down both the question
 8    and the answer.  In depositions sometimes it gets to
 9    be moving fast and furious and it's good that we
10    don't talk over each other.  Is that all right?
11         A.   Yes.
12         Q.   Okay.  Answer orally.  There's no way that,
13    as good as our court reporter is, and she's one of
14    the best, they can't take down nods as much as it
15    would be nice to do that.  So try to avoid ambiguous
16    answers like uh-huh (Indicating yes) or unh-unh
17    (Indicating no).  Make it, if you can possibly, yes
18    or no.  That would be the very best.  Okay?
19         A.   Yes.
20         Q.   If you don't understand the answer(sic)
21    just say so.  You're under an oath to do so, and that
22    goes for not remembering.  If you don't remember you
23    just say I don't remember.  If you do remember you're
24    under an oath to tell me what you do recall.  Okay?
25         A.   Uh-huh (Indicating yes).  I'm sorry.  Yes.
```

1    Q.   I wasn't trying to trick you on that one.

2    But your attorney also will have the right and will

3    be able to object to any questions that he thinks

4    need to be objected to and he'll have the right to do

5    that throughout the deposition.  If and when Mr.

6    Woodruff does that, stop, let him make his objection

7    and then we'll go back on the record.  Okay?

8         A.   Okay.

9         Q.   Don't assume that you're supposed to know

10   anything about what the answer should be from the

11   tone of the question.  I try to make mine tone deaf

12   as I can.  But if there's something that is read into

13   the question, I ask that you not do that, that you

14   simply testify about what you know from your own

15   observations.  What I call it is the sight, sound,

16   hear, whatever from all of your senses you've

17   gathered that you're testifying on the basis of that

18   knowledge.  Okay?

19        A.   Okay.

20        Q.   Don't let me interrupt your answer.  If I

21   do, shame on me.  I'll try not to do that.  If you're

22   not finished with an answer when my next question

23   starts, tell me right away and I'll stop.  I'll give

24   you a full, complete and fair opportunity to express

25   yourself.  Okay?

1        A.    Okay.

2        Q.    And I want you to finish each answer.

3    That's very, very important.  The lawsuit that has

4    been filed has some claims in there about emotional

5    distress, emotional injury.  Today, as you come in

6    here, are you well rested and ready to participate in

7    the deposition?

8        A.    I think I -- yes, I think so. Yes.

9        Q.    Okay.  Are you suffering from any emotional

10   condition right now that would interfere with your

11   testifying?

12       A.    I believe I do.

13       Q.    Pardon?

14       A.    Yes, I do.

15       Q.    Okay.  Do you feel that that emotional

16   condition would hamper your ability to be as

17   completely open and detailed and truthful about your

18   answers?

19       A.    I will be very open and truthful.

20       Q.    All right.  And any kind of emotional

21   injury or emotional distress that you have, that in

22   your judgement will not interfere with your ability

23   to answer the questions; correct?

24       A.    Correct.

25       Q.    Okay.  I hate to ask these kind of

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

```
 1   questions --

 2        A.   That's fine.

 3        Q.   -- because they're peppered all the way

 4   through depositions as long as I can remember.  But

 5   have you ever been convicted of a felony?

 6        A.   No.

 7        Q.   Have you ever discussed your testimony that

 8   you're going to give with anyone other than your

 9   attorney, Mr. Ron Woodruff?

10             MR. WOODRUFF:  Or anyone in our

11   office.

12        Q.   (Mr. Griffith)  Or anyone in the office of

13   Jim Waide and Associates.

14        A.   No.

15        Q.   Okay.  At any other time have you talked

16   with any family members or persons who were coworkers

17   about what you're going to testify to here today?

18        A.   No.

19        Q.   Okay.  And if you will, give me your full

20   name.  I understand you're a native of Russia.

21        A.   Correct.

22        Q.   And I have your maiden name.  Is it

23   Cipkowski.  Can you tell me what your full name is

24   today?

25        A.   Yes.  My legal name is Tatiana Cipkowski
```

 1    Sherman.

 2          Q.    Sherman.  Okay.

 3                THE COURT REPORTER:  I may need to get a

 4    spelling on that.

 5                THE WITNESS:  Okay.  T-A-T-I-A-N-A,

 6    C-I-P-K-O-W-S-K-I, S-H-E-R-M-A-N.

 7          Q.    (Mr. Griffith)  Ms. Sherman, where are you

 8    from, if we just --

 9          A.    Central part of Russia.

10          Q.    Central Russia?

11          A.    Uh-huh (Indicating yes).

12          Q.    Is it outside of Belarus?

13          A.    It's outside of Belarus.  Belarus is a

14    different country.

15          Q.    That's a loaded political question, isn't

16    it?

17          A.    Yes.

18          Q.    But you're in what we would call the

19    Central Caucasus Region of Russia?

20          A.    Yeah.  That's correct.

21          Q.    I've been there.  In terms of your own

22    history, we have already the data from the

23    universities and the schools that you attended in

24    Russia.

25          A.    Uh-huh (Indicating yes).

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 12

1      Q.   Can you tell the jury just for the benefit

2    of completeness --

3      A.   Sure.

4      Q.   -- what your educational background

5    consisted of?

6      A.   All right.  In Russia I earned two

7    bachelor's degrees.  One of them was earned from my

8    hometown university and my degree was in elementary

9    teaching and training.  And I also attended -- Moscow

10   State University opened a sister location in my

11   hometown.  So I went back to school and got a degree

12   in linguistics and international communication.

13         So when I came to the United States I went back

14   to school and I earned Master's in Business

15   Administration from Mississippi State.  I have taken

16   some additional classes in leadership through the

17   University of Mississippi.

18     Q.   Okay.  What are some of those classes, if

19   you can delineate?

20     A.   Leadership in community colleges.

21     Q.   When did you first move to Mississippi?

22     A.   In 2001.  The day after 9-11.

23     Q.   Oh, momentous.

24     A.   That's when -- I left New York the day

25   before 9-11.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 13

1     Q.    Okay.  Besides the educational background
2   and the degrees that you just described for me and
3   the fact that you are still attending school on a
4   basis of getting additional knowledge, are there any
5   other degrees that you've worked on or are working
6   on?
7     A.    I'm not currently working on any degrees.
8     Q.    Okay.  With respect to military background
9   and military training, have you had any connection
10  with military service, either in Russia or in the
11  USA?
12    A.    No.
13    Q.    Okay.  Are you married?
14    A.    Yes.
15    Q.    Okay.  Is this your first marriage?
16    A.    This is my second marriage.
17    Q.    Second marriage.  Okay.  I don't want to go
18  too deep into detail, but when did your first
19  marriage terminate?
20    A.    To my best knowledge, 2004 or '05.
21    Q.    At the time that first marriage ended,
22  where were you living?
23    A.    I was living in Fulton, Mississippi.
24    Q.    Okay.  And you remarried?
25    A.    Yes.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

```
 1        Q.    Correct?

 2        A.    Yes.

 3        Q.    Who did you marry?

 4        A.    I married Henry Sherman, Hank Sherman, my

 5   husband.

 6        Q.    Okay.  And Mr. Sherman is a doctor?

 7        A.    That's correct.

 8        Q.    In Fulton?

 9        A.    No.  He works with Campbell Orthopaedics.

10   He has an office in Southaven and he has an office in

11   -- right next to Southaven.

12        Q.    Horn Lake?

13        A.    I'm sorry.

14              MR. WOODRUFF:  Olive Branch.

15              THE WITNESS:  Olive Branch.  Thank

16   you.

17              MR. WOODRUFF:  The other direction.

18        Q.    (Mr. Griffith)  Right.  I just drove

19   through Olive Branch the other day.  And with regard

20   to your work history, I want to walk through this

21   step by step.  Before you came on with Itawamba

22   Community College, what kind of work did you do?  How

23   were you employed?

24        A.    I worked for the high school in Fulton and

25   I was a teacher's assistant for about a year.
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    Q.   Okay.

2    A.   And I also taught night classes at ICC,

3  English as a second language.

4    Q.   Okay.  These are students who are coming

5  from other counties --

6    A.   Correct.

7    Q.   -- that are learning to become proficient

8  in English?

9    A.   Correct.  So not only I was helping them

10  with their basics of reading and writing in English,

11  but I was also helping them to transcribe their

12  transcripts if they had a degree from a different

13  country.

14    Q.   Okay.  When did you first become employed

15  by Itawamba Community College, or ICC?

16    A.   I think it was in 2003, that summer.  And I

17  became a residence hall director.

18    Q.   What was the title of your position if

19  there was one?

20    A.   I believe it was residence hall director.

21    Q.   Okay.  Was it also called dorm manager?

22    A.   Dorm manager.  Correct.

23    Q.   Okay.  Tell me what your duties of that job

24  were.

25    A.   My main focus was to provide safety for the

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 16

1   residents, the girls that lived in that facility.

2       Q.   Okay.  What other responsibilities did you

3   have?

4       A.   I did room checks every Tuesday night.

5   There was a visitation, open door, Tuesday nights, so

6   I made sure there was somebody in the front lobby

7   helping people come in and find the room that they

8   were looking for.

9       Q.   Did you have coworkers or co-employees that

10  you worked with?

11      A.   I don't think so.

12      Q.   As dorm manager, you were the sole dorm

13  manager?

14      A.   In that facility.

15      Q.   In that facility.

16      A.   Correct.

17      Q.   Okay.  Can you tell me whether there were

18  ever any disciplinary problems at all that you were

19  involved in with respect to working with others and

20  performing your job, to your recollection?

21      A.   There was no disciplinary action.

22      Q.   Okay.

23           MR. WOODRUFF:  Can I ask for

24  clarification?  Are you talking about for the people

25  that she supervised -- the students or --

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

```
1        Q.   (Mr. Griffith)  Let me ask the question.
2    You understood my question.  Your lawyer didn't.
3        A.   I thought it applied to me.
4        Q.   Yeah.  It was meant to be applicable to
5    you.
6                   MR. WOODRUFF:  It was to her?  Okay.
7    That's fine.  I just wanted to make sure.
8                   MR. GRIFFITH:  I just wanted to make
9    sure we're on the same page.
10       Q.   (Mr. Griffith)  But there were, to your
11   knowledge and based on your experience, no other
12   disciplinary problems that you experienced in terms
13   of getting along with others or performing your job
14   as dorm manager, correct?
15       A.   Correct.
16       Q.   Okay.  After you were dorm manager -- in
17   fact, how long did that job last?  You began in 2003;
18   is that correct?
19       A.   Yes.
20       Q.   And when did it end?
21       A.   Well, I believe it ended in 2011.
22       Q.   Why did it end then?
23       A.   I met my current husband and we moved to
24   Oxford, Mississippi.
25       Q.   I'm sorry.  I didn't understand your
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 18

```
 1   last --
 2        A.   We moved to Oxford, Mississippi.
 3        Q.   To Oxford?  Okay.  And you're living in
 4   Oxford now, correct?
 5        A.   Correct.
 6        Q.   Okay.  After you left the position of dorm
 7   manager, what other job, if any, did you have?
 8        A.   So as I mentioned, I worked for the high
 9   school as a teacher's assistant --
10        Q.   Uh-huh (Indicating yes).
11        A.   -- for about a year.  And after that I was
12   employed in -- at that time it was called WIA
13   department.  And my job was to help case managers
14   with their files.  And I did that job for about a
15   year.  And later I was transferred to what's called
16   dislocated worker coordinator position, and that
17   position was under workforce development and
18   training.
19        Q.   Okay.  Let me ask you what WIA stands for.
20        A.   Give me a second.
21        Q.   That's okay.  Take your time.
22        A.   I cannot come up with an answer right now.
23   I'm sorry.
24        Q.   This is the WIA department?
25        A.   Department, yes.  It's a federally-funded
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 19

1   program that's specifically designed to help

2   individuals who are unemployed --

3        Q.   I understand.

4        A.   -- or to help individuals who recently

5   entered workforce with some skilled training or

6   reimbursement for the company that hired those

7   individuals.

8        Q.   Were you the workforce project manager at

9   that time?

10       A.   No.  I became workforce project manager

11  after I did my job as a dislocated worker coordinator

12  for about a year.  So just to give you a timeline, I

13  believe my full-time job started sometime 2004 at

14  WIA.  And 2005, that's when I came to workforce

15  development.  And, again, my title was dislocated

16  program coordinator.  However, my boss at that time,

17  Denise Gillespie, she started training me on

18  workforce projects, so she slowly started giving me

19  one project at a time.  So, yes, to answer your

20  question, now I remember.  So yes, I started managing

21  some projects --

22       Q.   You're doing fine.

23       A.   -- in 2005.  Yes, sir.

24       Q.   What is Ms. Gillespie's first name?

25       A.   Denise.

1      Q.   Denise Gillespie?

2      A.   Uh-huh (Indicating yes).

3      Q.   Who were project coworkers that you had at

4 that time?

5      A.   Sonny Nicks, Shelby McCullar, Lee Oswalt.

6 Oh, I'm so sorry. Denise was not my director at that

7 time. Andrew Hughes was my director for a couple of

8 years and then Denise became my director.

9      Q.   Okay.

10     A.   So at some point Denise was my coworker as

11 well.

12     Q.   Okay. Are those all the coworkers that you

13 can recall?

14     A.   Emily Lawrence and Deanna Duckworth.

15     Q.   Just like I asked you about disciplinary

16 problems, were there ever any disciplinary problems

17 in getting along with any of these coworkers?

18     A.   No. Only positive feedback.

19     Q.   Okay.

20     A.   Very positive.

21     Q.   After you served as the workforce project

22 manager, what other position, if any, did you hold?

23     A.   In 2018, in the summer, I was given a

24 different title and more work responsibilities as the

25 MEP coordinator plus workforce project manager.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    Q.   Okay.  Tell the jury what MEP stands for.

2    A.   It stands for manufacturing extension

3  partnership.  It's part of the MMA program in

4  Mississippi, which stands for Mississippi

5  Manufacturing Association.

6    Q.   Okay.  What were your duties at that job?

7    A.   My duties were -- so this particular

8  program generated additional $100,000 for the

9  college.  And my job was to report training

10  activities and programs, and the federal grant would

11  offset the cost of the college for the training hours

12  that the college involved with individuals or

13  manufacturing organizations.

14    Q.   As the MEP director, Ms. Sherman, who were

15  the coworkers that you worked with on that job?

16    A.   So there are a five MEP centers in the

17  state of Mississippi.  When I first started, Gulf

18  Coast was one of them.  And then for whatever reason

19  they stopped participating in this program.  So

20  Northeast Community College was another one.  Pearl

21  River Community College was involved and still is

22  involved.  Also Polymer Institute.

23    Q.   Where is that located?

24    A.   Close to Hattiesburg.  Close to Jackson.

25    Q.   Okay.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 22

1      A.   And two more I'm trying to remember now.

2   But that's to the best of my memory at this point.

3      Q.   Okay.  With regard to your MEP director

4   function and your job there, did you have a written

5   job description?

6      A.   My job description was expanded so, yes,

7   there were new duties that were added to my job

8   description.

9      Q.   What were those?

10      A.   To maintain proper records, data

11   collection, reporting system.  That's required for

12   MEP program, for us to generate the extra $100,000.

13      Q.   Okay.  And with respect to coworkers, can

14   you tell me who all of those were?

15      A.   I had to work with, for example, at that

16   time Jason Spradlin.  Before Jason was Liz Owings,

17   because I collected --

18           THE COURT REPORTER:  Excuse me.  I'm

19   sorry.  You need to slow down just a little bit.  I'm

20   having a hard time.

21           (Pause in Proceedings.)

22      A.   That's the internal staff.  Now, before I

23   became the MEP coordinator, we had an MEP director of

24   the college and her name was Debbie Martin.  So we

25   worked together also.  And, of course, when TZ joined

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1  the team as a director/workforce manager position,

2  because she also managed some projects, so I had to

3  work with her.

4      Q.   (Mr. Griffith)  You referred to TZ.  That's

5  Tzer Nan Waters?

6      A.   Waters, correct.

7      Q.   Besides Jason Spradlin, there was one

8  other.  Leo or Liz?

9      A.   Liz, L-I-Z.

10      Q.   L-I-Z.  I'm sorry.  Liz's last name was?

11      A.   Like O with the wings.  Owings.

12      Q.   Got it.  Did you experience any

13  disciplinary problems in connection with your work as

14  the MEP director?

15      A.   No.

16      Q.   Did you have any problems getting along

17  with or performing the job with these other

18  individuals?

19      A.   No.

20      Q.   Was there any other non-assigned work

21  besides the MEP director, the workforce project

22  manager position, dorm manager that you've described,

23  was there any other work at Itawamba Community

24  College that you performed?

25      A.   To my best knowledge at this time, I don't

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 24

```
 1   recall.
 2         Q.    Any other non-assigned work?
 3         A.    I served as a volunteer --
 4         Q.    Okay.
 5         A.    -- for the Regional Rehab Center for 10
 6   years and I raised $150,000 over the ten-year period.
 7         Q.    When you say you raised $150,000, tell me
 8   how you did that.
 9         A.    I visited most of my companies.  As a
10   project manager, each of us had a designated customer
11   list.  So we have five counties that we provide
12   services as a college -- Pontotoc, Itawamba, Lee,
13   Monroe and Chickasaw.
14         Q.    Got it.
15         A.    So I had close to 86 companies on my list.
16   I don't want to say I visited all of them, but I
17   visited most of them to raise the money.  And I spoke
18   as a liaison for the benefit of the Regional Rehab
19   Center.  I have a personal connection with this
20   Regional Center.  Kay Matthews, who was the executive
21   director at that time, was my personal friend.
22         Q.    In performing this work, were there any
23   others who assisted you or worked with you?
24         A.    Absolutely not.
25         Q.    You did it alone?
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 25

1     A.    I did it alone.

2     Q.    Okay.  Let me go into other areas.  Are

3 there any other industry positions that you held

4 during this period of time?

5     A.    I remember that I was asked to be an

6 interpreter for Syntron.  It is Syntron today.  It

7 had a different name at that time.  I can think about

8 it and tell you, but it is Syntron today.

9           THE COURT REPORTER:  Can you spell it,

10 please?

11          THE WITNESS:  Syntron.  I think it's

12 S-Y-N-T-R-O-N.  And a company from Russia was in the

13 process of buying license from Syntron, and I spent

14 about a week with them and translated the process and

15 documentation, things like that.

16     Q.    (Mr. Griffith)  You were that company's

17 primary liaison in the U.S. for translation purposes?

18     A.    I was not a project manager for Syntron,

19 no.  They were just looking for someone who could

20 assist them.

21     Q.    And that's what you did?

22     A.    Yes.

23     Q.    Was there any other job besides those that

24 you just described that you participated in and

25 undertook during this period of time?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 26

1   A. When you say other jobs, do you want me to
2 go over the responsibilities of me?
3   Q. If there were jobs that were identified by
4 title or name, yes.
5   A. All right. Well, as a workforce project
6 manager, my job was to promote services, workforce
7 services to companies in our district, which is a
8 five-county district. I annually visited those 86
9 companies, distributed information about the service
10 we provided. I took some initiative to promote
11 Pathways or Pathway programs for those individuals
12 who are currently unemployed or seeking entry-level
13 skilled training just to enter a workforce.
14   For example, I assisted with construction
15 pathway and later on with entrepreneurship pathway.
16   Q. All of this was during a period of time
17 when you were working for Itawamba Community College,
18 correct?
19   A. That is correct. Yes.
20   Q. Who were some of your friends and mentors
21 that you worked with at ICC?
22   A. My mentors? Well, of course, at first it
23 was Andrew Hughes. It was Denise Gillespie, who
24 personally trained me to be a project manager. I was
25 very close friends with Charlotte Faulkner when I was

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 27

1   in WIA.  I was friends with Liz Owings.  I was

2   friends -- very good friends with Tish Kelly, with

3   Cassie Alexander, Tanya Cox, some other people.

4        Q.   Any others besides these?

5        A.   Yes.  Pam Thornton.

6        Q.   Do you know Pam's last name?

7        A.   Pam Thornton.  She works in housekeeping

8   but she became a good friend.

9        Q.   Okay.  Any others?

10       A.   Stacy Stepp.

11            THE COURT REPORTER:  What's the last

12   name?

13            THE WITNESS:  Stepp, S-T-E-P-P.  Becky

14   Dallas.

15       Q.   (Mr. Griffith)  What is that last name?

16       A.   Dallas.

17       Q.   Dallas?

18       A.   I worked very well with many trainers and

19   we developed close, good working relationships, such

20   as Romeko Traylor.  Ronnie Partlow.  He passed away a

21   couple of months ago, which is very sad.

22       Q.   Any others?

23       A.   Are you talking about close friends or just

24   people that --

25       Q.   Friends, mentors, those that you were

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 28

1   associated with in carrying out your duties and

2   responsibilities.

3          A.    That's to my best.

4          Q.    Is that to the best of your memory?

5          A.    Yes.

6          Q.    Good.  Thank you.  Again, did you have any

7   conflicts with any of these individuals with whom you

8   worked while at ICC?

9          A.    I don't recall, no.

10         Q.    Were they -- did you encounter any

11  disciplinary problems or issues when you worked

12  with --

13         A.    No.

14         Q.    -- these individuals at ICC?

15         A.    No.

16         Q.    Okay.  What was your final position that

17  you held at Itawamba Community College?

18         A.    MEP/workforce project manager -- innovative

19  project manager.

20         Q.    Okay.  And when did that employment come to

21  an end, if it did?

22         A.    The letter was signed by Dr. Allen on May

23  24th, 2021.

24         Q.    How did that employment come to an end?

25  Why?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 29

1      A.   I was terminated without a reason.

2      Q.   How were you actually terminated?  Was it

3   as you just described, by a letter?

4      A.   I met with Tim Senter, who is the executive

5   HR.  Angie Norris was present.  And they presented me

6   with a letter and read the letter to me.  When I

7   asked for a reason they said that they are not

8   allowed to provide me information other than what the

9   letter said.

10     Q.   Who told you that?

11     A.   Tim Senter.

12     Q.   Was anyone else present when he told you

13  that?

14     A.   Yes.  Angie Norris was there.

15     Q.   Let me get Angie's last name again.

16     A.   Norris.

17     Q.   Norris.  Was anyone else present?

18     A.   No.

19     Q.   Where do you currently work?

20     A.   I work at the University of Mississippi.

21     Q.   And what is your --

22     A.   My title is -- I'm sorry.

23     Q.   That's okay.

24     A.   I'm a program coordinator.

25     Q.   The question that gives rise to in my mind

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 30

```
1    is a coordinator of what program?
2         A.   So I currently work for the Institute of
3    Child Nutrition.  It's a federally-funded program.
4    We covered all fifty states plus six U.S.
5    territories.  This program started about 30 years ago
6    by the Senator from Mississippi.  That's how the
7    University of Mississippi ended up with the hub for
8    the program.
9         Q.   Okay.
10        A.   So we provide training resources for all 50
11   states.  And I'm specifically assigned to what's
12   called STAR program, which is a federal corporate
13   agreement that's specifically designed to provide
14   more healthy menus for kids for K through 12.
15        Q.   When did that employment begin?
16        A.   February 22nd of 2002.
17        Q.   2002?
18        A.   Correct.
19        Q.   Okay.  And how long have you held that
20   position?
21        A.   Until now.  I'm still --
22        Q.   February 22 --
23        A.   Yes.
24        Q.   -- to 2002?
25        A.   I'm sorry.  It started February 22, 2022.
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 31

1      Q.    '22.  All right.

2      A.    Yes.

3      Q.    I thought you meant that.

4      A.    I'm sorry.

5      Q.    I was just making sure that we're on the

6  same page.  So how hard was it to find that job?

7      A.    I didn't find that job right away.  So when

8  my employment was terminated with the college on May

9  24th, I did not want to have any gap in my work

10  history and I applied for just any positions that

11  were available.  And my first job was operations

12  coordinator for the University for the McLean

13  Institute, and it started on July 1.

14      And later on as I learned more about the

15  University I was trying to see what would be a better

16  match for me as far as project manager and with the

17  skills that I have.  So that's how I applied for a

18  couple of positions and actually received multiple

19  offers.  One of them was working for the law school

20  at the University.  But I have chosen the Institute

21  of Child Nutrition because I think I can bring --

22  because I believe that I have more skills that I can

23  benefit them.

24      Q.    Relevant skill sets that you felt would be

25  transferable to that work?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 32

1     A.    Yes.  Yes.

2     Q.    Good.  If you had to say whether or not it

3  was difficult or you faced any adversity, was it hard

4  finding this new job?

5     A.    Are you talking about the Institute of

6  Child Nutrition?

7     Q.    Yeah, where you are now.

8     A.    I would say it was easy for me because I

9  was already an inside employee to apply for that

10  position.

11     Q.    I see.

12     A.    Because my initial position was way below

13  my skills and my experience as the operations

14  coordinator.

15     Q.    Okay.  I think you've described that

16  position adequately for me.  But to go from

17  operations coordinator up to your present position --

18     A.    Uh-huh (Indicating yes).

19     Q.    -- what do you consider your job title now?

20     A.    I'm sorry.  I thought -- it's a program

21  coordinator.

22     Q.    Program coordinator.  That's what I'm

23  asking.  Was that evidenced by a written employment

24  agreement between you and the University of

25  Mississippi?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 33

1          A.    I don't understand this question.

2          Q.    Was there an employment agreement, a

3     document that spelled out you are employed and this

4     is your job?

5          A.    I believe it was.

6          Q.    Okay.  Do you recall when that came into

7     effect?

8          A.    I don't understand this question.  When I

9     first took the job as an operations coordinator --

10         Q.    Right.

11         A.    -- so I became an employee of the

12    University.

13         Q.    Correct.

14         A.    So when I transitioned to another position

15    within the University, there was a job description

16    that was presented to me, but that's all I saw.

17         Q.    That's what I'm asking you about.

18         A.    Okay.

19         Q.    Was that job description contained in a

20    written employment agreement, a document as such?

21         A.    It was an electronic agreement, yes,

22    document.

23         Q.    Okay.  That would be in your permanent file

24    at the University, correct?

25         A.    Yes.  Yes.  Absolutely.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 34

1      Q.   Okay.  In getting ready for your testimony

2   today, I have in front of me what appear to be a set

3   of documents that your attorney has brought.  Have

4   you had an opportunity to review all of those

5   documents today?

6                 MR. WOODRUFF:  Objection.  Are you

7   talking about all these here in front of her?

8                 MR. GRIFFITH:  Yeah.

9                 MR. WOODRUFF:  She doesn't even know

10   what's in there.

11      Q.   (Mr. Griffith)  Do you?

12      A.   I don't know what's in there.

13      Q.   Fine.  In getting ready for your deposition

14   testimony this morning, what documents did you

15   reviewed, if any?

16      A.   I reviewed my Complaint.

17      Q.   Uh-huh (Indicating yes).

18      A.   And written discovery that we did.

19      Q.   And that is written discovery documents

20   that were produced by you --

21      A.   Correct.

22      Q.   -- in response to questions from other

23   parties in the case?

24      A.   Correct.

25      Q.   Okay.  Was anything read to you by any

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 35

```
1   other person --
2         A.    No.
3         Q.    -- to provide you with facts or data?
4         A.    I provided facts and data.
5         Q.    You did it yourself?
6         A.    Absolutely.
7         Q.    Got it.  What other documents besides the
8   Complaint -- and I understand the Amended
9   Complaint -- and discovery production, what other
10  documents, if any, did you review in preparation for
11  your deposition testimony this morning?
12        A.    I reviewed the Performance Improvement
13  Plan.
14        Q.    Sometimes called a PIP?
15        A.    PIP.  That's it.
16        Q.    And are there any other documents that you
17  kept on your own personal computer or your home
18  computer that you consulted or referred to in getting
19  ready for your deposition today?
20        A.    I did not.
21        Q.    Okay.  Do you have a home computer?
22        A.    Yes, I do.
23        Q.    Do you have an iPhone?
24        A.    Yes, I do.
25        Q.    Do you have an Android device?
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 36

1      A.    No.

2      Q.    Do you have an iPad?

3      A.    Right now I don't.

4      Q.    Okay.  But do you have any computer at home

5   that you have used to do your work during the

6   COVID --

7      A.    Yes, I do.

8      Q.    -- intermission, the period of time we call

9   the pandemic?

10      A.    Yes, I do.

11      Q.    Okay.  And that computer is still there at

12   your home, correct?

13      A.    Correct.

14      Q.    Okay.  Did you use your computer for job

15   hunting?

16      A.    My personal computer?

17      Q.    Yes.

18      A.    Yes, I did.

19      Q.    Okay.  In other words, not just to Google

20   information but to identify potential employers or

21   employment positions, correct?

22      A.    Yes.  When I looked for a job I used my

23   personal computer, yes.

24      Q.    And as of today you have not wiped your

25   computer clean of any of that data.  It's still

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 37

```
 1    there, correct?
 2         A.   I did not clean my computer.  I don't know
 3    if all the data is still there, but I never cleaned
 4    my computer.
 5         Q.   Would anyone else have had access to your
 6    computer besides yourself?
 7         A.   To my best knowledge, I don't think so.
 8         Q.   Okay.  Thank you.  In the damages that
 9    you've claimed in this lawsuit, you include a number
10    of elements.  Can you tell me what damages you are
11    telling the court and the jury you believe you have
12    sustained and you have suffered in this case?
13         A.   Loss of income is one.
14         Q.   Loss of income?
15         A.   Yes.
16         Q.   What else?
17         A.   I developed severe anxiety over this
18    process.
19         Q.   How did it manifest itself if it did?
20         A.   It deteriorated the quality of my life.
21         Q.   Okay.  In what way?
22         A.   I couldn't eat and I couldn't sleep and I
23    couldn't enjoy my life.
24         Q.   Okay.  When did that have its onset?  When
25    did that start?
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 38

1          A.    On March 8th, 2019.

2          Q.    And is it ongoing today?

3          A.    Yes.

4          Q.    Just as severe?

5          A.    Yes.

6          Q.    Okay.  Would it be fair to say that from

7    the date you just provided me, March 8, 2021; is that

8    right?

9                    MR. WOODRUFF:  No.

10         A.    '19.  2019.

11         Q.    (Mr. Griffith)  '19?  From that date until

12   this present, there has been no let up, no cessation,

13   no reduction in the amount of anxiety that you've

14   experienced, correct?

15         A.    I would say it has gotten worse.

16         Q.    Okay.  In what way?

17         A.    Sometimes I feel like I wear a scarlet

18   letter.

19         Q.    And that's a reference to Hester Prynne in

20   The Scarlet Letter by Hawthorn, correct?

21         A.    Yes.

22         Q.    I played Paris in the play that that was

23   based on.  In that, has anyone ever referred to you

24   in a derogatory manner that would be comparable to a

25   person wearing a scarlet letter?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1     A.    Yes.

2     Q.    Who?

3     A.    Can I say his name?

4     Q.    You may tell me whoever did that and if you

5  recall the name, please provide it to me and when it

6  was done.

7     A.    Dr. Nylander.

8     Q.    Dr. Nylander?

9     A.    Yes.

10    Q.    Tell me when that occurred.  I'm trying to

11 put some context into this.

12    A.    Sometime in July/August of 2021.

13            THE COURT REPORTER:  I'm going to need

14 a spelling.

15            THE WITNESS:  N-Y-L-A-N-D-E-R.

16    Q.    (Mr. Griffith)  Okay.  What brought that

17 about?

18    A.    I told him everything.

19    Q.    Okay.  And is that the point at which he

20 made a reference to the scarlet A?

21    A.    He didn't call me that word.  I said it

22 made me feel that I was wearing a scarlet letter.

23    Q.    Tell me what he said that suggested that to

24 you.

25    A.    That potentially me reporting the illegal

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    activity to the state auditor can affect my current

2    position with the University.

3          Q.    What is the illegal activity that you're

4    referring to?

5          A.    Misappropriation of state funds.

6          Q.    Misappropriation of state funds by whom?

7          A.    ICC.

8          Q.    At what time did that misappropriation, if

9    any, take place?

10          A.    It took place -- it started in

11    January/February of 2016.

12          Q.    Okay.  Do you have personal firsthand

13    knowledge of that misappropriation?

14          A.    Yes, I do.

15          Q.    Tell me where that firsthand knowledge

16    comes from.

17          A.    I was present when certain documentation

18    was altered, hidden and replaced from files.

19          Q.    And you observed this with your own eyes,

20    correct?

21          A.    That's correct.

22          Q.    And you actually were physically present

23    whenever there was any action that you would

24    described as illegal activity, correct?

25          A.    Correct.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1     Q.   But you're not assuming any of this.  This

2 is not based on your belief, it's based on what you

3 physically saw or experienced?

4     A.   That's correct.

5     Q.   Okay.  When did that occur?

6     A.   There are multiple things that have taken

7 place.

8     Q.   Okay.

9     A.   So, sometime in the fall of 2015 there was

10 a complaint from Southern Motion.  Some employees

11 reached out, called the college and said they were

12 being forced to sign training logs for training that

13 they never participated.  That's when Waters and I

14 went to Southern Motion and we met with Daniel

15 McClain, a lady, I don't remember her name, but she

16 was present and at that time I believe she was a

17 production manager.

18     And we had a discussion with the company that if

19 the training takes place it has to be factual.  And

20 that's when if someone signs a training log for

21 training that they didn't receive, that would be

22 fraudulent.

23     Q.   Did you see training logs to that effect?

24     A.   Did I see them?

25     Q.   Yes.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 42

1      A.   With the company?

2      Q.   Yes.

3      A.   No.  We never looked at the documentation.

4  We had a discussion.

5      Q.   That's what I'm asking is, what other --

6      A.   No.  Did I see training documentation in

7  the office?

8      Q.   Correct.

9      A.   Yes, I did.

10     Q.   Okay.  What other training documentation,

11  if any, did you see?

12     A.   With Southern Motion?

13     Q.   Yes.

14     A.   I only saw their training summary sheets

15  and class rolls.  That's when the participants sign

16  their attendance.

17     Q.   Okay.  Let me ask you.  Back earlier you

18  mentioned that you had experienced stress.

19     A.   Uh-huh (Indicating yes).

20     Q.   Correct?

21     A.   Yes.

22     Q.   Emotional stress?

23     A.   Yes.

24     Q.   There are several different ways we

25  describe it, but would emotional distress pretty well

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 43

1    describe what you underwent?

2         A.   I don't understand the question.

3         Q.   Did you experience emotional distress?

4              MR. WOODRUFF:  When?

5         A.   When?

6         Q.   (Mr. Griffith)  Over the period of time

7    that you've described as when you incurred damages

8    and you sustained damages for which you are now

9    seeking redress in federal court?

10        A.   I don't --

11             MR. WOODRUFF:  Objection.  I don't

12   understand the question.

13        A.   I don't understand the question.

14        Q.   (Mr. Griffith)  Did you seek counseling

15   from a doctor for your condition?

16        A.   Yes.

17        Q.   When did you seek that?

18        A.   I don't remember, but it was at the end of

19   my employment within the college.

20        Q.   Which would have been what year?

21        A.   I was terminated in 2021.

22        Q.   Uh-huh (Indicating yes).

23        A.   So that's when I felt like I really needed

24   help.

25        Q.   Okay.  From whom did you seek any type of

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 44

```
 1   medical care or treatment?
 2        A.   At first I started talking about it to Dr.
 3   Randy McGee, who is just my wellness doctor.  And
 4   then I started seeing Dr. McCormick at the
 5   University.
 6        Q.   Dr. McCormick?
 7        A.   Yes.
 8        Q.   And where did you see Dr. McCormick?
 9        A.   In her office.  Sometimes we had some
10   meetings, but mainly I felt like face-to-face was
11   more beneficial to me.  So I was seeing her in
12   person.
13        Q.   Where was Dr. McCormick's office?
14        A.   It's in Lester Hall on campus in Oxford.
15        Q.   Okay.  That's one of the real old dorms
16   that has been reconditioned and repurposed --
17        A.   It is.
18        Q.   -- as a facility for the campus doctor,
19   correct?
20        A.   Yeah.  She is the director of the
21   counseling center --
22        Q.   Right.
23        A.   -- and she provides counseling as a benefit
24   for employees at the University.  It's one of the
25   benefits.
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 45

1            COURT REPORTER: Spell that for me,
2     please.
3            THE WITNESS:  McCormick?  M-C Cormick.
4        Q.   (Mr. Griffith)  Okay.  What was the first
5     symptom, if any, that you experienced that you
6     attribute to losing your employment at ICC?
7        A.   Anxiety.
8        Q.   Okay.  And can you tell me when that first
9     appeared?
10        A.   Yes.  On March 8, 2019, when I was
11     presented with the poor evaluation and the
12     Performance Improvement Plan.
13        Q.   Okay.  And I understand from what you're
14     telling me is that persisted throughout that period
15     of time all the way up to today, correct?
16        A.   Yes.
17        Q.   What has been the day-to-day impact upon
18     you of that stress?
19        A.   I know it has deteriorated the quality of
20     my life.
21        Q.   In what way?
22        A.   I brought stress home.  I brought stress to
23     my child, my husband.  We all went to see a
24     counselor, Dr. Moore, for family counseling.  And she
25     specifically said that the problem is my anxiety.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

```
 1    That was her -- that was her assessment.
 2         Q.    During the period of time from your losing
 3    your employment with ICC in March of --
 4         A.    March 8th, 2019.
 5         Q.    -- '19 all the way up to the present --
 6         A.    It wasn't my employment.  That was 2021.
 7    May 24th.
 8         Q.    Okay.  Let's back up then to when your
 9    emotional symptoms or your stress or anxiety first
10    manifested itself.  When did that happen?
11         A.    When I first -- my stress started --
12         Q.    Yes.
13         A.    -- on March 8th, 2019.
14         Q.    Okay.  And when, if at all, did that
15    diminish?
16         A.    I don't know if it's diminished.
17         Q.    What you're telling me is it has been
18    ongoing and it's not diminished at all, correct?
19         A.    Yes.
20         Q.    Okay.  Any other symptoms besides those
21    that you just described for me that would be
22    attributable to not having your employment, no longer
23    having your job with ICC?
24         A.    Yes.  I am scared how it can affect me in
25    the future with my current job that I absolutely love
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 47

```
 1    and enjoy.  But it can still affect me.
 2         Q.   I'm sorry?
 3         A.   It can still affect me.
 4         Q.   Okay.  In what way?
 5         A.   Because sometimes people think that by
 6    doing what I did, they question where I found the
 7    strength and the courage to do that.  And they
 8    question why I felt like I could do it to an
 9    organization.
10         Q.   Okay.  How would you describe in your own
11    words the day-to-day impact of this stress and
12    anxiety upon you?
13         A.   It diminished the quality of my life.
14         Q.   Anything else?
15         A.   It took the joy out of my life.
16         Q.   Okay.
17         A.   The pride, the professional pride that I
18    had.
19         Q.   All right.  It took the joy, the
20    professional pride and what else?
21         A.   Embarrassed me.
22         Q.   Embarrassed you?  In what way did it
23    embarrass you?
24         A.   Because as a project manager I took my job
25    very seriously and I was dedicated 100 percent to my
```

Page 48

1   job.  When this performance evaluation plan was given

2   to me, it was given to me in a large room on the same

3   floor where my office was, where the wall was glass.

4   And everyone in that building asked me why I had a

5   meeting with the HR manager and Lowder, Joe Lowder,

6   in that room that day and I had to answer those

7   questions.

8       Q.   You had to answer questions that came from

9   coworkers?

10      A.   Coworkers.

11      Q.   Simply curious about what was happening to

12  you?

13      A.   It was abnormal.  Nobody has ever seen

14  anything like that before.

15      Q.   Okay.  But they were simply curious and

16  asking you what happened?

17              MR. WOODRUFF:  Objection.

18      A.   Well, okay.

19              MR. WOODRUFF:  You can answer, if you

20  know what they were thinking.

21      A.   Because everybody could see Lowder's

22  calendar.  And on Lowder's calendar it said Tatiana's

23  performance evaluation, 2:00, March 8, 2018.  So

24  everybody knew what it was.

25      Q.   (Mr. Griffith)  Okay.  You've described the

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    impact upon you.  Was there any other impact

2    day-to-day that these events have had upon you for

3    which you believe you've been damaged and are

4    entitled to money damages in a court of law?

5          A.   I don't understand the question.

6          Q.   Are there any other types of damages?

7          A.   I believe I have given the answer.

8          Q.   Is that as complete as you can make it?

9          A.   Correct.

10         Q.   That's all I'm asking for.  Between the

11   time of March '19, 2019, and the present time, you've

12   been married, correct?

13         A.   Correct.

14         Q.   And you have a child?

15         A.   Correct.

16         Q.   Is it a child of that marriage?

17         A.   No.  It's --

18         Q.   It was of the prior marriage?

19         A.   Prior marriage, yes.

20         Q.   Have you had times when the family together

21  has been able to engage in activities, vacations and

22  things like that?

23         A.   Since March 8th, 2019 --

24         Q.   2019, all the way up to the present.

25         A.   Have I taken family vacations?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1      Q.   Yes.

2      A.   I believe I have.

3      Q.   Okay.  And when did those vacations take

4 place?

5      A.   I don't remember.

6      Q.   Okay.

7      A.   I think we probably have gone to see my

8 husband's friend once maybe.

9      Q.   I'm sorry.  I did not understand.

10     A.   Maybe once we had -- I think maybe two

11 thousand -- I'm trying to remember.

12     Q.   Uh-huh (Indicating yes).

13     A.   2019 we had a couple-day vacation on the

14 beach because my husband wanted to see his friend and

15 we kind of had a little get-together, so that's one

16 vacation I remember.

17     Q.   Where was that, if you can recall?

18     A.   It was in Pensacola.

19     Q.   Okay.  And that was in the summer of 2019?

20     A.   Yes.  For a couple of days, yes.

21     Q.   Okay.  Besides the vacation to Pensacola in

22 2019, what other vacations, if any, did you have or

23 enjoy?

24     A.   I went to see my family but I went by

25 myself.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 51

```
 1              MR. WOODRUFF:  Slow down a little bit.
 2  You're talking over him.
 3              THE WITNESS:  Okay.  Sorry.  I went to
 4  see my family by myself.  So I don't know if it's a
 5  family vacation, but it was my mom and dad.
 6         Q.   (Mr. Griffith)  And that was in Russia,
 7  correct?
 8         A.   Yes.  Correct.
 9         Q.   Modern day Russia, which is the -- part of
10  the -- what do we call it now?
11         A.   Russia.
12         Q.   Our ancient phrase used to be USSR.  It's
13  completely different now.
14         A.   It is different now.
15         Q.   Independent states is one of those?
16         A.   My home is in Russia.
17         Q.   In Russia.  And you went to visit them and
18  you flew there, correct?
19         A.   Correct.
20         Q.   How long did you visit the family?
21         A.   I think it was four weeks.
22         Q.   Okay.  About when did that occur, Ms.
23  Sherman?
24         A.   I know it was in 2019.  I remember that.
25  So it was probably the end of July.
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 52

1      Q.   Okay.  After that four-week family visit --
2   would that be an accurate way to describe it?
3      A.   Sure.
4      Q.   Did you enjoy it?
5      A.   Yes, I did.
6      Q.   Okay.  Was there any other time when you
7   had what we would call a family vacation or personal
8   vacation or time off?
9      A.   Well, COVID started.
10     Q.   Oh, yeah.
11     A.   So we didn't really travel.
12     Q.   So COVID kind of nipped in the bud any
13  ideas of family travel at that point?
14     A.   Right.  Right.
15     Q.   Since that, have you participated in or
16  taken part in any family trips or family vacations?
17     A.   We went to see our son in college.  He's in
18  Chicago, Illinois, so we went to see him for a couple
19  of days.
20     Q.   Tell me when that was.
21     A.   It was in the fall of 2021.
22     Q.   Okay.  Can you remember the name of the
23  college?
24     A.   Oh, yes.  It's DePaul University.
25     Q.   DePaul.  Okay.  Downtown.  And in that

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

```
1    visit, how long did it take place?

2         A.   It was a long weekend.

3         Q.   Okay.  And did you fly straight into --

4         A.   Chicago.

5         Q.   Into O'Hare?

6         A.   Yes.

7         Q.   And rent a car?

8         A.   No.  Got on a train.

9         Q.   Okay.  You're lucky.

10        A.   Yeah.

11        Q.   And in doing that, that lasted for a long

12   weekend; is that correct?

13        A.   Yes.  It was four or five -- I can't

14   remember.  It was a long weekend.

15        Q.   Would it be fair to say that was an

16   enjoyable time for mother and son to catch up on each

17   other?

18        A.   No, it was not.

19        Q.   Tell me.

20        A.   As my counselor explained to me, the

21   separation with my son has impacted my condition even

22   worse, so my anxiety was extremely high.  And, as a

23   matter of fact, the recommendation from my counselor

24   was not to go see our son unless he wants to come and

25   visit.
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1        Q.   But you nonetheless did go visit him,

2  correct?

3        A.   That time, yes.

4        Q.   Would it be fair to say it was a good

5  visit?

6        A.   It was a bad visit.

7        Q.   It was a bad visit?

8        A.   Yes.

9        Q.   Tell me why.

10       A.   As the counselor described this to me,

11  every little thing had a very big impact on me.  So I

12  questioned very much about the school, the classes,

13  everything.  Which our son is a very good student and

14  I really didn't have a reason to stress that much,

15  but everything seemed to be a big deal and I saw

16  everything in a negative light.

17       Q.   It just magnified it?

18       A.   Magnified it, yes.

19       Q.   What reaction, if any, did your son have to

20  that?

21       A.   He didn't want to see us after that.  I was

22  very emotional.

23       Q.   And you have not seen him since then,

24  correct?

25       A.   Oh, yes, I have.  He came home for

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    Christmas that year and he's home now.  He was at
2    home for Christmas two thousand -- December 2021.
3    Then he came back home for the summer and he's home
4    now.
5         Q.   How would you describe your relationship
6    with your son in these visits?  And I ask that
7    because you told me that when you visited him in
8    Chicago earlier that it was not a good time.  How
9    would you describe these visits when he came home?
10        A.   I try to manage myself better because now
11   I'm aware of my issues.  My husband is helping me
12   through it also.  So I think as far as me being very
13   careful how I ask a question or how much information
14   I want to get from him and just letting him control
15   his own life is better.
16        Q.   Okay.  Let's look back at your time with
17   ICC all the way up to the time that you separated
18   from that employment.  Would it be fair to say that
19   you had a number of issues with your employer, a
20   number of grievances with your employer up until the
21   time you were actually let go?
22                  MR. WOODRUFF:  Objection.  You can
23   answer.
24        A.   I didn't understand the question.
25        Q.   (Mr. Griffith)  Did you have any personal

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1   grievances with your employer or any of those under

2   whom you worked?

3        A.   When you say grievance, I want to make

4   sure.  So there is a grievance process --

5        Q.   Yes.

6        A.   -- that the college has in place.  I've

7   never gone through this process.

8        Q.   Okay.  Was there any specific problem or

9   conflict or dispute that you had with any of those

10  with whom you worked at ICC before you were finally

11  separated from that employment?

12       A.   I don't believe there was any dispute.  I

13  don't believe so, no.

14       Q.   Okay.  In your lawsuit itself, you make a

15  reference to communications with the Mississippi

16  Department of Audit.

17       A.   Uh-huh (Indicating yes).  Yes.

18       Q.   Do you recall that?

19       A.   Yes.

20       Q.   When did you first initiate any

21  communication with the Mississippi Department of

22  Audit or the OSA?

23       A.   It was in September of 2019 when I wrote

24  that letter that went to the auditor and the college.

25       Q.   Okay.  Did you write the letter yourself or

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

```
 1   with assistance?
 2        A.   I did.  I wrote the letter.
 3        Q.   In sending that to the state audit
 4   department, with whom there at the audit department
 5   did you communicate?  By that I mean by oral
 6   communication or written communication, if you know?
 7        A.   You're asking after I wrote the letter who
 8   were my contacts?
 9        Q.   Yes.
10        A.   Okay.  One of them was Tim Powell and the
11   other one was Joe Bell.  No, not Joe Bell.  Joe -- I
12   don't remember his last name but I can provide it
13   later.
14        Q.   Was the last name Joel?
15        A.   Joel.  That's his last name.  Yes.
16        Q.   Did you know Mr. Joel?
17             MR. WOODRUFF:  Objection.
18        Q.   (Mr. Griffith)  Did you know Mr. Joel when
19   you communicated with the state department of audit?
20        A.   Personally?
21        Q.   Yes.
22        A.   No.
23        Q.   Did you know him in any way, by name or
24   otherwise?
25        A.   No.
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    Q.    Okay.  But when I prompt you with the name

2    Joel, you remember that was one of the individuals

3    with the audit department you communicated with,

4    correct?

5    A.    Correct.  I met with him, yes.

6    Q.    Okay.  Do you know anything of his

7    background?

8    A.    I know he's from Delta, from the Delta.

9    Q.    From Cleveland, Mississippi, to be exact.

10   A.    Cleveland, Mississippi, yeah.

11   Q.    Do you know, in fact, that his father was a

12   deputy sheriff?

13   A.    No, I didn't.

14   Q.    You didn't know that?

15   A.    No.

16   Q.    With regard to your contacts with

17   Mr. Powell and Mr. Joel, were there any others with

18   the U.S. -- with the Mississippi Department of Audit

19   with whom you communicated regarding these problem

20   areas?

21   A.    One in February of 2021, 15 officers, FBI

22   officers came with a search warrant.  They

23   interviewed us.  So there were other people

24   communicating with me, but I do not remember their

25   names at this time.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 59

```
1        Q.   Who were the officers with?  I think you
2   mentioned FBI.  Did you mean that?
3        A.   Yeah.  I think they were FBI.
4        Q.   Do you know who they were with?  What
5   department?  What agency?
6        A.   Yeah.  The department of state auditor.
7        Q.   Would it surprise you to know that they
8   were not FBI but were state audit employees?
9        A.   I knew they were state.
10       Q.   Okay.  That's fine.  With regard to the
11  claims that you've made in this case, would it be
12  fair to say that you are a high achiever?
13       A.   I was a very high achiever, yes.
14       Q.   And you still are today, correct?
15       A.   I want to be, yes.
16       Q.   You take pride in your work, correct?
17       A.   I do.
18       Q.   You did at the time that you received this
19  March 8, 2019, Performance Improvement Plan, correct?
20       A.   Correct.
21       Q.   Did you feel that that was a slander or
22  belittling you or making light of your professional
23  training and background?
24       A.   I believe it was a retaliation.
25       Q.   You believe it was retaliation for what?
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

```
 1        A.    For me -- prior to this Performance
 2   Improvement Plan, on numerous times we've had a
 3   discussion that documents cannot be altered and
 4   changed.  In November of 2018, I spoke with Waters in
 5   front of Spradlin.  They were about to process
 6   $28,000 reimbursement for the ICC food program, which
 7   was 100 percent funded by federal grant, as state
 8   auditor refers to now, the poor people money.  The
 9   money that went through MDA to Family First and was
10   given to ICC.  Very shortly after I had a meeting
11   with Joe Lowder in his office when he told me that he
12   was working on my evaluation and he needed time to
13   have it written down to present it to me.
14        Q.    Did you feel that when you received the
15   March 8, 2019, Performance Improvement Plan or PIP,
16   that you had to defend your reputation?
17        A.    Absolutely.
18        Q.    And you did that, correct?
19        A.    Correct.
20        Q.    And you did that based on what you felt was
21   a perfect record, correct?
22             MR. WOODRUFF:  Objection.
23        A.    I don't understand the question.  What was
24   perfect?
25        Q.    (Mr. Griffith)  Were you responding to that
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1  March 8, 2019, PIP on the basis that you felt you had

2  a perfect record and this was rendering a perfect

3  record something else?

4       A.   When I did the response to the PIP that was

5  presented to me --

6       Q.   Uh-huh (Indicating yes).

7       A.   -- in March 2019, I was the highest

8  performer doing all my projects and what's called

9  director's project, which were executive level

10 projects.  And just six months before my job

11 responsibility was expanded by me becoming also the

12 MEP program coordinator for the college.

13      Q.   The PIP, or the Performance Improvement

14 Plan, went into effect March 8th of 2019, correct?

15      A.   Correct.

16      Q.   All right.  And you responded to that, did

17 you not?

18      A.   I did.

19      Q.   Okay.  And the date of your response was

20 what, if you can recall?

21      A.   April 4th, 2019.

22      Q.   Okay.  And it consisted of approximately

23 100 pages of documents, correct?

24      A.   That's correct.

25      Q.   Okay.  Did you perform or provide or

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    prepare that all by yourself?

2         A.    Yes.

3         Q.    Did you have any other person assist you in

4    that process?

5         A.    I don't believe so.

6         Q.    You don't believe so?

7         A.    No, I don't believe so.

8         Q.    All right.  In order to make that response,

9    did you gather together documentation and refer to

10   information that was within your custody so that you

11   could have correct dates and descriptions of matters

12   that were set forth in your response?

13        A.    I want to explain.  I want to say yes,

14   because some of the responses, like the data

15   information, would come from our reports.  We had

16   quarterly reports.  And, remember, I was also the MEP

17   coordinator, so I did have a lot of data collection

18   for the entire department for me to see what projects

19   were done, what programs were offered --

20        Q.    Uh-huh (Indicating yes).

21        A.    -- and the amount of money we were

22   allocating through the reimbursement programs.

23        Q.    And you had access to all of that data when

24   you prepared your response that was submitted on or

25   about April 4 --

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 63

1          A.    Yes.

2          Q.    -- 2019, correct?

3          A.    Correct.

4          Q.    Okay.  From what other sources did you

5    collect that data?

6          A.    I used -- we used Pro Assessment and what's

7    called WESS, Workforce Enhancement Subgrant System,

8    which is the system that is offered through

9    Mississippi community college state board, and that

10   is how they monitor all training activities

11   throughout the community colleges.

12         Q.    Can we call that WESS for short?

13         A.    Yes.

14         Q.    Any other source of data or documents that

15   you used in order to prepare and provide your

16   response?

17         A.    Our billing person, Emily Lawrence, I think

18   her title was data specialist, she also had documents

19   on shared files to show just the information as far

20   as the cost for the training, books, training

21   material.  So I think I reviewed those.

22         Q.    Okay.  I think we've got this date-time

23   down in your testimony, but let me make sure I'm

24   right.  What was the date of your complaint to the

25   state auditor?

1      A.    It was September 2018 -- '19.

2  September 2019.

3      Q.    '19, okay.  Do you remember what day in

4  September that was?

5      A.    It was the end of September.  I remember.

6  Maybe the 23rd, 24th.

7      Q.    Okay.  When was your first report sent in

8  to the state department of audit regarding what you

9  called illegal activity at ICC?

10      A.    The letter?

11      Q.    This was it?

12      A.    Yes.  The letter was sent on

13  September 2019.

14      Q.    Okay.  And that was the first time that you

15  reported any matters involving what you are telling

16  us was illegal activity, correct?

17      A.    I reported to the state auditor, first time

18  to the state auditor, yes.

19      Q.    Who within ICC, with regard to ICC

20  personnel, did you report to regarding any claims of

21  illegal activity?

22      A.    I spoke to Lowder about Southern Motion and

23  it was in February of 2016.  I explained to him that

24  we could not change training logs unless Southern

25  Motion used class rolls without start and end time

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 65

1    listed on them.

2         Q.    Okay.  Who else within ICC did you

3    communicate with regarding illegal activity?

4         A.    And later it was Waters and Spradlin when I

5    spoke about the ICC Food Pathway program.

6         Q.    And when was that?

7         A.    That was November of 2018.

8         Q.    Okay.  Were there any other ICC personnel

9    or employees with whom you spoke regarding illegal

10   activity or claims of illegal activity during this

11   period of time?

12        A.    I do not believe so.  There were other

13   conversations that I tried to show that we were not

14   providing services based on our policies because of

15   the way we offer classes to individuals and charge

16   them based on the fact what they can afford to pay

17   for it versus what the cost actually was.

18        Q.    Okay.  You had a detailed job description

19   with ICC, did you not, in the last position that you

20   held there, correct?

21        A.    Correct.

22        Q.    And in reporting to the state audit

23   department on matters that you considered to be

24   illegal activities, you did that in order to make

25   sure that information was accurate and complete and

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 66

```
1    provided to a state agency that was in charge,

2    correct?

3        A.    I tried to be as honest as possible,

4    correct?

5        Q.    And you did that, correct?

6        A.    Correct.

7        Q.    And with regard to your superiors and those

8    that you considered yourself subordinate to, who were

9    those individuals during this period of time?

10       A.    TZ Waters was the director.  Joe Lowder was

11   the dean.

12       Q.    Any others?

13       A.    At that time that's who was in the

14   executive level position.

15       Q.    Okay.  If you had to put your finger on it

16   and say why you felt it necessary to contact the

17   state audit department regarding what you claim to be

18   illegal activities, would you agree that you felt it

19   was your job to do that?

20               MR. WOODRUFF:  Objection.

21       A.    No.

22       Q.    (Mr. Griffith)  Why?

23       A.    Multiple reasons.

24       Q.    Okay.  Tell me.

25       A.    I'll explain why.  Southern Motion, Chapter
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 67

1   3, food program were never assigned to me as a
2   project manager.  I was not even managing those
3   projects.  They had project managers.  It was Jason
4   Spradlin and then it became TZ Waters.  They managed
5   those projects.  They were never my responsibility
6   and they were never part of my job.
7       Q.   Yeah.  And even though you're telling me
8   now that those were not part of your job, you felt
9   that necessary in order to bring that to the
10  attention of the state authorities, correct?
11      A.   Because it was state taxpayer's money
12  misappropriation.  Yes.
13      Q.   Okay.  Did you see that your role with MEP
14  was consistent with that?
15              MR. WOODRUFF:  Objection.
16      A.   Role -- I'm sorry.
17      Q.   (Mr. Griffith)  Did you have a role with
18  MEP?
19      A.   A role.
20      Q.   I'm sorry.
21      A.   My title was expanded and I was given a
22  responsibility of the MEP coordinator, yes.
23      Q.   Was making the report as you did it to the
24  state audit department consistent with that role as
25  MEP coordinator?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

```
 1                    MR. WOODRUFF:  Objection.

 2        A.   No.

 3        Q.   (Mr. Griffith)  Was it inconsistent?

 4        A.   How was it consistent with that?

 5        Q.   I'm asking you.

 6        A.   I don't understand.

 7        Q.   Was your role with MEP something that

 8   required you to report information to ICC regarding

 9   alleged criminal activities or illegal activities?

10        A.   No.

11        Q.   Okay.  And did you have any other duties

12   that you took on that were not expressly communicated

13   to you in your job description?

14        A.   I don't believe so.

15        Q.   Okay.  Is it fair to say that as a matter

16   of professionalism you felt that it was proper and

17   necessary for you to report to the state audit

18   department in the manner in which you did?

19                    MR. WOODRUFF:  Objection.  You can

20   answer.

21        A.   No.

22        Q.   (Mr. Griffith)  You can answer.

23        A.   No.

24        Q.   You didn't feel it was a matter of

25   professionalism to do that?
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 69

1     A.    No.

2     Q.    Okay.  With regard to your compliance with

3     the applicable laws and regulations, you did not at

4     that time hold yourself out as having any specific

5     legal training or legal expertise, did you?

6     A.    No.

7     Q.    Okay.  You simply were looking at what you

8     considered to be requirements of the job, that is,

9     put beginning and end dates and put specific times of

10    performance of services, correct?

11                 MR. WOODRUFF:  Objection.

12    A.    I knew it was fraud.  Yes, I knew it was

13    fraud.

14    Q.    (Mr. Griffith)  Okay.  With regard to

15    fraud, how would you define fraud for me?

16    A.    Being noncompliant with policies and

17    procedures and allowing documentation that doesn't

18    meet the standards for reimbursement to pass, and

19    authorizing staff members to alter documentation for

20    it to be entered into the system so you could draw

21    state money for it.

22    Q.    Tell me how you know that.

23    A.    I know it from the conversation with Stacy

24    Loden and Emily Lawrence, that they were instructed

25    to do so with Southern Motion.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 70

1    Q.   How do you know that that constitutes

2    fraud?  From your experience, training and

3    background, how do you know?

4    A.   Documentation.  The class roll that's

5    submitted by the company has to be factual and has to

6    be signed by the trainer and all participants with

7    start time, end time and the dates for training.  ICC

8    is the accountability part or accountability step in

9    the process.  ICC is who determines whether it's

10   eligible for reimbursement or not.  But when the

11   documentation was submitted after the fact, ICC staff

12   members were changing information on the class roll,

13   because without that information ICC couldn't draw

14   state reimbursement.  That class roll serves as

15   basically an invoice from the company to the college

16   and the college is the one who determines whether the

17   invoice is eligible or not for state reimbursement.

18   And ICC staff members were altering that information

19   for it to be processed.

20   Q.   What ICC staff members were altering that

21   documentation?

22   A.   I saw it with my own eyes when Stacy Loden

23   had class documents laid out on her floor in her

24   office for her to line up trainers, because the same

25   trainer sometimes was listed on multiple classes.  So

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 71

1    she couldn't just key what the company submitted.

2    She had to manipulate the times and pick the trainer

3    for it to be input into the system.

4        Q.   Let me ask you about your ending of your

5    employment with ICC.  Tell me why you think you were

6    non renewed or terminated.

7        A.   Because ICC retaliated against me.

8        Q.   ICC is Itawamba Community College?

9        A.   Correct.

10       Q.   Who, in terms of an individual person, if

11   one or more, actually did that?

12                MR. WOODRUFF:  Objection.

13                THE WITNESS:  Do I need to answer?

14                MR. WOODRUFF:  Yes, you can answer.

15       Q.   (Mr. Griffith)  He's requesting to reserve

16   it.

17       A.   It was Lowder and it was Waters, and the

18   recommendation was made to the president.

19       Q.   And when you reported on illegal activity,

20   did you do this in order to carry forward what you

21   consider to be a need to be correct and compliant

22   with the regulations and the requirements?  Is that

23   why you did it?

24                MR. WOODRUFF:  Objection.

25       A.   I did because it was state tax money

Page 72

1    misappropriation.

2         Q.    (Mr. Griffith)  Okay.  And with regard to

3    state funding and appropriations of state funding and

4    the expenditure of those, what specific training did

5    you have regarding accountability and the recording

6    of or reporting of funds for which these individuals

7    were all accountable?

8         A.    Could you repeat your question?

9         Q.    Yes.  What training did you have that led

10   you to believe that you were in a position to report

11   on alleged illegal activity?

12        A.    I didn't have any training.

13        Q.    With regard to the actions -- and you've

14   referred to TZ Waters, Tzer Nan Waters several times.

15   Did you consider including any references to her in

16   your report that you made to the state audit

17   department?

18        A.    She was included on the letter.

19        Q.    Okay.  Did you consider what you were doing

20   an accusation of impropriety on her part?

21        A.    That I accused her?

22        Q.    Yes.

23        A.    No.  I didn't accuse her.  I'm sorry.

24        Q.    Did you consider what you were saying in

25   the report to the audit department of alleged illegal

Page 73

1   activity an accusation directed to Ms. TZ Waters?

2       A.   I don't understand the question.

3       Q.   I'm sorry you don't understand it.  Did you

4   consider that to be a disruptive accusation from you

5   as a subordinate to a person that was actually over

6   you in the department at ICC?

7                MR. WOODRUFF:  Objection.  You can

8   answer.

9       A.   I did not consider that it was anything

10  against her personally.  I did because, again, I

11  believed it was fraud and now I know it was.

12      Q.   (Mr. Griffith)  Okay.  With regard to your

13  knowledge that there was fraud, and you say now you

14  know it was, what has changed in your collection of

15  data and the knowledge that you have that's different

16  from what you knew at the time?  What additional

17  knowledge do you have now regarding the fraud?

18      A.   State auditor report.

19      Q.   The state auditor report?

20      A.   Yes.

21      Q.   And what is that report?

22      A.   Seven thousand page report that the state

23  auditor provided and I read it.

24      Q.   A seven thousand page report of the state

25  auditor which is filled with what?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1      A.    Documentation, explanation why it was
2   misappropriation.
3      Q.    And these are all matters that you have
4   personal firsthand knowledge of, correct?
5      A.    I do now, yes.
6      Q.    You do now?  And you have that as a result
7   of documents that the state audit department has
8   provided you in the form of a 7,000-page report,
9   correct?
10      A.    That's correct.
11      Q.    Okay.  With regard to the actions of TZ
12   Waters, did you consider yourself to be working under
13   her --
14      A.    Yes.
15      Q.    -- at ICC before you were separated from
16   your employment?
17      A.    Yes.
18      Q.    How would you consider your relationship
19   professionally to her in the course of your work?
20      A.    She was my director.
21      Q.    How would you characterize that work
22   relationship?
23      A.    I always felt that I was treated
24   differently from other team members.
25      Q.    What do you mean treated differently?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 75

1     A.   She never discussed with me projects I was

2  working on.  Every comment was in negative manner and

3  I felt like I couldn't do anything correctly.

4     Q.   Let's back up just a little bit.  For any

5  matter that was communicated to you in a negative

6  manner, tell me specifically what, if any, that

7  consisted of.

8     A.   I felt like everything came as a reprimand.

9     Q.   Everything that she said to you you felt

10  was a reprimand?

11     A.   Yes.

12     Q.   Whether it was stated as a reprimand or

13  not?

14     A.   I felt that she didn't seek information

15  before she made a conclusion and it was always a

16  negative conclusion towards me.

17     Q.   Okay.  Did you feel that she had any animus

18  or hatred of you?

19     A.   Animus, yes.

20     Q.   Okay.  Why did you feel that?

21     A.   I felt it because I exposed some things

22  that she allowed to take place as far as the projects

23  that she, in fact, was managing at that time, and now

24  I exposed them.

25     Q.   So the reason that you're telling me that

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    you say TZ had a negative manner in communicating

2    with you was that you had reported on her, correct?

3         A.   Absolutely.

4         Q.   Okay.  And did you have that same feeling

5    regarding any other ICC personnel -- ICC personnel,

6    employees?

7         A.   Joe Lowder, yes.

8         Q.   Okay.  And with regard to the way in which

9    you were treated, did you feel that you were not

10   being given respect?

11        A.   I felt like everything was designed to

12   diminish my credibility, yes.

13        Q.   Did you feel that you were being treated in

14   an antagonistic manner?

15        A.   Yes.

16        Q.   Did you feel that you were being treated in

17   a manner that was hostile?

18        A.   Yes.

19        Q.   Did you feel that you were being accused of

20   things that you were not responsible for?

21        A.   Yes.

22        Q.   Did you feel that you had leveled against

23   you charges and claims of improper conduct?

24        A.   My improper conduct?

25        Q.   Yes.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 77

 1        A.    I don't believe I had improper conduct.

 2        Q.    Did you believe that you were being

 3    communicated with by your superiors in a way that

 4    said we think that you've engaged in improper

 5    conduct?

 6        A.    Yes.

 7        Q.    Okay.  Why did you think that?

 8        A.    Because of all the exposure.

 9        Q.    All the exposure.  What do you mean by

10    that?

11        A.    Of money being mishandled.

12        Q.    Okay.

13              MR. GRIFFITH:  Let's take a break.

14              MR. WOODRUFF:  Yeah.  It's like noon.

15              MR. GRIFFITH:  Not too much longer.

16              (Recess.)

17        Q.    (Mr. Griffith)  All right.  Ms. Sherman,

18    we've had a brief break and I want to resume my

19    questions to you.  Can you tell me what specific bad

20    things or improper things ICC did to you that you

21    consider to be part of your damages?

22        A.    Okay.  It's the loss of income and the

23    anxiety and stress that has deteriorated the quality

24    of my life.

25        Q.    And what, if anything, did TZ Waters do to

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 78

1    you that caused you any part of that damage or

2    injury?

3         A.   She not only embarrassed me by wrongfully

4    making statements in her evaluation of me being a

5    project manager, she also wrongfully reprimanded me

6    in front of a very good college company

7    representative.

8         Q.   I believe that's an incident that's

9    referred to in documentation, is it not?

10        A.   Yes.

11        Q.   You're aware of that, correct, that

12   incident you just alluded to?

13        A.   Nathan Mills, yes.  That's who it was.

14        Q.   All right.  With regard to Ms. Waters, did

15   you consider her unqualified for her position?

16        A.   She did not have the experience of project

17   manager before she became the workforce director.

18        Q.   That wasn't my question.  My question, did

19   you consider Ms. TZ Waters unqualified for her

20   position?

21        A.   I never thought about her qualifications,

22   but I can only testify that she had no experience as

23   a project manager.

24        Q.   Okay.  Experience and qualifications are

25   two difference things.  Did you consider Ms. TZ

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 79

1  Waters without required qualifications to do her job

2  as your superior at ICC?

3              MR. WOODRUFF:  Objection.  You can

4  answer.

5      A.   I see qualifications as knowledge and

6  skills that you demonstrate when you perform a job as

7  the director or project manager.  She did not have

8  the knowledge or skills.

9      Q.   (Mr. Griffith)  And you base that on your

10  own observations of her work and documentation that

11  she participated in preparing, correct?

12      A.   Yes.  That is correct.

13      Q.   Before Ms. TZ Waters got to ICC, how long

14  had you been working in that department?

15      A.   I would say close to four years, to my best

16  knowledge.

17      Q.   And did you believe then as you do now that

18  you did your job very well?

19      A.   I do.

20      Q.   That you did your job in accordance with

21  the workplace policy or the employee policy that

22  covered employees?

23      A.   MCCB policies.  Yes, I do.  A hundred

24  percent.

25      Q.   Yes.  And you were very familiar with those

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

```
1   policies, were you not?
2        A.   Yes, I was.
3        Q.   Okay.  And did you believe you did these
4   actions, including reporting matters that you
5   consider to be illegal activities, correctly?
6        A.   Did I --
7             MR. WOODRUFF:  Objection.
8        A.   Did I write the report correctly?
9        Q.   (Mr. Griffith)  Did you consider your
10  actions in reporting alleged illegal activities
11  having been done correctly?
12       A.   Correctly means what?
13       Q.   Accurately.  Not made up.
14       A.   Absolutely not made up.  Whatever I
15  reported was not made up, no.
16       Q.   And what you did was consistent with your
17  approach to your job, correct?
18             MR. WOODRUFF:  Objection.
19       A.   When you say consistent, again, those were
20  not the projects I managed.  I only knew that the
21  documentation was altered.
22       Q.   (Mr. Griffith)  Uh-Huh (Indicating yes).
23       A.   Which is fraud.
24       Q.   Okay.  Let me ask you this question.  Was
25  there ever one document, one sheet that you say today
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 81

1    Ms. TZ Waters altered or doctored in your presence?

2         A.   She instructed Stacy Loden to alter

3    training documentation for Southern Motion.

4         Q.   Okay.  My question to you is this.  You

5    described earlier that Stacy -- I believe it was

6    Stacy Loden --

7         A.   Uh-huh (Indicating yes).

8         Q.   -- had a number of documents spread out on

9    a table?

10        A.   That's correct.

11        Q.   Did you have a chance to look at all of

12   those documents and determine what they were?

13        A.   I saw the documents.  They were on the

14   floor.  I saw the documents.

15        Q.   That's not my question.  Did you have a

16   chance to read those documents and see what they were

17   and identify them?

18             MR. WOODRUFF:  Objection.

19        A.   I can answer.  I saw the document.  Yes, I

20   read them.

21        Q.   (Mr. Griffith)  Were you familiar with the

22   contents of those documents?

23        A.   They were training documents, training

24   logs.  The forms, the applications that was designed

25   by our department to be compliant with policies and

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 82

```
 1    procedures.  And I observed her altering the
 2    documents.
 3         Q.   Is it fair to say that when I'm asking you
 4    if you saw all of those documents and understood what
 5    all those documents were, you are assuming that all
 6    of those related to one subject, correct?
 7                   MR. WOODRUFF:  Objection.
 8         A.   Which subject?
 9         Q.   (Mr. Griffith)  Did you have a chance to
10    read those documents or did you simply glance and see
11    that they were spread out on a table?
12                   MR. WOODRUFF:  Objection.
13         Q.   (Mr. Griffith)  You can answer.
14         A.   I read the documents, yes.  I saw --
15         Q.   You read the document then and there when
16    they were spread out on the table?
17         A.   On the floor, yeah.
18         Q.   On the floor with Ms. Spradlin(sic)
19    present, correct?
20         A.   Ms. Waters you want to say and not Ms.
21    Spradlin.  You said Ms. Spradlin.
22         Q.   Okay.  Who was it that you said had the
23    documents spread out on the floor?
24         A.   Stacy Loden.
25         Q.   Stacy Loden.  Okay.
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1     A.   Yes.

2     Q.   And Stacy Loden had those documents spread

3  out on the floor, correct?

4     A.   Correct.

5     Q.   And you're telling me under oath that you

6  have read every one of those documents.

7     A.   Not every one, no.

8           MR. WOODRUFF:  Objection.

9     Q.  (Mr. Griffith)  Oh, not every one?

10     A.   Not every one.

11     Q.   Oh, well, that's what I'm asking you.  Did

12  you make it your job right then and there to know

13  what the contents of all of those documents were and

14  to read them and be sure you knew what the contents

15  reflected?  Did you?

16           MR. WOODRUFF:  Objection.

17     A.   I did not read all the documents.

18     Q.  (Mr. Griffith)  Okay.  That's what I'm

19  asking you.

20     A.   Okay.

21     Q.   You did not read all of those documents.

22  And yet you're coming in hear under oath suggesting

23  that you had a full, detailed knowledge of all of

24  those documents that were laid out on floor.  That's

25  just simply not true, is it?

Page 84

1          MR. WOODRUFF:  Objection.

2      A.   I think you're misunderstanding.  When you

3   say all documents, Southern Motion would have

4   thousands of training logs.  Whatever was on the

5   floor was not the entire year's worth of documents.

6   It's whatever she was processing at that time.

7      Q.   (Mr. Griffith)  Uh-huh (Indicating yes).

8   Let me be real clear with you.  I'm not asking you

9   about 7,000 pages of documents from some agency.  I'm

10  not asking you for a year's supply of documents.  I'm

11  asking you about the documents that were right there

12  on the floor in front of you, and you did not read

13  all of those, and you did not know their contents,

14  did you?

15          MR. WOODRUFF:  Objection.  Two

16  questions.

17      Q.   (Mr. Griffith)  Is that fair to say?

18          MR. WOODRUFF:  Two questions.  Which

19  one do you want her to answer?

20      A.   Which one?

21          MR. WOODRUFF:  Which question do you

22  want her to answer?

23      Q.   (Mr. Griffith)  You did not have any

24  opportunity and you did not review all of those

25  documents at that time that were on the floor,

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

```
 1   correct?

 2                MR. WOODRUFF:  Objection.  Two

 3   questions.

 4        A.   To my best knowledge, I saw several

 5   training logs for different classes and I reviewed

 6   them.

 7        Q.   (Mr. Griffith)  You reviewed them

 8   individually?

 9        A.   They were on the floor and you could walk

10   in and you could see those documents with sticky

11   notes that Stacy would write to see how she could

12   manipulate the training time and the trainer so she

13   could put it in the WESS system to draw

14   reimbursements.

15        Q.   Tell me how you know that she was trying to

16   manipulate something?

17        A.   Oh, she talked about it.

18        Q.   Tell me.  Tell me what she said that

19   suggested manipulation.

20        A.   Okay.  She would have to -- so the company

21   didn't document the start and end time.  It was dates

22   with preprinted number of hours for each date to say

23   it was six hours of training this day.  So each

24   training log would have two trainers.  One of them

25   was the supervisor on the production line or training
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1   line.  The other one was production floor manager.
2   And the reason why I know it, because when Waters and
3   I went to the company, they discussed it with us.
4   And the reason why they put the production manager on
5   the class roll was because they didn't have enough
6   people qualified for reimbursement on the training
7   line.  So if the requirement was five people at that
8   time, it was maybe seven or ten, the policy
9   fluctuated through a couple of years, they didn't
10  have the number of people in class to draw
11  reimbursement.  So they combined two training lines
12  together.  And because one supervisor was working one
13  training line, they also added a production manager
14  on the training log who was making $35 an hour.  But
15  the problem was the production floor manager was on
16  the training log multiple times for the same dates.
17  So how can you key this documentation if it says John
18  Smith is training Monday through Friday this week in
19  this class, but he's also listed in this class?  So
20  she would have to put it in -- the system would
21  reject it.  You couldn't put the same trainer in the
22  system for the same dates, you couldn't, and for the
23  same time.  You couldn't.  The times were not
24  provided.  So she would have to manipulate.  She
25  would have to say, if I say that he was here from

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 87

1   6:00 to noon, then he was in this class from noon to

2   6:00 p.m.  That's how she manipulated and that's how

3   she'd give this information.

4       Q.   That was not responsive to my question.

5   And here's what my question is.  Specifically, when

6   Stacy Loden had documents in front of her on the

7   floor, you're telling me you read every one of those

8   documents, correct?

9           MR. WOODRUFF:  Objection.  Asked and

10   answered five times.

11       A.   To my best knowledge, what she had on the

12   floor I saw it and I read it and I saw her sticky

13   notes and I saw how she was manipulating times.

14       Q.   (Mr. Griffith)  You read every sticky note,

15   correct?  Every sticky note?

16       A.   Yes.  It had a number of the class and she

17   would write corresponding class, yes, on a sticky

18   note -- or the same sticky note on couple of classes

19   on the floor.

20       Q.   I'm caught a little bit in the problem of

21   asking you the time and you're telling me how to make

22   a watch.  All I want to know is did you then and

23   there -- and I understand your question is yes.  Did

24   you read all of the documents that Stacy Loden had on

25   the floor there in front of you?  And your answer is

1  yes under oath, correct?

2      A.   I reviewed the documents.  I reviewed the

3  documents.  I saw the documents.  That's how I knew

4  what was happening.

5      Q.   Well, I see the table in front of us and I

6  see a file folder in front of you.  I see that.

7  That's different from reviewing it.  You're telling

8  me you reviewed all of those documents though,

9  correct?

10     A.   I had them in my hand, yes.  And Stacy was

11 even telling me how she was doing it.  Yes, we even

12 talked about it.

13     Q.   Were they in your hand or on the floor?

14 Where were they, Ms. Sherman?

15     A.   They were on the floor.  Some of them were

16 on her desk and she was keying them.  She would pick

17 up a stack, she would put it on her desk and she was

18 entering the information to the system.

19     Q.   When you reported illegal activity to the

20 Mississippi State Department of Audit, did you have

21 any fear of being fired from your job?

22     A.   Absolutely I did.

23     Q.   Why was there a fear of losing your job?

24     A.   Because I already saw there was a

25 retaliation against me.  And I was making a big --

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1      Q.    You already saw that there was retaliation?

2      A.    Yes.

3      Q.    Excuse me.  You already saw that there was

4    retaliation?

5      A.    I felt it, yes.

6      Q.    All right.  What was retaliation against

7    you before you actually were separated from your

8    employment at ICC?

9      A.    I was placed on a bogus improvement

10   performance plan.

11     Q.    Okay.  When you say bogus, how many

12   individual -- excuse me.  How many PIPs have you

13   actually prepared and designed?  Any?

14     A.    Have I designed any PIPs?

15     Q.    Performance evaluation plans, yes.

16     A.    No.

17     Q.    You've not prepared any?

18     A.    No.

19     Q.    Yet you can come in here today under oath

20   and tell me what a bogus performance evaluation plan

21   is, correct?

22     A.    Yes.  And I can explain.

23     Q.    Right.  I'm sure you can.  But you're

24   telling me --

25                MR. WOODRUFF:  Let her explain.  Wait

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

```
1    a minute.  She has a right to explain her answer.

2                   MR. GRIFFITH:  And she will.  She

3    will, Counsel.

4                   MR. WOODRUFF:  Well, I know.  But she

5    was in middle of explaining it and you --

6                   MR. GRIFFITH:  If I interrupted you, I

7    am so sorry.

8                   MR. WOODRUFF:  She wants to explain

9    her answer.

10       Q.   (Mr. Griffith)  If I interrupted you, Ms.

11   Sherman, please continue, but make it responsive to

12   the question.

13       A.   Okay.  So based on that performance

14   evaluation, I was -- I demonstrate no skills and

15   goals were not met when my documentation was

16   submitted for state reimbursements, and I did not

17   meet auditors -- I was not compliant with the

18   auditor's expectations.  I have always had a perfect

19   record when it came to providing documentation for

20   reimbursements and my files were compliant with MCCB

21   policies.

22       Q.   Anything else?

23       A.   Yes.  Based on that Performance Improvement

24   Plan, one of the things that I, based on the

25   evaluation, was not compliant because of the time
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 91

1  frame when the documents were submitted for

2  reimbursement, and Joe Lowder is using 90-day

3  timeline.  Well, 90-day timeline is already not

4  complying with policies and procedures.  It's

5  60 days, it's not 90 days.  So here I am being

6  evaluated against the wrong timeline that is not in a

7  policy.  Based on that improvement evaluation, I have

8  no skills -- demonstrated no skills to respond in a

9  timely professional manner, to respond to e-mails and

10  phone calls from customers in a timely and

11  professional manner.  Mr. Griffith, I made it a goal

12  of every day of me being in an office to respond to

13  every e-mail and every phone call.  That is simply

14  not true.  That is simply a lie.  And --

15      Q.   When you say that is a lie, what are you

16  referring to?

17      A.   That's a lie.  I've always --

18      Q.   What is that?

19      A.   -- responded to phone calls.

20      Q.   Okay.

21      A.   I was trusted with executive-level

22  projects, including the five director's projects that

23  have always been done by a director previously.

24  Also, given MEP program that was also being done

25  previously by a director.  And yet I failed, based on

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    that Performance Improvement Plan, to respond to

2    phone calls, e-mails and I was totally not compliant

3    based on that evaluation.

4         Now, not only was I a bad employee, based on

5    that evaluation, I was the worst.  But yet those

6    projects, executive projects were not taken away from

7    me.  In fact, more work was given to me.  I was given

8    more projects, such as Legacy Boats that was funded

9    through MDA, which is a federal grant.  Sutter Home

10   Project, which is an entity of William Sonoma, which

11   is also funded by federal grant.  Entrepreneurship

12   Project for F. L. Crane, that was an exception.  It

13   has never been done within the college in my 17-year

14   experience.  So I was doing more work and high level

15   executive projects and yet I was the worst project

16   manager in that college.

17        Q.   And you were highly offended when you were

18   told otherwise, weren't you?

19                  MR. WOODRUFF:  Objection.

20        Q.   (Mr. Griffith)  You were highly offended by

21   that, weren't you?

22        A.   It was a lie.

23        Q.   You were offended by it though, weren't

24   you?

25        A.   I was devastated.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1      Q.   Okay.  You had a view of your role in the

2  workforce department that that department simply

3  could not function without you, didn't you?

4              MR. WOODRUFF:  Objection.

5      Q.   (Mr. Griffith)  Is that fair to say?

6      A.   I never thought of that.

7      Q.   Well, did you rely on any personnel within

8  ICC to achieve the results that you've described here

9  today?

10      A.   When you say personnel?

11      Q.   Employees, staff, any others.  Or did you

12  do it all by yourself?  Was it strictly Tatiana

13  Sherman and no one else responsible for the results

14  of carrying forward the workforce department work?

15      A.   As a project manager, it was just me.

16      Q.   Just you?

17      A.   Yeah.  It was my responsibility to work

18  with companies, develop strong relationships and

19  enroll them into our services.

20      Q.   Well, let me ask this question.  Did you

21  collaborate with others at ICC in order to succeed?

22      A.   We were a team.  Absolutely.  We all had

23  our roles.

24      Q.   Uh-huh (Indicating yes).

25      A.   And we had to work together as a team.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 94

1      Q.   Did you use the ICC process to achieve your

2   success?

3      A.   Yes.  We had an internal process, yes.

4      Q.   And it was a process that worked well, did

5   it not?

6      A.   Are you asking me -- because the process

7   has been changed a couple of times.

8      Q.   At the time.  I'm talking about at the

9   time.

10      A.   At the time when it was given to me.  The

11   process didn't 100 percent of the time work well.

12      Q.   But it worked well enough that you felt --

13   before you were separated from your employment at

14   ICC, it worked well enough that you felt that things

15   were going pretty well within the workforce

16   department under your leadership?

17                 MR. WOODRUFF:  Objection.

18      Q.   (Mr. Griffith)  Did you feel that?

19      A.   When I was fired?

20      Q.   Before.

21      A.   Before I was fired?

22      Q.   Yes.

23      A.   What time frame are we looking at?

24      Q.   Right before you were fired.  Say in the

25   month leading up to the time that you were actually

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    separated from your employment, nonrenewed I think is

2    the term.

3         A.   Okay.  So the question was if I believed

4    that the process worked well right before I was

5    fired?

6         Q.   Right.

7         A.   We had a good flow.

8         Q.   In other words, it wasn't dysfunctional.

9    It worked well.

10        A.   Well, I can make that statement.  When it

11   came to my projects I felt like my projects were

12   handled pretty well.

13        Q.   From your own perspective, correct?

14        A.   Correct.

15        Q.   Okay.  In your discussion of the work that

16   was carried out by the project managers, is it fair

17   to say there were two project managers, you and one

18   other person?

19        A.   Well, TZ Waters also managed projects.  So

20   let's say two and a half, three.

21        Q.   All right.  You and another and TZ Waters,

22   correct?

23        A.   Correct.

24        Q.   And it would have been easy for you to

25   manage a significant amount of funds when you were

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 96

1  dealing with large accounts?

2      A.   I managed all my projects, yes.  I'm not

3  saying it was easy, but I managed it.

4      Q.   But it was what you were able to do within

5  your capability, correct?

6      A.   There were instances when I had to come in

7  and work extra and I took some work home.  So there

8  were instances, but I managed.

9      Q.   Following the initial Performance

10  Improvement Plan, there were follow-up --

11      A.   Uh-huh (Indicating yes).

12      Q.   -- PIP meetings.  And you participated in

13  those, did you not?  We're part of an older

14  generation that remembers --

15          MR. WOODRUFF:  You told her to say yes

16  or no and she's uh-huhing over here and you're

17  letting her keep doing it.  So I'm just reminding her

18  to say yes or no.

19          MR. GRIFFITH:  She's doing well.

20          MR. WOODRUFF:  She has done great.

21      Q.   (Mr. Griffith)  You had one of the sets of

22  accounts as a manager, correct?

23      A.   I had just a specific list of accounts.

24      Q.   And who else had accounts as a project

25  manager?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 97

```
 1        A.    Jason Spradlin.

 2        Q.    Jason.

 3        A.    And TZ managed.  Because Jason was gone for

 4   almost nine months.

 5        Q.    He was deployed overseas, correct?

 6        A.    Right. Right.

 7        Q.    Okay.  And when the Performance Improvement

 8   Plan was initially given to you, there were follow-up

 9   meetings that you participated in, correct?

10        A.    I requested them.

11        Q.    And you took part in those, correct?

12        A.    Yes.  I request them and I participated.

13        Q.    And when you actually decided it was time

14   for you to complain to the state audit department,

15   how did that fit into the fact that you were given a

16   Performance Improvement Plan?  Did it trigger it?

17        A.    Yes, it did.

18        Q.    Okay.  Why?

19        A.    I was called an enemy of this college by

20   Joe Lowder.

21        Q.    With regard to your conduct that was

22   motivating you to go to the state audit department

23   and report, you did that at a time that you were

24   fearful of losing your job, correct?

25        A.    Correct.
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    Q.   And your report of alleged, quote, illegal

2  activity, went to the state department of audit?

3    A.   (Witness nods head affirmatively.)

4    Q.   Solely from you and from no one else,

5  correct?

6    A.   I wrote the letter.  I did it myself.

7    Q.   No one else wrote the letter, right?

8             MR. WOODRUFF:  Objection.

9    A.   I wrote the letter initially.

10    Q.   (Mr. Griffith)  Right.  You wrote the

11  letter.

12    A.   Yes.

13    Q.   No one else wrote the letter, right?

14    A.   I don't understand.  I wrote the letter.

15    Q.   You wrote the letter.

16    A.   Yes.  Of course, I had counsel.

17    Q.   I don't want to know about what your

18  counsel was doing.  But no one else besides you

19  actually wrote the letter?

20    A.   No.  I wrote that letter.

21    Q.   Why do you think you were nonrenewed after

22  working --

23    A.   I was the enemy of the college.

24    Q.   -- at ICC?  Well, why do you think you were

25  nonrenewed if you had worked so successfully at ICC

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    for all these years?

2         A.    Because I exposed.

3         Q.    Because you exposed?

4         A.    Exposed what was done, what was wrongfully

5    done, yes.

6         Q.    And when you did that, who else at ICC can

7    support or corroborate what you did?

8                   MR. WOODRUFF:   Objection.   Did what?

9         A.    Did what?

10        Q.    (Mr. Griffith)   Who else at ICC can

11   corroborate what you just told me, that you exposed

12   alleged illegal activity?

13        A.    Nobody knew at ICC that I wrote the letter.

14        Q.    Okay.

15        A.    I never shared it with anybody who was part

16   of ICC.

17        Q.    But you had a fear nonetheless that you

18   were jeopardizing your job and it would be a

19   possibility that you would be fired as a result.

20        A.    I did.   I was scared.   I was very scared.

21   It was a scary thing to do.

22        Q.    Was there another coworker or a friend with

23   whom you shared this information?

24        A.    That I wrote the letter?

25        Q.    Yeah.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 100

```
1         A.   I don't believe so.

2         Q.   Okay.

3         A.   Now, it's possible when I referred to

4    documents being altered other people heard me.

5    Because the discussion was, you know, it took

6    several -- we've talked about it between Stacy Loden,

7    myself, Emily Lawrence.  There was several

8    conversations about documents being completed by ICC

9    staff before we enter them into the system.

10        Q.   When was the very first time, if you can

11   tell me, when there was ever any discussion or any

12   conversation about alteration of documents at ICC?

13   The very first time.

14        A.   I think it was March 2019 with Stacy Loden.

15        Q.   And that took place --

16        A.   No.  You understand, I already knew it was

17   happening.  Because I knew that Joe Lowder changed

18   the form for Southern Motion and it happened in

19   February of 2017 -- or '16.  2016.

20        Q.   '16?

21        A.   Yes.  So I already knew it was happening.

22   I did talk to Liz Owings about it, but she said she

23   felt pressure and she needed a project that would

24   generate money for ICC because of -- they call it

25   kickback.  It's not the proper term for it, but ICC
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 101

1    would get additional six percent on top of the
2    reimbursement funds that we would process.  And
3    because I was managing multimillion dollars projects
4    and Liz did not have a reimbursement -- large
5    reimbursement project, she told me herself she felt
6    under pressure and she felt like her job was in
7    jeopardy and she needed to do that.  That's why she
8    agreed to let it go.
9         Q.   And you have an opinion about Liz being
10   nonrenewed?
11        A.   No.  Liz left on her own.
12        Q.   She left on her own?  Okay.  She wasn't
13   terminated?
14        A.   No.  Liz left shortly after.  She moved to
15   a different state.
16        Q.   Okay.
17        A.   You talking about Emily Lawrence, I think.
18        Q.   Yeah.  In the PIP, the initial PIP, did you
19   consider that Performance Improvement Plan a fraud?
20   Did you consider that false?
21        A.   I considered it false.
22        Q.   You considered it made up, right?
23        A.   Yes.
24        Q.   You considered it, and I think the words
25   you used variously throughout your complaint were

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 102

1  that it was --

2       A.   A hoax.

3       Q.   -- a hoax.  Yeah.  And other words that

4  basically would say the same thing, that it was

5  false.

6       A.   Yes.

7       Q.   That it was pretextual, that there was no

8  truth to it, correct?

9       A.   It was not based on facts, correct.

10      Q.   Okay.  And with regard to your

11 communications with the state auditor after your

12 report was sent in, you've told me about the only

13 individuals that you know, that was Mr. Powell and

14 Mr. Joel, and those were the only individuals at the

15 audit department with whom you communicated?

16      A.   That's who I communicated with, yes.

17      Q.   Okay.  Even up to today; is that correct?

18      A.   I have not spoken to them.

19      Q.   Okay.  All right.  When the PIP, the

20 initial PIP was given to you on March 8th of 2019; is

21 that correct?

22      A.   Yes.

23      Q.   Why did you respond to it?

24      A.   I wanted to -- I knew that Mr. Lowder never

25 managed projects.  When he was hired I helped him.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 103

So he came in the middle of the year, which most
projects they start after July 1.  So we have our
program here is July 1 through June 30.  So when he
came in the middle of the year, it was in the middle
of the training program.  So I help him through it,
and then he handed me all those projects, which were
always done before by a director or an executive
within the college.

Q.    I believe at some point after you received
the initial PIP, You made the reference to this
having been prepared for reasons other than providing
objective feedback.  What did you mean?

A.    It was designed to scare me and hurt me.

Q.    That it was pretextual?

MR. WOODRUFF:  Objection.

Q.    (Mr. Griffith)  Made up reasons?

A.    It was not based on facts.

Q.    That it was something that was done
strictly to harm you, correct?

A.    Hurt me, yes.

Q.    Okay.  And it was designed, are you saying
here today, to deprive you of the benefits of your
job and your employment at ICC?

A.    It was designed to scare me and hurt me,
yes.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 104

1      Q.   Yeah.  Was it designed to force you to

2  leave your job?

3      A.   Possible, yes.  I thought that too.

4      Q.   You actually suggested that a third-party

5  evaluator be brought in to evaluate you?

6      A.   Yes.

7      Q.   Have you ever seen that done with regard to

8  a Performance Improvement Plan in any field of public

9  or private sector activity?

10     A.   I know there is such a thing, but I've

11  never seen it.

12     Q.   Okay.  Is it common to file a response to a

13  Performance Improvement Plan?

14              MR. WOODRUFF:  Objection.

15     A.   How would I know?

16     Q.   (Mr. Griffith)  You would not know, would

17  you?

18     A.   No.

19     Q.   Okay.  And as far as you're concerned, you

20  feel the PIP was used for retaliation and to harm you

21  and to deprive you of your job.  Is that the sum and

22  substance of your testimony this morning?

23     A.   Yes.

24              MR. WOODRUFF:  Objection.

25     Q.   (Mr. Griffith)  And your basis for that is

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 105

1   you believe the PIP was false in every respect?

2       A.   It was not based on facts.

3       Q.   It was not factual.  And if it was not

4   factual that it must have been made up as a hoax.

5       A.   Yes.

6       Q.   Is that your word?

7       A.   Yes.

8       Q.   Okay.  Did anyone else suggest the word

9   hoax to you?

10              MR. WOODRUFF:  Objection.  If it's

11  your attorney that suggested it, don't answer the

12  question.

13      Q.   (Mr. Griffith)  I don't want to know

14  anything about your attorney.

15      A.   I don't think -- I don't remember.

16      Q.   Okay.  In terms of the activity that you

17  engaged in subsequent to your sending the letter to

18  the state department of audit, what further

19  communications, if any, did you have with ICC?  You

20  said at the time you had sent the letter to audit

21  that no one at work knew about it.

22      A.   No, nobody.

23      Q.   When was it that people at work, at ICC

24  knew that you had sent the letter to the audit

25  department?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 106

1     A.    I never told anyone.

2     Q.    Pardon?

3     A.    I never told anyone I wrote the letter.

4  Nobody asked and it never came up.

5     Q.    So the short answer is there was never an

6  occasion for anyone to have asked you anything about

7  the audit department report; is that correct?

8     A.    One time Tim Senter sent -- after the

9  letter was written -- now, I want to make sure I

10  understand the question.  You said in the department.

11  So in the department no one asked me.  Now, Tim

12  Senter is not in my department.  He asked me a

13  question about it after the letter was sent.  He

14  wanted to meet and he wanted to have a witness with

15  him.

16     Q.    Uh-huh (Indicating yes).

17     A.    And I was advised not to meet with him.

18     Q.    In regard to communications and

19  communicating using appropriate language and writing

20  and verbally in an appropriate manner in a variety of

21  situations, that was one of the many areas that were

22  covered in your performance improvement evaluation,

23  correct?  Your PIP?

24     A.    My written speech --

25     Q.    Yes.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 107

1          A.   -- or communication?

2          Q.   Communication, yes.

3          A.   I remember specifically there was one

4     rating for it, yes.

5          Q.   Is it possible that complaints would go to

6     your superiors as opposed to directly to you?

7                    MR. WOODRUFF:  Objection.

8          A.   I'm not aware of any complaints.

9          Q.   (Mr. Griffith)  Okay.  Have you ever had a

10    miscommunication or a lapse in professionalism with

11    either your colleagues or with customers?  Have there

12    ever been one to your knowledge?

13         A.   I can say this.  There was never a

14    miscommunication that led to a negative outcome.  If

15    there was, it was always resolved and I always have

16    very good feedback from my customers.

17         Q.   It was dealt with on the spot, correct?

18         A.   Absolutely.

19         Q.   Do you feel that have you been singled out

20    and treated differently from other employees at ICC?

21         A.   After the PIP?

22         Q.   Yes.

23         A.   Yes.

24         Q.   Okay.  And you believe that because you

25    think the PIP itself was false or based on fabricated

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 108

1    information and not facts?

2          A.    The fact that I was treated differently?

3          Q.    Yes.

4          A.    I know the facts that I was treated

5    differently.  I wasn't even allowed to participate to

6    defend my files in October, November of 2019 when

7    MCCB audit came.  And every other project manager had

8    about two weeks to follow up and collect missing

9    documentation or answer questions from the auditors.

10   I was the only project manager that was excluded.

11   And I just want to emphasize that at that time all

12   files with Southern Motion, Chapter 3, ICC Food

13   Program were not even in our office.  So 90 percent

14   of the files were managed by me and I was the only

15   person excluded from that process, even though the

16   process was spelled out in MCCB policies, that the

17   project manager would receive, you know, about two

18   weeks to follow up and answer questions from the

19   auditor.

20         Q.    Did you feel that the accountability

21   specialist at ICC did not do that person's job

22   correctly?

23         A.    Whose person's job?

24         Q.    Yours.

25         A.    My job?  Accountability person?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 109

1      Q.   Yes.

2      A.   She never did my job.

3      Q.   Did you ever feel that there was not a

4 level of accountability that should have been present

5 when it came to critiquing your work and the

6 effectiveness of it?

7      A.   Stacy Loden came new in March of 2019.  I

8 helped Stacy Loden understand the files and the

9 process when she had questions.  So she only did her

10 portion of the job, which was data management and

11 data entry.  I did my portion of the job when it came

12 to collecting documents that were complied with,

13 policies and procedures and explaining those

14 procedures to the customers.  So we had divided

15 roles.  We worked together side by side, but we had

16 divided roles within the process.

17      Q.   When the performance -- when the first PIP

18 was handed to you on March 8th, did you take that

19 very personally?

20      A.   I don't know if I took it personally.  All

21 I knew that -- that's why I answered to it, because

22 it was completely bogus and it didn't have any facts.

23 And as a matter of fact, I asked for examples.  I

24 asked to give me -- for me to understand what's the

25 reference with poor rating versus a document or bad

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 110

1   e-mail that was considered unprofessional that I

2   produced.  And no one gave me those facts.

3        Q.   Did you feel that it was necessary for you

4   to defect blame to others besides yourself that you

5   were not at fault?

6        A.   I didn't blame anyone.

7        Q.   Did you ever engage in a process of

8   deflecting blame to others as a way of saying that

9   was not my problem?

10                 MR. WOODRUFF:  Objection.

11       A.   No.

12                 MR. GRIFFITH:  Okay.  Take a break.

13                 (Recess.)

14                 (Exhibit No. 1 -- Performance

15   Improvement Plan dated 3-8-19 -- marked and may be

16   found attached to the back of the transcript.)

17       Q.   (Mr. Griffith)  Ms. Sherman, I'm handing

18   you what's been marked as Exhibit 1, the Performance

19   Improvement Plan dated March 8, 2019.  And I ask you

20   if you've ever seen that before.

21       A.   Yes.

22       Q.   And is that a true, accurate and complete

23   copy of the PIP that you received on that date?

24       A.   It looks like it.

25                 (Exhibit No. 2 -- ICC Employee

Page 111

1   Performance Evaluation Form for July 2017-January

2   2019 -- marked and may be found attached to the back

3   of the transcript.)

4        Q.   (Mr. Griffith)  Okay.  I'm handing you also

5   what has been marked as Exhibit 2, the Itawamba

6   Community College Employee Performance Evaluation

7   Form for the review period July 2017 to January 2019.

8   And I ask you if you've had an opportunity to see

9   that before.

10       A.   I believe so, yes.

11            MR. GRIFFIN:  Okay.  Those are all the

12  questions I've got.  Thank you, Ms. Sherman.

13            MR. WOODRUFF:  Mr. Sparks?

14            MR. SPARKS:  With the time being 1:00,

15  I'm going to say we're not going to make it by 2:00,

16  so if we want to break for lunch, I would say that

17  would probably be --

18            MR. WOODRUFF:  Any idea approximately

19  how much you've got?  Because I've probably got an

20  hour myself.  I mean, there's a lot of things we

21  haven't covered.

22            MR. SPARKS:  Then we definitely need

23  to break for lunch.

24            MR. GRIFFITH:  Looking at the

25  aggregate, I think I would allow four hours if I were

1  you guys.  One for you and two to three for him.

2              MR. WOODRUFF:  I get seven hours,

3  according to the rules.  All of a sudden you're

4  allotting the number of hours I can do.

5              MR. GRIFFITH:  You said you do all

6  your depositions in one hour, Bud.  So I'm putting it

7  back in your lap.

8              MR. WOODRUFF:  The problem is there's

9  so much that hasn't been covered.

10             MR. GRIFFITH:  Oh, really?  So there's

11 a problem with setting six depositions in one

12 afternoon.

13             MR. WOODRUFF:  She's the plaintiff.

14 She's not a fact witness for limited things.  I know

15 I've got probably an hour of stuff to cover.

16                   EXAMINATION

17 BY MR. SPARKS:

18     Q.   Ms. Sherman, I'm Daniel Sparks, the

19 attorney who represents Joe Lowder in this case.  I

20 will not go through the same colloquy that

21 Mr. Griffith did, but all those things do apply as

22 far as if you don't understand a question or anything

23 of that nature, or if you don't feel well or

24 anything.  As it regards to that, is there anything

25 that you believe would prevent from you continuing

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    answering questions?

2         A.   No.

3         Q.   Okay.  Do you recall receiving some

4    interrogatories in response to your Complaint from

5    Defendant Lowder?

6         A.   I do.

7         Q.   And did you have an opportunity to review

8    those and to provide answers for those?

9         A.   I did.

10        Q.   There were several questions that dealt

11   with illegalities, changing training logs.  Do you

12   remember specific questions like that?

13        A.   I do.

14        Q.   And you were asked in those questions, and

15   I would ask that question today, for instance, with

16   Southern Motion, what specificity, what statute --

17   when you say it was illegal, what statute was

18   violated as it relates to Southern Motion?

19        A.   I don't understand the question.  What

20   statute was violated?

21        Q.   Well, you have said it's illegal.

22        A.   Yes.  It was not compliant with policies

23   and procedures required for state reimbursement.

24        Q.   And what policy was it not in line with?

25        A.   The policy that has -- each class, each

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 114

1    trainer has to be documented based on the

2    requirements that's listed in the policy.  One of

3    those requirements, each class has to have a date,

4    start time and end time.  And if there is a break,

5    that break must be also notated on the class roll.

6         Q.   Okay.  And some of these may be repetitive.

7    But as to that particular first interrogatory, the

8    question was about illegality.

9                   MR. WOODRUFF:  Can she look at her

10   answer?

11                  MR. SPARKS:  Oh, yes.

12                  MR. WOODRUFF:  I'll give her a copy.

13   It will probably speed it up.

14                  MR. WOODRUFF:  You're asking in her

15   response to Interrogatory Number 1?

16                  MR. SPARKS:  That's correct.

17        A.   Okay.

18        Q.   (Mr. Sparks)  In the illegality under

19   Question 1, Subsection 3, each statute -- do you

20   understand what a statute is?

21        A.    It's a requirement.  It's a standard that

22   you have to be compliant if you use workforce

23   enhancement training funds for reimbursement.

24                  THE COURT REPORTER:  Wait.  I didn't

25   understand all that you said.

**Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023**

Page 115

1           THE WITNESS:  It's a requirement in a

2  policy for workforce enhancement training funds to be

3  used -- or allocated.  Used.

4       Q.   (Mr. Sparks)  Is that a crime?

5       A.   I think it is a crime.

6       Q.   So which criminal statute was violated?

7       A.   I don't know if I can answer that question.

8  I understand it's a crime because it's not compliant

9  with the policy.

10       Q.   And I'm using the terms out of the

11  Complaint which you filed.  And the specific question

12  was what statute supported your allegation of

13  illegality, and right now -- you did not list one in

14  your response; is that correct?

15       A.   It's correct.

16       Q.   Okay.  You reference the state auditor's

17  report, and I believe you discussed that a little

18  earlier today.  What are you referring to as the

19  state auditor's report?

20       A.   The report that was issued after the

21  investigation was completed, which was in the fall of

22  2021.

23       Q.   And is this the 7,000 pages you referenced

24  earlier?

25       A.   It is the 7,000 pages that I referenced

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 116

1   earlier, but also state auditor released his
2   statements on social media.
3       Q.   That's just a press release, correct?
4       A.   Right.  But we also have a copy of his
5   7,000 page report.
6       Q.   And you said earlier that you had read that
7   entire report; is that correct?
8       A.   I have done to the best of my ability.
9   That is correct.
10      Q.   And did you have that report when you filed
11  your Complaint?
12      A.   When I wrote the letter in September of --
13      Q.   No.  This is the actual Complaint when you
14  filed your initial lawsuit.
15      A.   I don't think.  I don't remember.  I don't
16  remember.
17      Q.   Do you know when you received this
18  7,000 pages?
19      A.   Around that time, but I don't remember.
20      Q.   Around what time?
21      A.   Around the time when the Complaint was
22  filed.
23      Q.   Okay.  In Interrogatory Number 3, you had
24  stated that it was Lowder's policy to obtain maximum
25  money for furniture manufacturers and/or Defendant

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 117

1    ICC even though this involved committing fraud

2    against taxpayers.  I had asked for the policy that

3    you said supported this allegation, because you said

4    Dr. Lowder's policy.  Was this a written policy?

5                    MR. WOODRUFF:  Objection.  You were

6    asking her what statute.

7                    MR. SPARKS:  No, I'm sorry.  I'm on

8    Interrogatory Number 3.

9                    MR. WOODRUFF:  I know.  But -- oh,

10   you're talking about the question.

11                   MR. SPARKS:  Yes.

12                   MR. WOODRUFF:  Okay.  I'm sorry.  I

13   apologize.

14       A.   What policy?  No.  He had shared his vision

15   for the division to obtain as much money in

16   reimbursements as possible because, as he would say,

17   ICC would get a bigger kickback, which would be the

18   additional six percent the college was receiving

19   based on the total amount of reimbursements we have

20   done for the year.

21       Q.   (Mr. Sparks)  So it would increase revenue?

22       A.   Yes.

23       Q.   And was that policy in writing?

24       A.   It's possible it was in the e-mail.  He was

25   encouraging us to increase -- he actually -- I would

1  say his direct quote was, "Give them as much money as

2  they want."

3      Q.   Okay.  I'm using your language though, was

4  his policy.  My question is, is there a policy in

5  writing that you received from Dr. Lowder that you

6  recall?

7      A.   I don't remember.  But I know that that was

8  the language that he used during the meetings and

9  other communication.

10     Q.   So you don't have a writing policy.  You

11  don't know have a policy in writing?

12     A.   So the policy -- asking me if he made a

13  policy that says our policy to obtain maximum money

14  for furniture manufacturers.  So you're saying did he

15  write that in some kind of handbook.

16     Q.   When you saw policy, yes, that's correct.

17  I'm asking is there a written policy.

18     A.   His policy was the vision.  That is what he

19  wanted to do.

20     Q.   So not in writing?

21     A.   I'm not sure if it's in writing or not.

22  It's very possible that it is.

23     Q.   And then you finish that interrogatory,

24  which is, again, I attempted to pull directly from

25  your Complaint, the language, that committed a fraud.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1   Now, a policy -- we've addressed that issue.  What

2   fraud statute had been violated?

3        A.   So MCCB --

4             MR. WOODRUFF:  Listen to his question.

5   He said what fraud statute?

6             THE WITNESS:  I don't understand the

7   question.

8             MR. WOODRUFF:  I don't think she knows

9   what statute is.  Can you explain to her what a

10  statute is?

11            MR. SPARKS:  I'll be glad to.

12       Q.   (Mr. Sparks)  A statute is a law that's

13  voted on that's put in the criminal code that when

14  someone speeds there's a particular statute they

15  violated.  So -- but they have to charge them under

16  the speeding statute, not under the no headlight

17  statute, which is a completely different statute.  So

18  when you say someone has committed a fraud or a

19  crime, I'm just asking which statute are you alleging

20  they violated?

21       A.   So the policy language was taken from the

22  Senate Bill 2564.  And that's the direct language

23  that that's written in the policy.  So it is the law.

24       Q.   Okay.  But you're talking about the

25  policy -- when you're talking about the Senate

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 120

```
 1   bill --
 2        A.   The language in the policy was taken
 3   directly from the Senate Bill 2564.
 4        Q.   Okay.  But that's still not a statute.
 5        A.   That's a law.
 6        Q.   I understand that.  But it's not a criminal
 7   statute.  I'm asking specifically what statute was
 8   violated.
 9        A.   Misappropriation of taxpayer's money.
10   That's fraud.
11        Q.   Okay.  And you're saying that that occurred
12   in this particular occasion because the policy was to
13   obtain more money for ICC?
14        A.   He said, "Give them as much money as they
15   want."
16        Q.   Okay.  As a project manager, what --
17   describe to me your role in setting up a project.
18        A.   So there are multiple steps and they are
19   described in the departmental handbook, and I will go
20   over them the best I can.  As a project manager, my
21   main focus was to provide training resources to the
22   customers in the five-county district.  I did have a
23   designated customer list and I worked diligently with
24   those companies and businesses in the area.  And my
25   goal was to make them aware of training services that
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 121

1    we have to offer, explain to them what the policy

2    measures are for them to receive training at the

3    lowest cost possible.  Then I helped them schedule

4    classes.  Sometimes they wanted to use ICC trainers,

5    so I coordinated training programs with our trainers.

6    Sometimes companies wanted to use their own trainers.

7    So if they were eligible for reimbursement, I would

8    explain to them documentation that was required, help

9    them sometimes, walk them through the paperwork.  And

10   then I would collect documentation, I would review it

11   to make sure it was compliant, and then I would give

12   it to the data specialist or accountability

13   specialist.  And they would review it again and they

14   would key the documentation into Pro Assessment and

15   WESS system for them to obtain reimbursement.

16        Q.   And so as a project manager you kind of

17   started the ball rolling --

18        A.   Yes.

19        Q.   -- with a particular company?

20        A.   I was the glue between the college and

21   companies, yes.

22        Q.   And you mentioned that you wanted to

23   provide this training at the lowest cost possible?

24        A.   That is how the language reads in the

25   policy and the Senate Bill.

Page 122

1        Q.   It reads lowest cost possible?

2        A.   The lowest cost -- no cost or lowest cost

3  possible.

4        Q.   Okay.  What policy are you referring to?

5        A.   MCCB policy.

6        Q.   Which particular?

7        A.   2019, 2020, 2021.  But if you can go back

8  for the last 17 years, the language has not changed.

9  It's taken from the Senate Bill directly.

10       Q.   And it says lowest cost possible?

11       A.   So, you understand, so there are two

12  different services.  We can offer training using our

13  ICC resources, such as trainers, or help them find an

14  appropriate vendor for the training they're making

15  the request for.  Or we can provide reimbursement for

16  the training they do in-house.  So the reimbursement

17  they do in-house, of course, we just reimburse for

18  their costs.  Now, if we use our trainers and our

19  resources, the goal is to provided it at no cost or

20  at the lowest cost possible.

21       Q.   Is that a requirement?

22       A.   It's in the policy.  It's a requirement,

23  yes.  And it spells out why we can offer it a no cost

24  or we can reduce the cost as much as possible.

25       Q.   Does the policy actually say however is

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 123

```
 1   appropriate and desired that the cost of such
 2   training be shared between the employer and the
 3   college?
 4        A.   It does.  And I can explain what that
 5   means.
 6        Q.   Okay.  Please.  Thank you.
 7        A.   For example, if I hire Romeko Traylor to a
 8   HAZWOPER class, which is actually very costly --
 9             THE COURT REPORTER:  Excuse me?
10             THE WITNESS:  HAZWOPER.  I know.  I
11   would hire him to teach a HAZWOPER class.  For
12   example, for Intercorp, they did a lot of HAZWOPER
13   classes.  This particular certification for a trainer
14   is quite expensive.  So Romeko was receiving $45 an
15   hour.  Because this training qualified as -- well,
16   it's marked under safety category.  We could only
17   reimburse $25 an hour for this training.  So the $20
18   had to be covered somehow.  That's the cost -- that's
19   the shared cost that the policy would not cover and
20   it had to go either a participant or a company.  So
21   that's what that means.
22        Q.   (Mr. Sparks)  Is that your definition of
23   what that means?
24        A.   That is not my definition.  We were trained
25   on how to interpret this policy when I first started
```

1   my job.

2          Q.    So who trained you that that's what --

3          A.    MCCB.  We actually went through multiple

4   training sessions and different MCCB representatives

5   interpreted the policy to us.

6          Q.    Okay.  The MCCB interpretation that you're

7   reciting is not in the policy, that's what you were

8   taught in trainings over the years?

9          A.    What language is not in the policy?  I'm

10  not following you.

11         Q.    You just went through this definition.

12         A.    I explained what shared cost means.  Share

13  cost means there is specific costs for training.

14  MCCB provides us hourly reimbursement.  The hourly

15  reimbursement can fluctuate between $25 an hour and

16  $50 an hour, depending on the category this training

17  falls under.  For example, if you ask me for advanced

18  robotic training, MCCB allows for us to reimburse $50

19  an hour.  If it's safety training, we can only

20  reimburse $25 an hour.  However, if in that area we

21  cannot find a trainer who can agree to teach this

22  training at $25 an hour, the shared cost, the $20 of

23  $45 an hour would have to be covered somehow, and it

24  would go to a company who requested the training.

25         Q.    Okay.  But that is one definition of shared

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 125

1    cost.  You've given us a very specific example of a

2    shared cost, correct?

3         A.   I can give you more examples if you would

4    like.

5         Q.   Well, the reason I ask that is, I would

6    submit to you that you keep referring to policy and I

7    keep asking you which policy and you're telling me

8    the general policies of Mississippi --

9         A.   MCCB policy.

10                   MR. WOODRUFF:  Let him finish.

11                   THE WITNESS:  Okay.  Go ahead.

12         Q.   (Mr. Sparks)  If you don't know, just say I

13    don't know.  But when you say it's in the code, it's

14    in the policy book, that's a little vague.  I had

15    asked you in writing specifically which policies and

16    I was repeatedly referred to the auditor's report.

17    So now here -- I wouldn't be asking these questions

18    if, in writing, this had been laid out.  But the

19    sentence in the policy that says, "However, it is

20    appropriate and desired that the cost of such

21    training be shared between the employer and the

22    college," that sentence speaks for itself, correct?

23                   MR. WOODRUFF:  Objection.

24         A.   No.  And here is why.  Because if you read

25    the policy, the page before, it says the goal is to

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 126

1    provide training at no cost.

2        Q.    (Mr. Sparks)   Okay.

3        A.    And it says it multiple times in the

4    policy.  But the reason explanation and what you're

5    referring to is a detailed explanation on how to

6    manage those classes.  The training program through

7    MCCB doesn't require 100 percent of the training

8    cost.  And that is when we apply what's called shared

9    cost, so the company covers the remaining portion.

10       Q.    So you think it's inappropriate to bill a

11   company in addition to the cost of training?

12       A.    It's appropriate to bill the company for

13   the cost that is not covered by MCCB reimbursement,

14   allowed reimbursement.

15       Q.    So you think it's inappropriate to bill a

16   company for training in excess of MCCB's

17   reimbursement?

18       A.    It's inappropriate to bill the company for

19   training to generate profit, additional profit on top

20   of the cost of this training.

21       Q.    Okay.  Is there a policy that says that?

22       A.    The policy says to provide training at no

23   cost to participants or employer.  However, if the

24   cost is higher than the policy can cover, then you

25   can share the cost between the company and the

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 127

```
 1   college.
 2        Q.    Okay.  In Interrogatory Number 4, you
 3   allege that money was received under false pretenses.
 4   Do you specifically have a statute you're referencing
 5   with false pretenses?
 6        A.    False pretense means --
 7                    MR. WOODRUFF:  He's asking you a
 8   statute, a law on the books, if you know.
 9                    THE WITNESS:  No, I don't.
10        Q.    (Mr. Sparks)  Okay.  But these are your
11   words in the Complaint, correct?
12        A.    Correct.
13        Q.    You've accused --
14                    MR. WOODRUFF:  Objection.  Our clients
15   don't write Complaints.  Attorneys write Complaints.
16        Q.    (Mr. Sparks)  Well, the conclusions that
17   are in the Complaint, which you signed as being
18   accurate, include the allegations of criminal
19   offenses, terminologies such as false pretense,
20   fraud, things of that nature.  And I'm just asking
21   you, again, as was asked in the interrogatories, if
22   you have a specific statute, and you keep referring
23   me back to the answer to 1, which is state auditor's
24   report.  Is that -- do you have a statute?
25        A.    I don't know how to answer this question.
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 128

1    Q.   Your particular response to Interrogatory
2  Number 4 dealt with Southern Motion training.
3  Earlier you stated that the paperwork was changed for
4  Southern Motion.  Could you please tell me what you
5  were referencing earlier when you said the form was
6  changed to benefit Southern Motion?
7    A.   Yes, I can.
8    Q.   Thank you.
9    A.   So the form was developed prior to the time
10 when Joe Lowder became the director of the department
11 and he removed the start time and end time from the
12 form.  And instead of documenting what time this
13 training began and what time this training ended,
14 it's strictly only a reference to the date.  So it
15 would say January 2nd through January 15th.  That's
16 an example.  And it will say, six hours a day,
17 without providing the explanation when actually it
18 started and when it actually ended, which is a
19 violation of the policy.
20    Q.   Where is it a violation of the policy?
21    A.   The policy has a specific list of items
22 that the class roll has to contain and verify by
23 every trainee who attended that class.  And it
24 specifically says start time and end time.  It needs
25 to be signed by the trainer and every person who

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 129

1    attended that class as a student.

2        Q.   Who is supposed to explain that to the

3    employer?

4        A.   The project manager.

5        Q.   So are you telling me the project manager

6    didn't explain it?

7        A.   No.  I want to make sure it's clear.  I was

8    not the project manager for Southern Motion.

9        Q.   I didn't ask that, but thank you.

10       A.   Whose job it was to explain?

11       Q.   Yes.

12       A.   I believe it was the responsibility of the

13   director, project manager or the dean.

14       Q.   But wouldn't a project manager explain all

15   this on the front end before they entered into an

16   arrangement with an employer?

17       A.   So Joe Lowder removed that section from the

18   classroom.  The project manager would have to go

19   against Joe Lowder and go back and tell the company

20   to add this section back to the classroom.

21       Q.   How do you know that your accusation that

22   Mr. Lowder removed from it from the class roll?

23       A.   He told me.

24       Q.   Okay.

25       A.   I spoke with him about that.  And I went

Page 130

```
 1    back to my office and I picked up the policy.  I
 2    walked in his office and I showed him the page, what
 3    is -- at first he said he did not see that
 4    requirement in the policy.  So I showed him the
 5    policy and I said, it specifically says on this page
 6    what must be presented on the class roll.  And that's
 7    when he told me that nobody likes people like me
 8    because I'm too much by the book.
 9         Q.    So the forms for Southern Motion, were they
10    unique to Southern Motion?
11         A.    Yes, they were.
12         Q.    So every one of your projects had a start
13    and end time slot on the paperwork?
14         A.    That is correct.  And every project that
15    was offered by ICC hired trainers had that
16    information too.
17         Q.    And it's -- the document you're referring
18    to is kind of what I refer to as a class roll.
19         A.    Correct.
20         Q.    It has the name of the people.
21         A.    Correct.
22         Q.    Their signature.
23         A.    Correct.  And I will also say -- I'm sorry.
24    I didn't mean to interrupt you.  I just wanted to add
25    this statement.  Joe Lowder told me he made Southern
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    Motion an exception.

2         Q.   Do you know why that exception was made?

3         A.   Yes.  Because Southern Motion had an issue,

4    when their employees complained that they were being

5    forced to sign training logs for training that they

6    didn't receive.

7         Q.   Okay.  And when did that occur?

8         A.   To my best knowledge, it happened right

9    before Joe Lowder started his job at ICC.

10        Q.   So you had a complaint that occurred prior

11   to Dr. Lowder's arrival, correct?

12        A.   Correct.

13        Q.   Well, who was in charge when the form was

14   changed?

15        A.   Joe Lowder.

16        Q.   When was the form changed?

17        A.   In February of 2016.

18        Q.   Who was the dean in February of 2016?

19        A.   I don't think we had a dean at that time.

20        Q.   Did you have an acting interim dean?

21        A.   There was a -- Dr. Cole served as an

22   interim.  I'm not sure what his title exactly was.

23   And he was leaving around that time.  Maybe he was

24   gone by that time.  So I know that when Joe Lowder

25   came on board, it was a short period of time when Dr.

1   Cole left.  So I can't tell you exactly the date when

2   he left.

3       Q.   So it's possible that Dr. Cole was still

4   there when this form you allege to be changed was

5   changed?

6               MR. WOODRUFF:  Objection.

7       A.   I don't remember.  I remember me

8   specifically speaking with Joe Lowder only about that

9   matter.  I don't remember anyone else being involved.

10      Q.   (Mr. Sparks)  But this Dr. Cole person

11  would have been the superior to Dr. Lowder at that

12  time in the interim?

13      A.   Initially when Joe Lowder was hired, yes,

14  Dr. Cole was the person to help with the transition.

15      Q.   Did you report this to Dr. Cole?

16      A.   I don't believe he was in the office when

17  that happened.  I do not believe so.  That's to my

18  best memory.  Because I remember speaking only to Joe

19  Lowder about that.

20      Q.   Okay.  Dr. Cole, you said he served as an

21  interim.  What is his -- what is his full name?

22      A.   Dr. David Cole.

23      Q.   Okay.  And was he a workforce development

24  guy?

25               MR. WOODRUFF:  Objection.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    Q.    (Mr. Sparks)  Excuse me.  Was he in the

2    workforce development business?

3    A.    He was over multiple departments of our

4    division.  So the division has four departments.  So

5    he was the person overseeing four departments.

6    Q.    Is this the same Dr. David Cole that was

7    president of the community college?

8    A.    It is.

9    Q.    Was he still president at the time?

10   A.    No, he was not.

11   Q.    But he had returned in -- can you tell me

12   if you know what had happened there?

13   A.    We lost a director or a vice president at

14   that time and he stepped in to help with the

15   transition until the new person would be hired.

16   Q.    Okay.  But you never reported any of what

17   you're talking about right now that happened in 2015

18   or early 2016 to Dr. Cole?

19   A.    No.

20           MR. WOODRUFF:  You're talking about

21   the Southern Motion issue?

22   A.    Southern Motion issue.

23   Q.    (Mr. Sparks)  That's correct.

24   A.    Yes, that's what I understand.  No.  And I

25   honestly, to my best knowledge, I do not believe he

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    was present when the class roll was changed for

2    Southern Motion, that the requirements were changed.

3         Q.    In Interrogatory Number 5, you referenced a

4    theft of taxpayer funds.  Again, same question.  Is

5    there a statute that you're relying on?

6         A.    I cannot answer that question.  My best

7    understanding was -- the two trainers were listed on

8    the summary sheets and class rolls at the same time.

9    One trainer was a supervisor on the training line and

10   the other person was a production manager who was

11   making close to $35 an hour.  The supervisor was

12   making $15, $18 an hour.  The problem was that the

13   production manager was listed on multiple class rolls

14   at the same time.  So for the college to calculate

15   reimbursement at the higher rate, which is $35 an

16   hour, they would have to, after the fact, after

17   documentation was submitted, they would have to go

18   back and manipulate the time on the class roll to put

19   in the system that the person who makes $35 an hour

20   was teaching one class for six hours, which would be

21   from 6:00 a.m. until noon, and the other one from

22   noon to 6:00 p.m.  Southern Motion only operates --

23   their door opens at 7:30 a.m. every day and

24   operations start at 8:00.

25        Q.    So you're saying that training occurred

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 135

1    outside of the hours that they were open?

2        A.   Somehow it happened on the training --

3    sorry.

4                 MR. WOODRUFF:  Let's him finish his

5    questions.

6        A.   Go ahead.

7        Q.   (Mr. Sparks)  So you're saying training

8    occurred outside of the hours that the facility was

9    actually open?

10       A.   On the training line inside on the

11   production floor.  On the production floor on the

12   training line, yes.

13       Q.   Did you witness this?

14       A.   Did I witness that the training started at

15   6:00 or did I witness --

16       Q.   Yes.

17       A.   It didn't happen.  That's the problem.  The

18   floor -- the plant would open doors at 7:30 a.m.

19       Q.   Okay.  Did you raise this issue with anyone

20   about the training times?

21       A.   I was told that I was -- yes.  I addressed

22   it with Joe Lowder who said that I was too much by

23   the book and he fired somebody like me at Florida

24   State.

25       Q.   But this was not your class, your project,

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    correct?  Southern Motion was not your client.

2         A.    Was not my project, no.

3         Q.    Whose project was it?

4         A.    Initially it was Liz Owings.

5         Q.    Okay.

6         A.    Then it was Jason Spradlin, then it was TZ

7    Waters.

8         Q.    Did you tell each of them about this issue?

9         A.    No.  After Joe Lowder told me that he fired

10   somebody like me, I did not discuss it again for a

11   while, until Stacy Loden came on board.

12        Q.    What happened when Stacy Loden came on

13   board?

14        A.    She told me that she had to manipulate

15   class time in the system because otherwise the

16   training records cannot be entered into WESS system

17   to draw state reimbursement.

18        Q.    Is this the same occurrence that was

19   discussed in detail earlier about papers on the floor

20   and papers on the desk?

21        A.    Yes.

22        Q.    Okay.

23        A.    And I also -- I don't want to forget to

24   mention that Emily Lawrence told me she refused to

25   key it.  She refused to do the job that Stacy was

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 137

1  doing, manipulating time in the system.

2      Q.   I want to address the trainers.  You said

3  two trainers were involved.  To your knowledge, were

4  two trainers ever paid for the same training?

5      A.   No.  The person who was -- nobody got paid.

6  The program was reimbursed for.  The company received

7  the reimbursement check was submitting documentation

8  that didn't meet the state guidelines.

9      Q.   And pardon me.  The proper way for me to

10 have said that, do you believe a company was

11 reimbursed for two trainers for the same class?

12     A.   The trainer that the company received

13 reimbursement for never provided training.  He was a

14 production manager.

15     Q.   Okay.  But my question is, are you

16 alleging -- because you mentioned there are two

17 trainers?

18     A.   Uh-huh (Indicating yes).

19     Q.   Are you alleging they both were reimbursed

20 to the company?

21     A.   I don't think it's a proper question

22 because it's misleading.  The two trainers were

23 listed on two classes that happened at the same time.

24 One of the two trainers was a supervisor.  For

25 example, Daniel Sparks was a supervisor.  Joe Lowder

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 138

1   was a production floor manager on one class.  On the

2   next class, Ben Griffith was a supervisor.  But Joe

3   Lowder was also production manager and he was listed

4   on that second class.  So Joe Lowder receive the $35

5   an hour reimbursement for both classes.  Yes.

6       Q.   But now I want to ask my question again.

7   You're not alleging that two trainers were paid for

8   the same class.

9       A.   They're two different classes.  They're not

10  the same classes.  There are two different classes.

11  Not the same class.

12      Q.   There was not ever a situation where there

13  were two trainers training a class at the same time?

14      A.   Not with Southern Motion.  That happened

15  with Chapter 3.  Not with Southern Motion.

16      Q.   Okay.  All right.  So is this the

17  continuation of trying to raise the revenue to

18  Southern Motion that you alleged earlier?

19      A.   Yes.  Southern Motion was able to receive a

20  large amount of reimbursement because their

21  reimbursement was calculated at $35 an hour for --

22  sometimes for 12 hours a day with no break time and

23  lunch time for training.  So that person, the

24  production manager, based on our record, started

25  training at 6:00 a.m., never took a break, never had

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 139

1    lunch, finished one class at noon and continued the

2    next class from noon until 6:00 p.m.

3         Q.   And that's the paperwork provided by the

4    employer, correct?

5         A.   That's the paperwork that ICC altered.

6    That's based on what ICC, which is Stacy Loden, who

7    altered that documentation.  That is what now the

8    data represents in the system.

9         Q.   Okay.  The document originated at the

10   employer, correct?

11        A.   The document initially -- yes.  The

12   signatures were collected without start time or end

13   time and the employer didn't tell us exactly which

14   one of the two conducted training.  ICC, Stacy Loden,

15   made those decisions.

16        Q.   Okay.  And you mentioned, obviously, 2015,

17   2016, is when the issue with the form arose.  Was

18   this ongoing during that time?

19        A.   That's when it started.  So documentation

20   changed in 2016, in the spring, and went through the

21   end of 2019.

22        Q.   And when you saw all of these sticky notes,

23   when was that?  When you refer to sticky notes that

24   were on the table and the floor.

25        A.   So Stacy was hired, I believe, in February

Page 140

1    of 2019.  And that's when I saw it.

2         Q.   Okay.

3         A.   And I believe even before that when Emily

4    shared with me that documentation is not -- is not

5    calculated the way it needed to be, because the

6    supervisor on a floor, the one who is training on the

7    production line, should be chosen for reimbursement

8    calculations for his rate and not for the rate of the

9    production floor manager was paid for.

10        Q.   Did you ever have any of your projects not

11   have the start and end time on the paperwork when it

12   was turned in?

13        A.   No, I did not.

14        Q.   So your employers always without fail

15   filled out the form properly?

16        A.   If they failed to do so, the documentation

17   was sent back and not allowed for reimbursement.

18        Q.   Okay.  Well, that was my question.  So you

19   did have employers who failed to do something?

20        A.   It's possible occasionally they would

21   forget to do -- document when the training ended or

22   when the training started.

23        Q.   So there is a possibility that could be

24   human error.  Is that what you ascribe those things

25   to?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 141

1      A.   I think it is a human error if it is one

2   class out of 100, or even out of 10.  But not every

3   class.  Now, I want to make clear, we're not speaking

4   of human error.  The class roll for Southern Motion

5   didn't ask for start time and end time.

6      Q.   It would --

7      A.   There was not even a place to put it.  It

8   wasn't listed on the classroom.

9      Q.   So if I look at the documents for Southern

10   Motion I'm not going to be able to find a spot that

11   has a start and end time?

12      A.   You will not find a place where the company

13   said it started at this time.  You will see a place,

14   but that was completed by ICC staff members, such as

15   either Jason or Stacy Loden.

16      Q.   Okay.  Let me make sure I'm understanding

17   this.  If I look at the form, you've said that the

18   start and end time was removed, that section of the

19   form was removed -- let me finish -- specific to

20   Southern Motion.  And I've looked at a lot of

21   discovery and I've seen a lot of start and end times,

22   and I'll have to go back and double check that it's

23   Southern Motion.  Are you saying that that portion of

24   the form was removed specifically for Southern Motion

25   or it just wasn't filled in?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 142

1            MR. WOODRUFF:  Objection.

2      A.   I can answer that question.  I've read the

3 documents.  I saw what Stacy was doing.  So even if

4 there was a line, what you say that says start time,

5 there was a date that was placed instead of start

6 time.  But not the start time for class.  It wasn't

7 listed on the class roll.

8      Q.   (Mr. Sparks)  I understand you to say that

9 it has been filled out improperly.  But I want to be

10 clear, because this is why we're asking these

11 questions.  I understood you for several moments here

12 now to say the form was altered to remove this

13 category.  But now you're telling me the word was

14 there, the line was there, it just was a date, not a

15 time.

16      A.   If you put side by side the class roll that

17 Southern Motion did against any other class roll,

18 let's say the company that I managed that they used,

19 you will see the difference.  And I'm telling you the

20 difference was either the time line was not there at

21 all or if there was, instead of start time and end

22 time, it was only the date.  But there was a change

23 in that class roll.  And I can -- if I have documents

24 I'll be happy to show it to you.

25      Q.   Okay.  And I'm just wanting to make sure

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 143

1   I'm clear.  Because the start time and end time,

2   that's what the blank could say and someone could put

3   the wrong information in there, in other words, a

4   date instead of an hour, minute.

5        A.   All other class rolls had both.  It had

6   date and then start time and end time.  Southern

7   Motion didn't.  They were missing some lines.  That's

8   why you -- no one knew if it started at 6:00 a.m. or

9   12:00 p.m.  No one knew.

10       Q.   So as a project manager, does the company

11  return these types of paperwork, the class rolls,

12  directly to you or to the college?

13       A.   Both.  Sometimes they would be mailed to

14  the college and sometimes a project manager would

15  make a trip and collect the documents and then bring

16  them.

17       Q.   Didn't a project manager have a duty under

18  the policies and procedures to monitor ten percent of

19  their projects?

20       A.   Absolutely, yes.

21       Q.   But, to your knowledge, the three project

22  managers you mentioned never caught this issue you're

23  explaining about Southern Motion?

24       A.   I didn't say they didn't catch it.  They

25  allowed for that to continue.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 144

1    Q.   Well, did you share this information when

2  an -- you know, as I understood you to say, that Liz

3  Owings, was she the project manager first in sequence

4  that you're describing?

5    A.   She was.  And I did speak to her.  And she

6  said she felt under pressure because she didn't have

7  a large money reimbursement project and she felt that

8  her job was in jeopardy.

9    Q.   Okay.  And then Jason Spradlin was next; is

10  that correct?

11    A.   Was next, correct.

12    Q.   Did you mention it to Jason when he came

13  along?

14    A.   No.  He actually, to my best knowledge, was

15  a project manager for a very short period of time.

16  Because when he transitioned, he was drafted for

17  about nine months and Waters became the project

18  manager.

19    Q.   Did you report this to her?

20    A.   No, I did not.

21    Q.   To Waters.  But you would have been the

22  senior project manager based on this turnover; is

23  that correct?

24    A.   I was the project manager with the most

25  experience who was told that I was too much by the

1   book and somebody like me was fired at Florida State.

2      Q.  Well, I'm more concerned with your project

3   manager that comes in.  There was a lot of discussion

4   about teamwork and performance improvement plans.  I

5   don't want to make an assumption.  I'll ask the

6   question.  When a new project manager came on board,

7   did you attempt to assist them, being that you had

8   the experience?

9      A.  I did not manage Southern Motion.  When

10   Emily Lawrence asked me a question, I agreed with her

11   that that is not compliant.  And when I saw Stacy

12   Loden completing documents, I'm the person who told

13   her I advise you not to do so.

14      Q.  And I appreciate that information, but I'm

15   going to re-ask my question.  As the senior project

16   manager to Liz Owings -- did you have more experience

17   than Liz Owings?

18           MR. WOODRUFF:  Objection.  I've never

19   seen senior project manager.

20           MR. SPARKS:  In time, I think

21   that's -- had you been there longer than Liz Owings?

22           MR. WOODRUFF:  Well, that -- you just

23   made up the senior.  I've never seen a document that

24   said she was a senior project manager.

25      Q.  (Mr. Sparks)  I'm not referring to you as a

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 146

1   titled person.

2              MR. WOODRUFF:  You mean senior as far

3   as time?

4       Q.   (Mr. Sparks)  As the longest tenured

5   project manager.

6              MR. WOODRUFF:  Okay.  That's better.

7       Q.   (Mr. Sparks)  As the longest tenured

8   project manager, when Liz came on board did you try

9   to show her the ropes or help her?

10      A.   Yes, I did.

11      Q.   And did you do the same for Jason Spradlin?

12      A.   He was there for a very short period of

13  time.

14      Q.   But did you try to assist him?

15      A.   On certain projects I did, but I cannot

16  remember if we had a discussion about Southern

17  Motion.  But I actually did.  On certain projects he

18  had questions and I answered.  Yes.

19      Q.   Getting to your tenure.  I heard earlier

20  you described your training.  When you moved from --

21  or, excuse me, your work experience.  When you moved

22  from a dorm monitor or dorm related person to the

23  projected manager, who promoted you?

24              MR. WOODRUFF: Objection.  That

25  misstates facts.  She did both for a long period of

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 147

1    time.

2        Q.   (Mr. Sparks)  Who approached you to add the

3    workforce work that you did when you were dorm

4    manager?

5        A.   I think there was a misunderstanding.  When

6    I was a dorm manager I also had a position in WIA at

7    the same time.  So I was already in the division of

8    what was economic development.

9        Q.   I believe I recall when you testified, and

10   you correct me if I misheard you, you came in

11   originally as a dorm employee?

12       A.   Uh-huh (Indicating yes).

13       Q.   And then you also taught some classes based

14   on the linguistics language; is that correct?

15       A.   Correct.

16       Q.   And then at some point you went in to -- is

17   it WOIA or WIA?

18       A.   Now it's WOIA.  At that time it was WIA.

19       Q.   And you worked there how long?

20       A.   A year.

21       Q.   Who was your immediate supervisor?

22       A.   I don't -- I remember -- I don't remember.

23       Q.   Who was over the division or who was over

24   WIA?

25       A.   I remember James Williams was the vice

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 148

1    president, and I remember Andrew Hughes.  Maybe it

2    was Meredith, Meredith Byars.

3        Q.   And you explained earlier that WIA was a

4    federal program that dealt with, I believe you said

5    OJT.  You meant on-the-job training?

6        A.   On-the-job training.  Correct.

7        Q.   And is that program different from the

8    project manager programs where you were paying a

9    trainer?

10       A.   It is different.

11       Q.   Okay.  OJT, you're actually paying the

12   employees' time.

13       A.   Participants, right.  Participants.  Not

14   for the trainer, but for people who are enrolled as

15   students or trainees.

16       Q.   Now, as you worked with WIA, do you recall

17   who -- was your next move into project manager?

18       A.    I remember there was a position because

19   there were a couple of people that left because of

20   their retirement.  And, yes, there was a way for

21   people to move around.  So, yes.

22       Q.   And who was -- you mentioned James

23   Williams.  Is that the -- you said vice president.

24   Is the dean of workforce and vice president, is that

25   the same person?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 149

1      A.   We didn't have the dean at that time, so I
2  was reporting -- so when I came to workforce
3  development training, I was reporting to Andrew
4  Hughes.
5      Q.   And that's when you became --
6      A.   I became dislocated program coordinator and
7  then Andrew Hughes moved me into project manager.
8      Q.   Okay.  Did you have multiple projects or
9  did you kind of start from scratch?
10     A.   Started with small projects.  So even when
11 I was a dislocated program coordinator, I was given a
12 few smaller projects and then gradually, gradually
13 transitioned.  And they did tell me that if there is
14 a position open, if I learned how to manage those
15 projects, I will get a chance.
16     Q.   So you served on some projects before you
17 were hired as the project manager position?
18     A.   That's correct.
19     Q.   And when were you hired into that full
20 project manager position?
21     A.   So it was around 2005.
22     Q.   And when you were hired into that
23 full-time -- or that full role as project manager,
24 who was the director or the dean, whatever the proper
25 terminology at the time was, over workforce?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 150

1      A.   It was Andrew Hughes and then it was Denise

2  Gillespie.

3      Q.   And who was the president of the college?

4      A.   I had two -- three presidents -- four.  Dr.

5  Cole, then Mike Eaton and then Dr. Allen.

6      Q.   Dr. Cole was president when you started the

7  full workforce project manager?

8      A.   I started working on project around 2005.

9  So, yes, he was the president.

10     Q.   In the communication you referenced a

11 letter that you had written several times.  Is this

12 the September dated letter that went to the state

13 auditor's office?

14     A.   That's the only letter I've written to the

15 state auditor.  And, of course, other staff members,

16 ICC staff members were cc'd or included as recipients

17 on that letter, such as TZ Waters, Joe Lowder, Tim

18 Senter and Jay Allen.

19     Q.   Okay.  And as far as the state auditor's

20 office, had you ever communicated with them prior to

21 September 2019?

22     A.   I don't believe so.

23     Q.   What about after 2019, have you

24 communicated with individuals in the state auditor's

25 office?

1  A.  After I wrote the letter?

2  Q.  Yes.

3  A.  Yes, I communicated with them.

4  Q.  And earlier you mentioned somebody Joel and

5  a Tim Powell.

6  A.  Correct.

7  Q.  Is that the only two people --

8  A.  The only two I spoke with.

9  Q.  Did you ever e-mail or -- did you ever

10  e-mail them?

11  A.  When they asked me to I did.

12  Q.  So there are some e-mails between

13  Mr. Powell and yourself?

14  A.  Yes.

15  Q.  And would those be from your personal

16  e-mail account or from your work e-mail account?

17  A.  I don't remember 100 percent, and I believe

18  I used my work e-mail and my personal e-mail.

19  Q.  Did you e-mail with Mr. Joel?

20  A.  If I did, I don't remember right now.

21  Q.  What about text messages?

22  A.  Yes, I had text messages.

23  Q.  With both?  With both Mr. Joel and

24  Mr. Powell?

25  A.  Again, I don't remember, but I think -- I

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 152

1    remember Mr. Powell for sure.  But I don't
2    remember --
3          Q.   What was your most recent communication
4    with Mr. Powell?
5          A.   It was about a year ago.
6          Q.   Any phone calls with Mr. Powell or
7    Mr. Joel?
8          A.   Yes, I did.
9          Q.   Approximately how many of those?
10         A.   Very few.
11         Q.   Less than five?
12               MR. WOODRUFF:  Are you talking about
13    together between the two?
14         Q.   (Mr. Sparks)  I'll let you tell me each
15    one.  How many approximately calls with Mr. Powell
16    and how many with Mr. Joel?
17         A.   Maybe five.
18         Q.   Each?
19         A.   Total.
20         Q.   What about e-mails?
21         A.   Same.  Maybe five.  But it is to my best
22    memory.
23         Q.   I'm not holding you to a specific.
24         A.   I believe all this information is provided
25    too.  So --

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 153

1      Q.   What about MCCB, did you communicate

2 directly with the monitoring personnel at MCCB in

3 your role as a project manager prior to 2019?

4      A.   Did I communicate about the audit and

5 documentation before 2019 with MCCB auditors?

6      Q.   Auditors, monitors, whatever.

7      A.   What's required for the audit, did I have

8 those conversations, right, that's what you want to

9 know?

10     Q.   Right.

11     A.   Yes, I did.

12     Q.   Okay.  So you spoke directly with MCCB

13 personnel when you had a question about compliance?

14     A.   Not when I had a question.  I knew the

15 answers to the questions.  I spoke to them when they

16 came to review the files and when they wanted to

17 monitor if we were compliant with policies.  That's

18 when I had conversations with them.

19     Q.   Okay.  So outside of the scheduled

20 monitoring, you didn't communicate with MCCB

21 personnel?

22     A.   Unless it was a meeting where every project

23 manager in the state was invited and we had a

24 discussion of how to improve our process and if we

25 had any question about compliance.  So we had open

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 154

1  communication with them during those meetings.

2      Q.    What about after the September 2019 letter,

3  did you have occasion to text message MCCB personnel?

4      A.    No, I didn't.

5      Q.    So no texts with anybody at MCCB after

6  September of 2019?

7      A.    That is correct.

8      Q.    Any phone calls?

9      A.    No.

10     Q.    E-mails?

11     A.    No.  I want to make sure.  I think there

12  was a question about one of my projects, but it was

13  not related to, you know, misappropriation or not

14  being compliant.  It was just a specific question

15  because we were trying to do a new program for a

16  company, so we communicated about that.

17     Q.    Okay.  In the discovery there was one issue

18  that you had raised about a payment approximately

19  $80,000 that was made that you appeared to be upset

20  about that payment because it had not been entered

21  into the system.  Do you recall?

22     A.    Right.  It was a reimbursement that was

23  issued.

24     Q.    Sorry.

25     A.    I believe to Ashley Furniture.  And the

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 155

1    reimbursement was issued six months before I

2    discovered that the data was not entered into the

3    system.  Now, I want to make sure that everybody here

4    understands that we had a policy in place and it was

5    our process where the documents travel from the

6    project manager to the data specialist, to the

7    accountability specialist.  We had a training log --

8    I mean, trucking log where every person had to date

9    and sign after they completed their job with that

10   stack of documents.  So the training log was signed

11   but it was keyed and it was verified, but it was not

12   keyed.  Which means the college drew $80,000 from the

13   state and issued it to the company and signed by a

14   staff member that the information was keyed, but the

15   information was not keyed.  So I was very concerned.

16        Q.   Were you -- was that your client?

17        A.   Yes.

18        Q.   Okay.  And you said it was Ashley?

19        A.   Yes.

20        Q.   So --

21        A.   I believe it was Ashley.  I want to make

22   sure.  Because I think a similar thing happened to

23   Cooper Tire too.

24        Q.   In a situation like that you're the project

25   manager, do you ever help key in information?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 156

1    A.   When I was asked, yes.  And as a matter of
2    fact, I came many times during Christmas break and
3    spring break when no one else was in the office and I
4    helped.
5         Q.   And what system are you keying into?
6         A.   So there was a change.  Initially when I
7    started my job we used GCR system, which is a state
8    subgrant system.  And the system didn't have every
9    detail about a class.  So at first we used -- not
10   Excel, but Access system internally.  Later we
11   developed what's called Pro Assessment system.  So
12   Pro Assessment system was specifically designed to go
13   through every step of the policy for the training log
14   to be keyed, verified and then later the information
15   with training amount, reimbursement amount, was keyed
16   into GCR.  And, finally, we had what's called WESS
17   system, which WESS system basically duplicated Pro
18   Assessment system.  So it had all information about
19   the class, the trainer, the start time, end time,
20   dates and hourly rate for training.
21        Q.   So the WESS system, I think you had said
22   earlier to Mr. Griffith, that's an MCCB system,
23   that's how MCCB monitors.  Do you recall saying that?
24        A.   Correct.
25        Q.   And Pro Assessment was something internal

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1　to Itawamba?

2　　　A.　It's actually used by four other colleges.

3　Yeah, in a consortium.

4　　　Q.　Which of those two -- are you saying that

5　the Pro Assessment was not keyed in before this

6　payment was made?

7　　　A.　Right.　This information was not keyed in

8　to Pro Assessment.　But it was signed as if it was

9　keyed.

10　　　Q.　So that -- is that a violation of the law?

11　　　A.　It is.　So here is what potentially can

12　happen.　So we are, as project managers, you know, as

13　the department of workforce development and training.

14　The policy says very strict.　So if you draw money

15　from the state, you are accountable to provide and

16　verify the following information.　And the

17　information is that every person that is enrolled in

18　class has to provide their demographics.　So

19　basically we have to verify that these are the

20　people, they are residents of Mississippi, because

21　this is Mississippi taxpayers' money.　So they are

22　residents of Mississippi, and they have to provide

23　their personal demographic information.　And we have

24　to verify that we have the minimum number of people

25　enrolled in this class before we can ask for

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 158

1    reimbursement.

2        Q.   But is it a requirement to have it entered

3    into Pro Assessment before a college can ask for

4    reimbursement?

5        A.   It's a requirement that we provide

6    accountability that we check, yes.  It's a

7    requirement that we provide data backup, yes.

8        Q.   But is it a requirement that it's entered

9    into Pro Assessment?

10       A.   When the auditors come to do MCCB audit,

11   they check two things.  They want to see

12   documentation and they want to see Pro Assessment.

13   It's required by the auditors.  That's the two things

14   that's checked and verified.

15       Q.   So the auditor looks at -- even though the

16   information is in WESS, they want to see it?

17       A.   No.  When this happened we didn't have

18   WESS.

19       Q.   Okay.

20       A.   WESS was not in place.

21       Q.   Okay.

22       A.   When the $80,000 happened it was when we

23   had GCR.  That's why we had to enter this information

24   in Pro Assessment.  That's before the WESS system.

25   After the WESS system came on board, there was no way

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 159

1   you could ask for $80,000 unless you put every

2   participant in WESS.

3       Q.   What did the ten colleges that don't have

4   Pro Assessment, what do they do?

5       A.   They have similar -- Pro Assessment is

6   something that we internally -- the name for the

7   system that we internally just voted on, but other

8   colleges have a very similar system.  The name may be

9   different, but the system is very much the same.

10      Q.   Do you have any belief that that training

11  did not occur?

12      A.   Which training?

13      Q.   The $80,000 worth of training at Ashley?

14      A.   It's not about training.  It's about -- if

15  we didn't have enough students in class, we are not

16  allowed to ask for reimbursement.  And when I say not

17  students, even if on paper you see that there are ten

18  people in class but you only have three participant

19  registration forms, you are not allowed to ask for

20  state reimbursements for this class.  That's the

21  issue.

22      Q.   Did you have any belief that the training

23  did not occur?

24      A.   I didn't question if the training occurred

25  or not.  I questioned the fact that we asked for

1    state reimbursement for $80,000 and didn't check if

2    we were qualified to ask for reimbursement.

3         Q.    And I understand that you're troubled by

4    that.  But you have no doubt that the training

5    actually occurred, it was just a failure to enter

6    data?

7         A.    No.  It was a failure to ensure that this

8    training was eligible for state reimbursement.

9         Q.    But you would --

10        A.    The training may have taken place.  We're

11   not questioning that.  But we just paid for this

12   training using workforce enhancement state dollars.

13   That's the problem.  You can only ask for money for

14   reimbursement if you provide all steps of

15   accountability that's required by the policy, and we

16   didn't do it.

17        Q.    But ultimately the documentation was

18   entered, correct?

19        A.    After the fact, yes.

20        Q.    And, to your knowledge, the college didn't

21   have to pay that $80,000 back?

22        A.    That was my project and we did not have to

23   pay $80,000 back.

24        Q.    Now, you mentioned when you were discussing

25   that with Mr. Griffith that Emily Lawrence had

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 161

1    documents on a shared file and that's how you

2    recognized that.  Did I hear you correctly when you

3    said that?

4         A.   All projects -- all files were stored on a

5    shared drive.  And all project managers had to save

6    their files on shared drive.

7         Q.   So who all had asked -- access, excuse me,

8    to the shared files?

9         A.   Everyone in the department.

10        Q.   As far as Ms. Lawrence, have you talked

11   with her about the allegations in your Complaint?

12             MR. WOODRUFF:  Are you talking about

13   after she was fired?  Before she was fired?  Any time

14   while it was going on?  I'm just asking, what time

15   period are you talking about?

16             MR. SPARKS:  Well, I'll let her answer

17   the first question first.

18        Q.   (Mr. Sparks)  Have you had any contact,

19   conversation with Ms. Lawrence about the subject

20   matter of your allegations?

21        A.   After I filed the letter or before I filed

22   the letter?

23        Q.   Either.

24        A.   No.  As I mentioned, there was a

25   conversation about Southern Motion that Emily said

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 162

1   she refused to key it, and she did say I believe it's

2   fraudulent and I don't want my hands on it.  And she

3   expressed it to TZ Waters and TZ Waters said it's

4   fine, Stacy Loden will key it.  So there was a

5   conversation with her.

6          Q.   Okay.  But have you discussed the subject

7   matter of your allegations other than that with Ms.

8   Lawrence?

9          A.   There was a conversation about Chapter 3,

10  yes.  But I spoke about Chapter 3 not just with Emily

11  Lawrence, also Stacy Loden spoke to me about that.

12  And Stacy Loden is the one who saw after she was on

13  the job for two or three weeks that the same trainees

14  were enrolled in multiple classes at the same time.

15         Q.   Who saw that?

16         A.   Stacy Loden.

17         Q.   And did Stacy Loden find something with

18  Chapter 3 as well?  Are you aware of anything that

19  she found?

20         A.   As I just mentioned, yes.  Stacy Loden was

21  on the job for two or three weeks when she said that

22  she actually memorized not just people's names but

23  their Social Security numbers, because they are the

24  same people in every class.  That's what she said to

25  me.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 163

1     Q.    Did she report that, the issue with Chapter

2   3?

3     A.    I believe she did to TZ Waters.

4     Q.    And did you understand that there was a

5   resolution reached with MCCB on that issue?

6     A.    Let me explain.  The answer is no.  And

7   here is why.  Chapter 3, as I mentioned, had the same

8   people in multiple classes at the same time.  When

9   Stacy realized that this happened, of course, she

10  spoke to TZ Waters.  And the decision was, and I'm

11  gathering this information from Emily and from Stacy,

12  to remove every other class.  So if someone is listed

13  in two classes, keep the class with the most amount

14  of money and remove the other one with the least

15  amount of money.  Try to salvage as much money as

16  possible in this project.  Now, this happened in the

17  spring of 2019.  Before this happened, Chapter 3,

18  which is 150 people -- that's total.  That's not the

19  people that come to work every day.  That's total.

20  And the turnover rate in the furniture company is

21  close to 40 percent.  So by that time, by the fall --

22  by the spring of 2019, Chapter 3 received over

23  300,000.  Now, for the previous year, for 2018,

24  Chapter 3 received over 400,000.  Four hundred

25  thousand.  One of the things that they turned in was

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 164

1  called managerial training.  I've been a project

2  manager for 17 years.  I never in my life have seen

3  something that's called managerial training.  And if

4  I did, I would probably ask a question what this was.

5  Because a project manager also had to go inside and

6  monitor all training activities just so you

7  understand what we are reimbursing the company for.

8  I will make a strong statement that this training was

9  never monitored.  And when the issue was reported to

10  MCCB for 2019, only half of those classes were

11  reported and no one reported the same issue for 2018.

12      Q.   Who was the project manager for Chapter 3?

13      A.   At that time it was TZ Waters.

14      Q.   As far as your employment -- as far as the

15  salvage side, you provided some documentation that

16  dealt with your salary over the years.  Were you at

17  one time during your employment a part of the Step

18  faculty raise or payment system at ICC?

19      A.   Yes, I was.

20      Q.   Can you explain what that means?

21      A.   So, years ago every employee -- that's to

22  my -- that's to my best knowledge, depending on the

23  level job you were performing, was qualified for the

24  Step Program, which you would receive an increase for

25  your salary based on your years of experience.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 165

1      Q.   Okay.  And was it for faculty?

2      A.   It wasn't just for faculty, because there

3  are multiple staff members that worked with me in the

4  same department that were also part of the Step

5  Program.  And I know other staff members who worked

6  with different department and they're just staff,

7  professional staff, but they also were on that Step

8  Program.

9      Q.   Who signed the contract that put you on the

10 Step Program?

11     A.   I believe it was Denise Gillespie, because

12 I was already a program manager.

13     Q.   And did you ultimately get removed from the

14 Step faculty compensation program?

15     A.   The decision was made when Mike Eaton

16 became the president that we will keep our salaries

17 but we will no longer receive another step.  Yes.

18     Q.   Did they give you an explanation that this

19 was supposed to be for faculty even though

20 non-faculty people had received these step increases

21 over the years?

22     A.   I really don't remember at this time if

23 there was an explanation.  But there was a letter

24 that I think probably had the details describing why

25 this was done.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 166

1        Q.   Dr. Lowder's appearance at Itawamba

2  Community College, he arrived in the position of

3  director of the workforce; is that correct?

4        A.   That is correct.

5        Q.   Did you know Dr. Lowder before he arrived?

6        A.   I did know him before he arrived.

7        Q.   Did you recommend him for the job?

8        A.   I asked to consider him for a job, yes.

9        Q.   Who did you ask?

10       A.   I believe I mentioned it to Mike Eaton and

11  Dr. Cole.

12       Q.   Was Mike Eaton the president at the time?

13       A.   Yes.

14       Q.   So what was Dr. Cole's role?

15       A.   I think he was the interim at that time.

16       Q.   Okay.  Did -- ultimately did that director

17  of workforce position become available while you were

18  still employed at ICC?

19       A.   Yes, it did.

20       Q.   Did you apply for that position?

21       A.   Yes, I did.

22       Q.   What year was that?

23       A.   It was August -- maybe August, maybe July

24  of 2018.

25       Q.   Were you ultimately selected for that role?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 167

1      A.   When I applied for this job I already knew

2   I was not going to be selected.  Joe Lowder told me

3   in our conversation it would not be me, because based

4   on his conversation with Dr. Allen, Dr. Allen wanted

5   someone with industry experience in that role.  So

6   when I applied for this job I knew I was not going to

7   be selected for that position.

8      Q.   Okay.  If you know -- if you don't just

9   tell me you don't know.  Who ultimately makes that

10  decision?  Is it Dr. Lowder or is it a board?

11     A.   So the committee had five members.  So I

12  understand the committee makes a recommendation and

13  then Dr. Lowder makes that decision.

14     Q.   Okay.

15     A.   And I can actually explain more about me

16  applying for that position.  Because, so I knew I was

17  not going to be selected and Joe Lowder also

18  explained to me that I would not make any more money,

19  there was no reason to me to apply for that job.

20     Q.   Was there a reason you weren't going to

21  make any more money?

22     A.   I cannot answer that question.  He said

23  that I would not be making more money than I was

24  already making.

25     Q.   Was it ever discussed with you that due to

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1  you being on the Step increase program you had

2  actually exceeded salaries of other comparable people

3  in the department?

4      A.   I don't know if I exceeded.  I don't know

5  that.  I don't have that information.  I don't know

6  if I exceeded the amount.

7      Q.   When you took on the role of MEP that you

8  described earlier, did you have a discussion with Dr.

9  Lowder that that would help justify your salary?

10     A.   He told me if -- initially when he

11  mentioned to me about taking MEP position, that I

12  need to be on the director's level for me to justify

13  my salary.  So I need to combine two roles, being a

14  project manager doing my load, normal load, plus

15  become an MEP director.  But he then never gave me

16  the title.

17     Q.   Okay.  At that period of time, if you

18  know -- if you don't that's okay.  Do you know if

19  funding was cut for the workforce department at ICC?

20     A.   Funding was never cut for the workforce

21  department at ICC.

22     Q.   General funding for the college, was it

23  reduced?

24     A.   Workforce development and training

25  department is fully funded by workforce enhancement

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 169

1  training funds.  Each college receive about $450,000

2  a year.  That's how the salaries are divided.  Plus

3  we had another 100,000 for the MEP center, because we

4  were one of the five centers.  Plus we had from time

5  to time up to three, then two, trainers that were

6  fully funded by the consortium project, which is

7  another funding source.  Stacy Loden's salary was

8  100 percent funded by MCCB.

9       Q.   And you know this how?

10      A.   It was common knowledge.  And I was

11  included as -- being part of MEP center, we had to

12  provide broken budgets of every state dollar that

13  paid for us, because we used that information to show

14  how many people we had on a team, who was the

15  trainer, what kind of services were provided.  So

16  that's how this information was shared for the MEP

17  project.

18      Q.   But the MEP project is different than the

19  consortium, correct?

20      A.   Correct.

21      Q.   But you knew her salary but you didn't know

22  if you were the highest paid project manager?

23      A.   Whose salary when you say her salary.

24      Q.   You referenced -- just who you were

25  referencing.  Ms. Loden?  Who did you just reference?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 170

1      A.   I wrote the project for her.  I'm the one

2  who actually wrote the project to ask -- actually, at

3  that time, from year to year sometimes it covered the

4  county accountability specialist salary and the data

5  specialist, such as Emily Lawrence.  So sometimes we

6  received funding for two positions.  It just depends

7  from year to year.

8      Q.   So funding does change?

9      A.   But we never lost funding.  The question

10 was did you lose -- did you receive any cuts for your

11 department and I said no.

12     Q.   Okay.

13     A.   We never received a cut.  We received

14 sometimes an extra source.  Like, for example, for an

15 additional trainer or for an additional staff member.

16     Q.   So variations?

17     A.   Variations.

18     Q.   Are you privy to the overall financial

19 situation of the office of workforce at ICC?  Did it

20 operate at a profit or loss, if you know?

21          MR. WOODRUFF:  You're talking about

22 when she was there?

23          MR. SPARKS:  Yes.

24     Q.   (Mr. Sparks)  Let's just say in the years

25 '15 to '19.  Do you know if it operated as a profit

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 171

1   center or if it lost money each year?

2       A.   I've never heard we lost money.  As a

3   matter of fact, it was always communicated to us that

4   we have solid funding.

5       Q.   And understand, solid funding doesn't mean

6   that it operates at a profit.  If you don't know,

7   that's okay.  But do you know if the office of

8   workforce operated at a net profit or loss?

9       A.   As the MEP coordinator, I had information

10  about everyone's salary in the department.  Everyone.

11      Q.   In the entire department?

12      A.   In the workforce development training

13  department.  And I do have an accounting degree.  And

14  I did provide financial statements for MEP center and

15  never it showed that they were at a loss.

16      Q.   If you have access to every salary, you

17  still don't know if you were the highest paid project

18  manager?

19      A.   I thought you said if you were the highest

20  paid person in the division.  I was the highest -- I

21  was not the highest project manager in history

22  because we had others, like Lee Oswalt.  I have no

23  idea what she was making.  She was a project manager

24  and she wasn't in the Step program.

25      Q.   Well, the line of questions -- and I

Page 172

1   apologize if you didn't understand it.  But,

2   obviously, I had walked up to the point that you had

3   been removed from the Step program and that you had

4   been -- discussed this MEP obligation.  And I asked

5   you directly if Dr. Lowder had addressed that that's

6   how you could justify your salary.  And in that line

7   of questioning I asked you were you the highest paid

8   project manager at that time.  You said you didn't

9   know.  Do you know now?

10       A.   I will correct my answer.  At that time I

11  was the highest paid project manager, but I was not

12  the highest paid staff member in the division that

13  also had the staff salary increasement(phonetic) for

14  the years.

15       Q.   Okay.  As it relates to the billing for a

16  project, when you go in and with a particular

17  business you're offering them training, how did you

18  know what to quote them on a price?

19       A.   That's a good question.  I would like to

20  explain it to you.  So the quote was always in our

21  departmental book.  It was attached.  And as we just

22  previously discussed, the training had multiple

23  budget lines.  There is a salary line, there is a

24  line for supplies and books, possible travel and

25  things like that.  So the quote that we had always

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 173

1    used before Lowder and Waters changed the way the

2    quote looks had a training column with a cost for the

3    salary, books, software, possible travel, and there

4    was another column showing the reimbursement from the

5    state.  And then it had a section that was called

6    company share.  Just like it's in the policy.  And it

7    showed the difference.  So after Lowder became the

8    director, I believe it was about 2017, when he made a

9    decision to remove the section that showed state

10   reimbursement.  And as a matter of fact, he said that

11   we should not be discussing what the state is

12   reimbursing for this class.  And our job was to

13   determine what the training budget for every company

14   was and then base the decision on cost regarding, you

15   know, how much money they have dedicated for that.

16        Q.   So it's safe to say as a project manager,

17   if I understood your response, you were tasked with

18   kind of trying to figure out what the market would

19   bear, what they could bear in the market and you

20   would price accordingly.  Is that --

21        A.   Basically, yes.  It was based on the

22   information what we thought the company could afford.

23        Q.   And you don't care for that model?

24        A.   What I don't care, that sometimes multiple

25   companies participated in the same class.  But they

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1   have students in the same class at the same time and
2   they were billed different amounts.
3       Q.   But is that your decision to make or is
4   that the director's decision to make?
5       A.   We charged different amount of money for
6   the same class to different participants.  We were
7   not allowed to discuss what was reimbursed by the
8   state.
9       Q.   But is that your decision or is it the
10  decision of people who you report to to change --
11      A.   And they did.  They made that decision.
12              MR. WOODRUFF:  Let him finish.  He's
13  in the middle of his sentence.
14              THE WITNESS:  Okay.  Go ahead.
15      Q.   (Mr. Sparks)  To change the model you've
16  been working with.
17      A.   They made that decision and they changed.
18      Q.   But it's their authority to do that,
19  correct?
20      A.   It is their authority.
21      Q.   And if you don't particularly like it,
22  that's your choice.  But you carried that out; is
23  that fair?
24      A.   I addressed the issue that I felt that it
25  was unethical.  And I can explain why it was

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 175

1    unethical.  Because in our five-county district, the

2    turnover, as I mentioned, is pretty high.  So very

3    often I will have one HR manager working for Ashley

4    Furniture today and then working for Hunter Douglas

5    next week.  This information was shared with them.

6    So I felt it could complicate our relationship with

7    companies when they find out that we actually are

8    charging them different amounts for the training that

9    happened.

10        Q.   And there could be other reasons that

11   training costs are different in the sense of volume,

12   potential discounts or things of that nature?

13        A.   So one day the theory was like that.  Well,

14   they only want this class one time, we can give them

15   a discount.  Next time it was, no, they want lots of

16   classes so we need to charge them more because they

17   will utilize our trainer.  The training would be

18   available to others.  The next day it was, well,

19   we're doing a lot of training for this company.  We

20   need to give them a discount.  There was no system in

21   place.  It was just whatever they felt.  When I say

22   they, Waters or Lowder felt like to do with quote.

23        Q.   But it was part of their job description to

24   set the budget for the department and to set pricing

25   structures as they saw fit?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1       A.    But it was against the policy.

2       Q.    Well --

3       A.    To charge without actually showing what the

4  training cost was.  It was based on commercial

5  pricing versus what the cost for training was.

6       Q.    It was factoring in market pricing, was it

7  not?

8       A.    It was based on marketing pricing.  For

9  example, Ashley Furniture asked for industrial

10  maintenance training and we as the department gave

11  them a quote based on commercial pricing.  Ashley

12  Furniture is our number one customer.  Very important

13  to us.  Ashley Furniture went to Northeast Community

14  College and received this training for free.  Free.

15       Q.    And I appreciate that that seems to be an

16  issue for you.  But being against the law or a

17  decision you don't think is prudent are two different

18  things.

19       A.    Our mission was to provide training.  As

20  workforce development training department, to provide

21  training to our customers.  We lost Ashley Furniture

22  when it came to industrial maintenance training.

23       Q.    And whose client was that?

24       A.    It was mine.  And I was very upset about

25  it.

Page 177

```
 1        Q.   Who is the number one -- during '15 to '19,

 2   who was the number one receiver of funds through wet

 3   funds?

 4        A.   2018, '19, number one as far as the

 5   company?

 6        Q.   As far as reimbursements?

 7        A.   As far as reimbursement.  I can't tell you

 8   year to year.  So I know in the past -- I'm just

 9   going to say in the past, Southern Motion was the

10   leader.  Ashley Furniture was somewhere in the

11   middle.  United Furniture, since they had six plants

12   in five county districts, more than any other

13   facility, they received more money because they had

14   five locations within the district.  Max Home.  Of

15   course, you know about Chapter 3.  They received a

16   lot of money.

17        Q.   Is United your client?

18        A.   United is my client.

19        Q.   Okay.  Max Home?

20        A.   My client.

21        Q.   And you said Southern Motion was not?

22        A.   Southern Motion was not.

23        Q.   Okay.  And we've talked a lot about this,

24   but I'm going to ask you kind of a direct question as

25   it relates to Southern Motion.  Did Southern Motion's
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 178

1  reimbursements go up in total volume after Dr. Lowder

2  arrived?

3      A.  I can't say right now.  I'd have to look.

4      Q.  Well, I mean, you've made several

5  allegations in your Complaint that the form was

6  amended and that all this tomfoolery was going on.

7  But you don't know if when Dr. Lowder arrived

8  Southern Motion's total reimbursements climbed or

9  decreased?

10     A.  I know Southern Motion reimbursement was

11 close to 400,000 one year when Joe Lowder came on

12 board.  So it was somewhere in that.  Yes, somewhere

13 in that.

14     Q.  But if Southern Motion's reimbursements

15 decreased after Dr. Lowder came on board, it would

16 kind of be peculiar, based on all your allegations,

17 about forms being changed to benefit Southern Motion

18 and to flow more money to them, correct?

19     A.  So are you saying that even though they did

20 not provide the information that was required for

21 reimbursement, they decreased the amount of

22 reimbursement, it was fine for them not to be

23 compliant is what I understand?

24     Q.  No, that's not what I said.  I'll try to

25 re-ask my question.  You've made all these

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 179

1  allegations about favorable treatment to Southern

2  Motion.  You've brought up issues with other

3  companies that you thought were unfavorable.

4       A.   Okay.

5       Q.   But as it relates to Southern Motion, would

6  it not stand to reason that if the intent of the

7  policy, I believe was your word, to increase

8  reimbursements to Southern Motion, if they didn't

9  actually go up, that would be counterintuitive, would

10  it not?

11      A.   Southern Motion, before Joe Lowder came on

12  board, because there was multiple complaints from

13  employees that they were being forced to sign

14  training logs for training that they didn't receive,

15  they stopped doing reimbursement.  So if you look at

16  the record, there's going to be a gap.  They stopped

17  submitting documents.  And when Joe Lowder allowed

18  for the training logs not to ask for specific

19  information when this training actually took place,

20  such as start time and end time, Southern Motion

21  began receiving reimbursements.

22      Q.   So Southern Motion's reimbursements would

23  have increased?

24      A.   It was a gap.  There was no reimbursements

25  at some point until the training documentation was

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    altered.  The summary sheet was changed.  The

2    requirements for the records were changed for

3    Southern Motion.

4         Q.   And you said that happened in February of

5    '16?

6         A.   Yes.  That was the conversation that I know

7    about Joe Lowder and Liz Owings visited the company

8    and that's when the conversation took place.  And

9    they talked about it in front of me and that's when I

10   said that this is wrong.  This is very wrong.  And I

11   actually told Joe Lowder that my job is to protect

12   you because you're my director, and I want you to

13   know that this is not being compliant and we will

14   receive -- there's going to be a payback for this.

15        Q.   So you think Southern Motion's revenues

16   would have increased dramatically after February of

17   '16?

18        A.   I think Southern Motion allowed a second

19   chance to receive reimbursements because they were

20   not getting anything.

21        Q.   If you don't know you can say you don't

22   know.  Did Southern Motion's reimbursements increase

23   under Dr. Lowder?

24        A.   I don't know if it increased.  I don't

25   know.  I know there was a gap, because they were not

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 181

1  sending documents for reimbursement until the logs --

2  the requirements for the class roll was changed.

3      Q.   Okay.  Could you give me the names of

4  employees who were forced to sign documentation?

5      A.   I cannot.

6      Q.   You don't have them or --

7      A.   I don't remember.  I do know that they were

8  from a certain department, that's what the company

9  said, that they were working in shipping and

10 receiving department.  And that information was

11 discussed with us when Waters and I went to visit the

12 company in the fall of 2015.

13     Q.   Who spoke on behalf of the company in that

14 conversation?

15     A.   So I was not a project manager at that time

16 and Waters was not a project manager at that time.

17 She was a trainer.  And now, looking back, I think

18 Liz was either sick -- I don't remember why she was

19 not on that conversation.  Now, Liz had some health

20 issues and I can't remember if she was sick at that

21 time.

22     Q.   I may have not asked that question clearly.

23 You said earlier the company said -- because I asked

24 you what employees and you said I don't know, I don't

25 recall.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 182

1      A.    Uh-huh (Indicating yes).

2      Q.    And then you said the company said.  Who

3  spoke on behalf of the company?  The company can't

4  speak.

5      A.    Oh, I'm sorry.

6      Q.    That's okay.

7      A.    It was Danny McClain for sure.  He was

8  present.  There was a lady and she was a production

9  manager.  I don't remember her name.  It's possible I

10 can look it up, but I don't remember.  But at some

11 point I also remember that Roger Bland was involved

12 in a conversation too.

13     Q.    That last name?

14     A.    Bland.

15            MR. SPARKS:  Can we take a break?

16            MR. WOODRUFF:  Sure.

17            MR. SPARKS:  Thank you.

18            (Recess.)

19     Q.    (Mr. Sparks) We are back on the record.

20 I'll continue if you're ready, Ms. Sherman.

21     A.    Yes.

22     Q.    Earlier you had made a statement, I

23 believe, correct me if I'm wrong, that Dr. Lowder had

24 recommended nonrenewal in your case.  Do you recall

25 making that statement?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 183

1      A.   I said -- I said either Waters or Lowder

2  made that recommendation.  That's what I said, I

3  believe.

4      Q.   So you don't know that Dr. Lowder

5  recommended anything about nonrenewal?

6      A.   He was the dean of the department who had

7  the knowledge of what's going on in the department.

8  After the fact I saw a memo from Waters to release me

9  from my duties.

10      Q.   Do you have a memo from Dr. Lowder?

11      A.   I do not.

12      Q.   So you are drawing a conclusion there or do

13  you have any personal knowledge that Dr. Lowder

14  recommended your nonrenewal?

15      A.   That was my understanding that he was aware

16  that Ms. Waters --

17              MR. WOODRUFF:  Answer his question.

18      A.   Okay.  I'm making a conclusion.

19      Q.   (Mr. Sparks)  Your nonrenewal letter, was

20  that ultimately signed by Dr. Lowder?

21      A.   The memo that I saw was e-mailed to Tim

22  Senter.  That's all I know.

23      Q.   So Dr. Lowder wasn't even on the e-mail

24  thread?

25      A.   He was not, from what the records show.

Page 184

```
1       Q.   And, ultimately, you received a letter, did
2   you not, of nonrenewal?
3       A.   From Dr. Allen.
4       Q.   Did you receive -- was Dr. Lowder included
5   in that letter?
6       A.   He was not.
7                MR. WOODRUFF:  You keep saying
8   nonrenewal.  She was an at-will employee.
9       A.   I was terminated.
10               MR. SPARKS:  Well, and I don't want to
11  debate that.
12               MR. WOODRUFF:  I can show you the
13  documents.
14               MR. SPARKS:  No. No. Well, I'm
15  saying --
16               MR. WOODRUFF:  They took her away from
17  her yearly contract the year before just so they
18  could fire her.
19               MR. SPARKS:  Well, I'll object to that
20  into the record that you just testified.
21               MR. WOODRUFF:  That's was not on the
22  record.  It's in our Complaint.
23               MR. SPARKS:  Yeah.  Well, let's talk
24  about that.
25       A.   He was included in the mail of me going
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 185

1  from the contract employee to become an at-will

2  employee.  He was included in that e-mail.

3       Q.   (Mr. Sparks)  And I don't want to ask you a

4  bunch of legal questions.  But did your contract in

5  prior years have a term?  Did it have a period of

6  time it covered?

7       A.   So that's a good question.  And I talked to

8  the HR people within the college.  Even though we

9  were all, as contract employees, hired for 12 months

10  to not assign a contract for the upcoming year would

11  mean termination.

12            MR. WOODRUFF:  That's nonrenewal.

13       A.   That was how it was explained.

14            MR. SPARKS:  That's what I said.

15            MR. WOODRUFF:  She was not a contract

16  employee when she was terminated.

17            MR. SPARKS:  I never used the word

18  contract.  I said nonrenewal.

19            MR. WOODRUFF:  Nonrenewal is contract.

20       A.   My letter says terminated.  It didn't say

21  nonrenewed.

22       Q.   (Mr. Sparks)  And I don't have it in front

23  of me.  I'm not bickering about it.  I want to go

24  ahead and ask a couple of questions.  You went from a

25  contract -- that contract covered one year of time,

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    each of your contracts.  Do you recall that?

2         A.    Yes.

3         Q.    All right.  So each year you signed a new

4    contract.

5         A.    That's correct.

6         Q.    And then in the final year or two it was

7    changed to a work agreement; is that --

8         A.    At-will employee.  Correct.

9         Q.    Well, did you sign a document each year?

10        A.    When I was a contract employee, I signed a

11   document of intent, which means I didn't plan to move

12   to a different state, I didn't plan to relocate, I

13   planned to remain with the college.  Yes.

14        Q.    But you signed --

15        A.    I signed of a letter of intent.  That's

16   what it's called.

17        Q.    So you signed a written document covering a

18   period of time.  Were the terms of your salary in

19   that letter?

20        A.    No.  I don't believe so.  I don't believe

21   so.  It's just do you plan to remain as an employee

22   or do you plan to not?  And you say yes or no every

23   year.

24        Q.    And you're saying that's what you were --

25   that's what --

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 187

1        A.    It's called a letter of intent.

2               MR. WOODRUFF:  That's where -- yearly

3    employees, they have to send a letter in January or

4    February saying they'd like to be renewed for the

5    next year.  I think that's what she's talking about.

6               THE WITNESS:  It's called a letter of

7    intent.

8               MR. WOODRUFF:  But then eventually

9    they have to decide whether they renew them or not at

10   a certain point in time.

11              MR. SPARKS:  I understand.  I'm just

12   saying --

13              MR. WOODRUFF:  I think you're talking

14   about her letter of intent, what she had to send to

15   them to tell them that she intends to come back.  But

16   they have to then offer her another contract.

17       Q.    (Mr. Sparks)  You brought up a word, I

18   believe.  I hope your attorney didn't say it, I think

19   you said it.  You said at will.  Did you say at will?

20       A.    After I being a contract employee in 2020,

21   I was moved to be an at-will employee.

22       Q.    Okay.  And even under a contract someone

23   can still be terminated, you just -- the contract

24   governs.

25       A.    Not by the president.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 188

1          MR. WOODRUFF:  Objection.

2     A.    Not by the president.

3     Q.    (Mr. Sparks)  Okay.

4     A.    On the contract you cannot be terminated by

5 the president.  On a contract you actually have a

6 process, what's called grievance process.  If you --

7 whatever -- you know, if you're not recommended for

8 renewal, as you mentioned.  And then you can go and

9 actually present your objection or grievance

10 complaint to the entire board.

11     Q.    Do you know or if you know, were you the

12 only person that was changed from --

13     A.    From what I know.

14     Q.    But you don't know everybody's situation.

15 It could have happened to other employees at the same

16 time?

17          MR. WOODRUFF:  Objection.

18     A.    At the same time?

19     Q.    (Mr. Sparks)  Uh-huh (Indicating yes).

20     A.    I don't know.

21     Q.    Okay.  And if you're an at-will employee,

22 you got to spend a lot of time on the improvement

23 plan.  And I'm not going to belabor that much.  But

24 you were an at-will employee.  They could have -- the

25 college could have thrown the improvement plan in the

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 189

1   garbage, could they not?

2                    MR. WOODRUFF:  Objection.

3        Q.   (Mr. Sparks)  You were an at-will employee

4   is what you're saying.  An at-will employee -- what

5   do you understand an at-will employee to be?

6        A.   That means you can be fired for no reason

7   and you don't even have a chance to go through the

8   grievance procedure.

9        Q.   And that's like a lot of the places that

10  you did projects, that's exactly the kind of employee

11  they were, at-will employees.

12       A.   What places?

13       Q.   Like your furniture -- your project people,

14  your clients.  Their employees mostly were at-will?

15       A.   I don't know that.

16       Q.   All right.  But you understand what an

17  at-will employee is?

18       A.   What an at-will employee is?

19       Q.   Yes.

20       A.   I do.

21       Q.   What did you do each year, if anything, to

22  prepare for MCCB's monitorings?

23       A.   Reviewed the files, make sure that all

24  documents were filed properly, locate those documents

25  and organize my file.

Page 190

```
 1        Q.   Did you only do that for your project
 2   files?
 3        A.   Yes, I did.
 4        Q.   Okay.  Did you ever assist with other
 5   people's project files if they were behind?
 6        A.   If they asked me I would always help if
 7   that was the case.
 8        Q.   Okay.  The monitorings, if you know, from
 9   the years prior to 2019, do you recall any major
10   findings by the MCCB monitors?
11        A.   Prior to 2019?
12             MR. WOODRUFF:  Against her, you mean?
13        Q.   (Mr. Sparks)  Well, in total.  Against the
14   projects.
15             MR. WOODRUFF:  Are you talking about
16   anybody or just her major?
17        Q.   (Mr. Sparks)  No.  I'm talking about the
18   projects for the college.
19        A.   There were never any findings in my
20   projects since my career with the college.
21        Q.   Well, did you ever have a finding -- and
22   I'll ask, since you answered specifically to yours.
23   Did you have a finding with F. L. Crane at one point
24   from MCCB?
25        A.   Three dollars, seven dollars.  That could
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 191

1   be possible.  Something three or seven dollars that I
2   could remember.
3        Q.   But when I said that, you didn't go I don't
4   know what you're talking about.
5        A.   So because everything under $10 that was
6   like room for forgiveness.
7        Q.   I got it.  You just -- earlier you were
8   asked if you had a perfect record and you said yes.
9   That would be a little asteric maybe?
10                  MR. WOODRUFF:  Objection.
11       A.   But also cannot -- I consider myself with a
12  perfect record.
13       Q.   (Mr. Sparks)  So in 2019 -- are you
14  familiar with the monitoring that MCCB did at ICC in
15  2019?
16       A.   Yes.
17       Q.   For fiscal year 2019.
18       A.   Yes.
19       Q.   Did that stand out in any way different to
20  you based on your years of experience dealing with
21  monitors?
22       A.   Yes.
23       Q.   In what way?
24       A.   They audited 100 percent of our files.
25       Q.   Had they ever audited in the 15 years

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 192

1   you've been there 100 percent of your files?

2        A.   I do not recall.

3        Q.   Is there a policy that relates to

4   100 percent of files and MCCB if you're aware?

5        A.   It's in the policy that says MCCB has the

6   right to monitor five, ten or a hundred percent of

7   files if they wish.

8        Q.   They've just got wide discretion?

9        A.   They can do whatever they want.  Correct.

10       Q.   When that monitoring occurred, what was

11  your role in 2019?

12       A.   I was a project manager at MEP and -- made

13  a manager.

14       Q.   And when would that monitoring have

15  occurred for fiscal year '19?

16       A.   It was October, November.

17       Q.   Of?

18       A.   2019.

19       Q.   All right.

20       A.   Oh.  So the question was -- can you repeat

21  your question?  I want to make sure the timeline is

22  correct.

23       Q.   I don't want to confuse you.  I'm asking

24  about fiscal year '19.

25       A.   2019.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 193

1      Q.   Yes.

2      A.   So that was -- yes, that's correct.  In

3  2019.  Yes.  So that -- after -- in Y19, it happened

4  in October, November of 2019.

5      Q.   So it was 100 percent audit by MCCB?

6      A.   Yes.

7      Q.   And that was unique?

8      A.   Yes.

9      Q.   Did this 100 percent audit occur after your

10 September letter?

11     A.   Yes.

12     Q.   Did any of your projects in the 2019 audits

13 have any findings?

14     A.   Three projects had questions and I was not

15 allowed to defend my project as its written in the

16 policy, MCCB policy, that each project manager has

17 two weeks to answer or defend files within two weeks

18 after the audit.  I was the only project manager

19 excluded from this process.

20     Q.   Okay.

21     A.   And only staff member excluded in this

22 process.

23     Q.   Okay.  I guess I'll be glad to let you

24 elaborate on that, but I'm curious more so the

25 findings.  What three companies or projects were

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 194

1   they?

2       A.   One of them was Max Home.

3       Q.   Okay.

4       A.   One of the was Bauhaus.  And one of them

5   was -- it was like $60.  It will come back to me.  It

6   will come back to me.

7               MR. WOODRUFF:  If you think of it

8   later, I'm sure he wants you to let him know.

9               MR. SPARKS:  Sure.

10              MR. WOODRUFF:  If you think of it

11  later on, just let him know.

12              THE WITNESS:  I will.  I will.

13      A.   As I talk through it, it will come back to

14  me.  So those three projects.  So Bauhaus, the

15  wrong -- so by the time I saw the results, that's all

16  I can say.  As you know, accountability people key

17  all this information.  So the record on file didn't

18  match the one on the class rolls attached to the

19  file.  And what it was, it was a copy of another

20  class roll for another class.  And then I located the

21  correct class roll, but I was not allowed to defend

22  that file.  So that's one that I can remember very

23  clearly.  So that's the money that ICC should have

24  never paid back if I was included into the defending

25  process for this project.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 195

1       The other one, one of the three that I can
2   remember was Max Home.  And here's what happened with
3   Max Home.  Until -- for the previous years, before
4   Lowder and Waters came as the executive level of the
5   department, the companies, if they had multiple days
6   on the class roll, we would also ask them to allow
7   their participants to put their initials on every
8   class.  When Lowder and Waters became the directors,
9   they overruled it.  And I tried to tell them that
10  could be a violation.  And that's what it was.
11      Q.   Okay.
12      A.   So they found a class, even though the
13  signatures were there -- and I even have an e-mail
14  somewhere that actually explains it, when they said
15  they don't want a company to put their initials on
16  the dates, if there are five dates on the class roll.
17  But that's what it was.  Even though we had the
18  minimum participants, all the signatures were in
19  place, one person failed to put initials for every
20  day.
21      Q.   Okay.  You said somebody explained that to
22  you.  Who were you referencing?  You said something
23  about an e-mail or somebody explained.
24      A.   I think the e-mail was from Waters when she
25  said the companies don't have to do it.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 196

1      Q.   Are you aware that there were a large
2  amount of findings that year against ICC?
3      A.   I saw it with my own eyes.
4      Q.   Okay.  Does 124,000 or so sound right on
5  the initial number?
6      A.   I don't remember the total.
7      Q.   Do you remember the number fluctuating
8  three times?
9      A.   Oh, I was not privilege to that
10 information.
11     Q.   So you don't have any idea what happened
12 post MCCB monitors visiting about the findings
13 against ICC?
14     A.   I only had the information after the audit
15 results were final.
16     Q.   You don't have any idea if they went up or
17 down?
18     A.   No, I do not.
19     Q.   And you said there's a protest period or an
20 appeal period, I think, that potentially you could
21 have put up?
22     A.   Defend.
23     Q.   Defended.  Okay.  And so if you don't know
24 what happened in 2019 monitoring ultimately with
25 MCCB, how do you know what to prepare for in 2020?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 197

1     A.    Repeat your question.

2     Q.    Well, I asked was there anything unique,

3  and the 100 percent, obviously, was unique.  I asked

4  you were there major findings.  And I thought at

5  first you said yes, there were, but then you didn't

6  know what happened after that.  Do you have any

7  knowledge of the college appealing?

8     A.    I know the college was appealing, yes.

9     Q.    Do you know if MCCB gave multiple answers

10  for the findings for the audit year of 2019?

11     A.    I was not privileged to that information.

12     Q.    So you don't know?

13     A.    If MCCB gave different answers?  No, I do

14  not know that.

15     Q.    In 2020, in preparation for the audit, the

16  fact that you had had 100 percent audit the year

17  before, did you have any guidance differently of how

18  to do the 2020 monitoring preparation?

19            MR. WOODRUFF:  From her bosses?

20     A.    From who?

21     Q.    (Mr. Sparks)  Well, from ICC, I would say.

22  In other words, ICC as a team -- I assume MCCB didn't

23  just say give me the Sherman projects.  They could

24  choose out of any of the projects.  In '19 they chose

25  all the projects.  So as a team, how was ICC

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1   preparing for 2020?

2       A.   I did my job just like I have always done.

3   The only change that was done that Lowder instructed

4   two days before the audit, to remove all quotes and

5   billing statements and actually replace summary

6   sheets with new summary sheets.  And I don't know if

7   it was just Joe Lowder, because TZ Waters was also

8   present during the process.  And I saw three people,

9   Sharon Clemmer, Emily Lawrence and Stacy Loden

10  replacing every class summary sheet with a new

11  summary sheet without any information about billing.

12      Q.   Well, let me ask you this.  On a summary

13  sheet -- again, I've looked at a lot of discovery,

14  but I want to make sure we're talking about the same

15  thing.  The summary sheet, is that an internal

16  document for the file that tells what would be billed

17  for reimbursement and what would potentially be

18  billed to an employer?

19      A.    It never was.  After Waters and Lowder made

20  a decision that it didn't have to say company.  So at

21  first it was signature had to be provided by company

22  representative.  Later on it was ICC/company

23  representative.  So at that time, to my best

24  knowledge, it was company representative that had to

25  verify information on the summary sheet.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 199

1     Q.    Yeah.  But you have handled project files

2  for years.

3     A.    Yes.

4     Q.    Are there things that are in the project

5  file that you take out prior to the monitorings?

6     A.    I've never removed any files from my -- any

7  documentation from my files before the audit.

8     Q.    Are their ever any receipts for travel or

9  things like that that are potentially in your project

10 file?

11              MR. WOODRUFF:  Slow down.  Let him

12 finish his question.

13              THE WITNESS:  Sorry.  Receipts for

14 travel in the project have to be included.

15     Q.    (Mr. Sparks)  So they're in there.  And can

16 you request reimbursement for that even if it's above

17 the maximum amount of $50 or $35, the MCCB

18 reimbursement rate?

19     A.    Okay.  So you just asked me about travel

20 and now you're asking me about $35 and $50 an hour.

21 So are we speaking about travel receipts or are we

22 speaking about invoice that has something to do with

23 the hourly rate for the trainer?

24     Q.    No.  No.  I'm talking about the receipt for

25 travel.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 200

1      A.    Uh-huh (Indicating yes).

2      Q.    Would you ask for reimbursement for that?

3      A.    It's possible.  Yes, you can.  If it

4   exceeds 25 miles.  Like if it's just mileage.  So it

5   exceeds 25 miles from the office to a company and

6   back, yes, there is a line, a travel line in projects

7   that we can reimburse for that.

8      Q.    Do you recall at one of the audits that

9   there was a debate over a receipt that was in a

10  project file that MCCB demanded a clawback of the

11  reimbursement that they had actually not reimbursed

12  ICC?

13     A.    If you give me more information I might

14  remember.  Like what project was it?

15     Q.    I don't remember the project off the top of

16  my head.  I was just curious if you ever were aware

17  of items being in the file that the community college

18  board monitors said the files need to be neat and in

19  order and just like we've asked for them.

20     A.    Uh-huh (Indicating yes).

21     Q.    Is that how they request them?

22     A.    They want files to be neat and in order.

23  That's correct.

24     Q.    Okay.  And did they give you any guidance

25  of how to prepare them?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    A.    Through the years, yes.  We had meetings

2  where they actually would pull out a folder or a file

3  and they'll show everybody what it should look like.

4  So they gave us some, yes.

5    Q.    They give you some kind of example.

6    A.    Yes.

7    Q.    All right.  And in going into the 2020

8  audit -- monitoring, rather, do you recall having

9  conversations with MCCB directly prior to the audit?

10    A.    I don't necessarily remember -- I don't

11  know how to answer this question.  I don't remember

12  my every conversation with MCCB.  I can tell you that

13  one of my projects was used as a sample to show

14  everyone how the project should be written.  So there

15  was an example like that.

16    Q.    Yeah.  And I appreciate that.  But I'm

17  talking about specifically going into the

18  October 2020 -- fiscal year 2020 audit.  Did you

19  communicate with anybody from MCCB about any way the

20  files were being prepared at ICC?

21    A.    I do not recall that conversation.

22    Q.    Did you have any communications with the

23  state auditor's office about how files were being

24  prepared in the 2020 audit -- monitored?

25    A.    I do not -- the conversation how we were

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    preparing for 2020 audit with the state auditor's

2    office?

3         Q.   Yes.

4         A.   I had a conversation.

5         Q.   Who did you have a conversation with?

6         A.   Tim Powell.

7         Q.   And when was that conversation?

8         A.   I think it was around the audit time.

9         Q.   Did you have multiple conversations while

10   the audit was, in fact, going on with anyone from the

11   state auditor's office?

12        A.   2020?  I don't think so.  I spoke maybe

13   once.  I spoke with Tim Powell maybe once or twice

14   around that time.  That's all I remember.

15        Q.   Well, what would the 2020 monitoring for

16   the Itawamba Community College by the Mississippi

17   Community College Board require calling Tim Powell?

18        A.   There was a question about double billing.

19        Q.   Okay.  Well, tell me what's going on there.

20        A.   The information that -- we discussed the

21   fact that the documents were replaced, removed and

22   hidden from Mississippi auditors.

23        Q.   Okay.  So when did you have that

24   conversation?

25        A.   It was around MCCB time, audit time.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    Q.   Did you call Agent Powell?

2    A.   I believe I contacted him either through

3  text or call.

4    Q.   Okay.  Did you take any pictures?

5    A.   Of what?

6    Q.   Any files.

7    A.   I don't think so.

8    Q.   Did you text or call anyone with MCCB

9  during that same period of time?

10    A.   I did not.

11    Q.   Did you talk with anybody other than

12  Mr. Powell about --

13    A.   I don't believe so.

14         MR. SPARKS:  May I pass a letter?

15         MR. WOODRUFF:  Are you going to make

16  this an exhibit?

17         MR. SPARKS:  Well, I'm going to let

18  her look at it.  I don't know if she has ever seen

19  it.  I'm trying to establish it.  It has been in

20  discovery.

21         MR. WOODRUFF:  There's no Bates stamp

22  on it.

23         MR. HALBERT:  Oh, my word.

24         MR. WOODRUFF:  Well, I mean, that's

25  when you know somebody provided it in discovery.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 204

1          MR. HALBERT:  Is it illegal to not

2     have a Bates stamp on it?

3          MR. WOODRUFF:  No.  But it's proof

4     that it has been provided in discovery.  I don't know

5     whether this has been provided or not.

6          MR. SPARKS:  May I ask if she

7     recognizes the document?

8          MR. WOODRUFF:  Sure.  Absolutely.

9     A.   I don't think I recognize it right now.  I

10    have to read it carefully.

11         MR. WOODRUFF:  Take whatever time you

12    need to review it before you answer the question.

13         (Pause in Proceedings.)

14    Q.   (Mr. Sparks)  All right.  We're back on the

15    record.  I presented you a document.  Purports to be

16    a letter from Mississippi Community College Board to

17    Dr. Lowder.  Do you recognize the document or have

18    you seen this document before?

19    A.   I don't believe I've seen this document.

20    Q.   Okay.

21         MR. GRIFFITH:  What's the date on it,

22    by the way?

23         MR. SPARKS:  It's September 22, 2020.

24    I'll make double sure if y'all don't have it or I

25    will point it out.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 205

1          MR. WOODRUFF:  Well, it's being
2    produced now anyway.  Can we mark it as an exhibit?
3          MR. SPARKS:  Oh, yes.  Absolutely.
4          MR. WOODRUFF:  Any time something is
5    discussed I always like to mark it just so there's no
6    arguments later on about what exactly the document
7    was.
8          (Exhibit No. 3 -- Letter from Shawn
9    Mackey, Sr., to Dr. Joe Lowder dated 9-22-20 --
10   marked and may be found attached to the back of the
11   transcript.)
12   Q.    (Mr. Sparks)  I realize the letter wasn't
13   sent to you, that the letter was sent to Dr. Lowder.
14   And it purports to be from the Mississippi Community
15   College Board and signed by Shawn Mackey.  Do you
16   know a Shawn Mackey?
17   A.    Yes.
18   Q.    What do you know Shawn Mackey?
19   A.    I believe he is the executive over
20   workforce program for the state.
21   Q.    And do you recognize any of the names that
22   are carbon copied, cc'd at the bottom of the letter:
23   A.    Andrea Mayfield was the executive director.
24   Shawn Mackey.  Dexter Holloway, he's over the
25   monitoring.  Davita is also the auditor for MCCB.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    Jason Carter, he's one of the employees.  And I don't

2    remember Missy Saxton.

3        Q.    So the bulk of those people are at MCCB, to

4    the best of your recollection?

5        A.    Yes.

6        Q.    If you've had a chance to look at the

7    letter, do you understand it to lay out the terms of

8    what needs to be in the file for MCCB's monitoring?

9        A.    I believe I do.

10       Q.    And how many items do you see there?

11       A.    Fifteen.

12       Q.    Does that look similar to the list that

13   you've been provided in your trainings before?

14       A.    This is just the categories for the

15   documents that they were looking for in the file.

16       Q.    Okay.  When you say categories, so

17   everything within that category should be in the

18   file?

19       A.    Yes.

20       Q.    Okay.  If there's something not in one of

21   those categories, is it required to be in the file?

22       A.    If it was related.  All the documentation

23   that was submitted for any project or was involved

24   with any project should be in the file.

25       Q.    But they had a very specific list of things

Page 207

```
 1    that they requested to be in the file.
 2                    MR. WOODRUFF:  Objection.
 3        Q.   (Mr. Sparks)  There's a list of 15 items
 4    that were.
 5                    MR. WOODRUFF:  She said categories,
 6    not items.  She said categories.
 7        A.   Categories.  It's very broad what I'm
 8    looking at.
 9        Q.   (Mr. Sparks)  Okay.  Would you say that
10    that would be a good --
11        A.   Eleven, copy of the project plus
12    modifications and reimbursement documents.  This
13    particular line can involve so many different things.
14                    MR. WOODRUFF:  You said 11?
15                    THE WITNESS:  Yes, just for example.
16                    MR. WOODRUFF:   Number 11.
17        Q.   (Mr. Sparks)  But this is guidance,
18    purports to be from Dr. Mackey to Dr. Lowder on how
19    to prepare for the 2020 monitoring.
20        A.   I believe so.
21                    MR. WOODRUFF:  I don't think we'll
22    argue about the authenticity.
23        Q.   (Mr. Sparks)  And I know we've kind of
24    beaten a dead horse on some of this, and I think
25    there's just a difference of philosophies.  But Dr.
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 208

1  Lowder's billing procedures not being a price list

2  like you were used to, you called that unethical

3  earlier.  What makes that unethical?

4       A.  We charged different prices to participants

5  sometimes in the same class.  Not two different

6  classes, not two different training programs.

7  Sometimes they were enrolled in the same class and

8  they were still paying different amounts.

9       Q.  And you are personally saying you find that

10 to be unethical?

11      A.  I believe that that can long-term really

12 jeopardize the relationship between the college and

13 the companies.  Because if one company discovers that

14 someone received this training at a very little cost

15 and they paid a high-dollar price for the same type

16 of training, I can tell you very honest, I've been in

17 this job for a very long time, it can completely

18 destroy the relationship between the company and the

19 college.

20      Q.  Well, and I understand that.  But,

21 ultimately, that is the decision made by the director

22 whether to choose a revenue increasing model or

23 neutral model, whichever way you would categorize it,

24 it would be their discretion?

25      A.  It was their discretion to do so.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1      Q.   As far as the double billing you

2  referenced, I think I understand that to where you're

3  saying that MCCB reimbursed at the applicable rate

4  for the class.  And that --

5      A.   At times it was 100 percent reimbursement.

6      Q.   Yes.  Let's just assume it's 100 percent.

7      A.   Okay.

8      Q.   And then ICC additionally billed an

9  employer for training charges as well.  Is that what

10  you're defining --

11      A.   Profitable price.  So it was not for the

12  cost -- for the remaining cost.

13      Q.   Yes.

14      A.   It was based on the commercial price.

15      Q.   It was above and beyond the reimbursement

16  amount.

17      A.   Yes.

18      Q.   And the reimbursement amount would have

19  covered that trainer's cost, correct?

20      A.   Reimbursement amount would cover the

21  trainer's cost.  Correct.

22      Q.   And you're referring to double billing

23  because they also billed the employer.

24      A.   Or participant.

25      Q.   Or participant.  Okay.  And from that

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 210

1  standpoint, you believe that the college would be

2  making a profit or making something above what their

3  cost was?

4       A.   It was not from my point of view.  The

5  direct instruction was treat this as your own

6  business, in January, the max amount of dollars for

7  the college.

8       Q.   Okay.  So the process and the policy was

9  let's try to build revenue here in the workforce

10  department.

11      A.   Treat it as your own business.  Yes.

12      Q.   But you take umbrage with that or you don't

13  like that.

14      A.   It's not like I don't like that.  So I just

15  want to make sure you understand.  Some of these

16  classes were offered at the Belden Center, ICC Belden

17  Center.  But some of these classes were offered on

18  site at company's location.  And we still -- the

19  prices were designed strictly on what we thought as

20  the department or this company can afford and not

21  what this cost is.

22      Q.   Yes.  I understand.

23      A.   Okay.

24      Q.   I just want to make sure we're on the same

25  page.  Now, this double billing that you refer to,

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 211

1    did you witness that prior to the fiscal year 2019?

2        A.   No.  As I described, we had a specific

3    quote that showed cost for training, reimbursement

4    and the remaining amount that was not covered by MCCB

5    money.

6        Q.   So your position is that ICC had never done

7    this before 2020, that they billed an employer above

8    the cost of the training that they had already been

9    reimbursed?

10       A.   I've never been exposed to this information

11   and I can say 100 percent sure, that I'm very sure

12   that it was never based on commercial pricing.

13   Strictly to bill the company based on the information

14   about what they can afford.

15       Q.   And I understand.  Let me make sure I'm

16   clear.  In 2020 --

17       A.   Uh-huh (Indicating yes).

18       Q.   -- we understand the allegation and we

19   understand you're referring to that as double

20   billing.

21       A.   Uh-huh (Indicating yes).

22       Q.   I understand that's your words, not mine.

23       A.   Uh-huh (Indicating yes).

24       Q.   Now, what I'm asking though is, in fiscal

25   year 2019 or any year prior to that, did you see

1    where ICC would bill an employer for an amount when

2    they had been reimbursed by MCCB for the cost of

3    training?

4         A.   Prior to this fact, every cost was

5    justified.  If I send the bill I would have a

6    detailed breakdown how this bill came together.  So

7    there was never an amount that we just billed a

8    certain amount just because we thought that this

9    training, that's what we should collect to generate

10   the profit.  There was always justifiable description

11   for every dollar we billed.

12        Q.   I understand.  But prior to 2020, I'm

13   asking what you're -- I don't want to say complaining

14   of, but what you're speaking of in the 2020 audit,

15   did that happen in 2019, '18, '17 or '16?

16        A.   The double billing?

17        Q.   Yes.

18        A.   That's a complicated question.  Because it

19   started out as -- we tried to design a chart that we

20   would bill a certain amount for different types of

21   classes and why we would bill this amount.  Then the

22   direction was to go up to $100 an hour if one of our

23   trainers -- no, $135 an hour if one of our trainers

24   conduct training.  Then it went down to 100.  It

25   fluctuated so many times.  So between 2017 and 2020,

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 213

1    it kind of went back and forth on that.

2         Q.   Yeah.  But I'm referring specifically to

3    what you're calling double billing.  Let's just

4    assume, if it's okay for this example, it's a $50

5    training class.

6         A.   Uh-huh (Indicating yes).

7         Q.   The class happened.  It occurred.  There's

8    no question.  MCCB reimbursed $50.  And then I billed

9    Company A another $50.  That's what you're calling

10   double billing, correct?

11        A.   That's right.

12        Q.   All right.  Do you know if that was

13   happening prior to the 2020 monitoring?

14        A.   It was.

15        Q.   Okay.  Do you know -- when is the first

16   recollection you have of seeing that?

17        A.   About 2017 or '18.

18        Q.   So 2017, 2018, what you're calling double

19   billing was happening?

20        A.   Started happening.  That's right.

21        Q.   Well --

22        A.   Started happening.

23        Q.   It was happening.  Okay.  What about 2019?

24        A.   It was happening.

25        Q.   Okay.  Was it increasing in its percentage,

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1  to your knowledge?

2      A.   It was -- yeah.  I don't know if it was

3  increasing, but it was happening.

4      Q.   Okay.  Well, in the letter you penned in

5  September 2019 that you told us you wrote, you didn't

6  mention double billing.

7      A.   I believe I did.  The ICC food program was

8  100 percent reimbursed by the federal grant and then

9  the project was written and MCCB paid over $12,000

10  for one year.  And ICC was about to draw 28,000 for

11  another year, and that's where I spoke to Waters and

12  Spradlin and told them it was fraud.

13      Q.   And I want you to explain that and I'm

14  going to come back and ask you a question about that.

15  But I'm going to go back to my original question.

16      A.   Yes.

17      Q.   The double billing.  Not federal projects,

18  not Families First, not TANF money, not any of this

19  other stuff.  General projects, you said double

20  billing had started occurring as early as '16 or '17;

21  is that correct?

22      A.   Uh-huh (Indicating yes).  That's correct.

23      Q.   And I asked about '18 and '19, and I

24  believe you answered in the affirmative.  You didn't

25  address that in your letter to the state auditor, I

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 215

```
1    don't believe --
2                    MR. WOODRUFF:  Objection.
3         Q.   (Mr. Sparks)  -- as double billing.
4                    THE WITNESS:  Do you want me to
5    answer?
6                    MR. WOODRUFF:  Yeah.  I'm just
7    objecting.
8         Q.   (Mr. Sparks)   And I have your letter
9    handy.
10                   MR. WOODRUFF:  It's attached to the
11   First Amended Complaint.
12        A.   The terminology double billing didn't come
13   from me.  That came from the state auditor's office.
14        Q.   (Mr. Sparks)  Okay.
15        A.   However, when I spoke during the
16   investigation, I explained to them how we had a grant
17   from Dickie Scruggs that's called Incentive to
18   Success and how we --
19        Q.   I want to stop you just a second.  I want
20   you to explain that, the food program.
21        A.   Okay.
22        Q.   I'm talking about --
23        A.   It's not for the food program.
24        Q.   -- the standard project.  Okay.  Go ahead.
25   I apologize.
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    A.    No, that's not for the food program.  What

2  I'm referring to is Dickie Scruggs gave the grant

3  that's called Second Chance.  And then we had another

4  grant that was called Incentives to Success.  And it

5  is through MDA, Family First, same source of funding.

6  And the classes that were free and designed for

7  pre-employment training for those individuals who

8  were seeking an entry-level job.  So we wrote -- when

9  I say we, I didn't do it.  I want to make sure you

10  understand.  So the project was written.  MCCB money

11  was requested to pay for the trainers and also the

12  money -- the grants -- two different grants were

13  charged per participant for participating in that

14  class.  It was completely paid.  So that's when -- I

15  didn't call it double billing, but I knew it was.

16    Q.    I just -- in your complaint the term was

17  used repeatedly and I just found it interesting.

18  Because I didn't know if you believed it was going on

19  prior, but you've answered that, that it was.  Are

20  you aware of any MCCB finding opposing the double

21  billing during '16, '17, '18 and '19?

22    A.    I'm not aware.

23    Q.    Are you aware of -- and I'll try to wind up

24  here.  I'll probably hand you something else that's

25  not Bates stamped.  Are you aware of any discussions

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    with MCCB about revenue sharing or what you're

2    calling unethical or not proper to bill above and

3    beyond your cost?  Did you ever have any discussions

4    with anybody at MCCB in the trainings?

5         A.   No, I did not.

6         Q.   Okay.  If you may, I'm going to have an

7    e-mail thread I wanted to -- again, it's certainly in

8    production.  I apologize it doesn't have a Bates

9    stamp.  And you take your time to look at that.

10        A.   (Witness reviews document.)

11                  (Pause in Proceedings.)

12        Q.   (Mr. Sparks)  We are back on record.  And I

13   had given you a document that purported to be a

14   little string of e-mails on October 17 that purports

15   to be between Dexter Holloway and Joe Lowder.  Do

16   you -- have you had a chance the review that?

17        A.   I just did.

18        Q.   It appears to me, and correct me if I'm

19   wrong, that this e-mail came from Dexter Holloway,

20   that first writing.  Do you see that?  At the bottom

21   of Page 1 and then I think his message is on Page 2.

22        A.   Yes.

23        Q.   Okay.  And Dexter at this time was the

24   assistant executive director for workforce and

25   economic development with MCCB?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 218

1    A.    Yes.

2    Q.    Do you notice that he was asking about a

3  model that some colleges were using to generate

4  revenue and he inquired about would you share that

5  information with us?

6    A.    You want me to --

7    Q.    I was asking, yes, that's what I read

8  Mr. Dexter to be asking.  I just don't want to --

9            MR. WOODRUFF:  You're cross-examining

10  her about a document she has never seen.

11            MR. SPARKS:  It's one paragraph.  I

12  just want to know if she --

13    A.    I think I understand.  I can read it again.

14  That he is asking about a model where a workforce

15  department can generate some revenue.  So he is

16  asking, you know, for more information about that.

17  Okay.  All right.  Yes, I understood.

18    Q.    (Mr. Sparks)  Okay.  And do you see that

19  Dr. Lowder actually responded to Dexter and kind of

20  explained some of his policy as it relates to revenue

21  funding?

22    A.    I do see his response.  Yes.

23    Q.    And do you see that Dr. Lowder acknowledges

24  we're charging for services because of the quality of

25  training?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1     A.    I see where he says that.

2     Q.    So when MCCB asked about a revenue model, I

3  don't know who else replied to this e-mail, because

4  it appears to go out to the entire workforce

5  community college body, and I'll have a chance to ask

6  Dexter this question, so I'm not asking you to speak

7  for Mr. Holloway.  But it appears in October of 2018

8  Mr. Holloway asked about a revenue funding model and

9  Dr. Lowder openly replied to him on a work e-mail.

10  Does that -- is that fair?

11            MR. WOODRUFF:  You want her to

12  authenticate a document she has never seen?

13            MR. SPARKS:  I'm not asking her.

14            MR. GRIFFITH:  It's the subject.

15     A.    But it's very vague what the answer is.  As

16  a project manager I already have so many questions

17  about this answer.  So the trainers that we are

18  charging for, are they full-time ICC employees?  Is

19  that who he's referring to?  It's not clear.  Who are

20  the trainers?  I need to know to answer your

21  question.

22     Q.    (Mr. Sparks)  And I understand that.  I'm

23  not trying to grill you on the contents of it, other

24  than the fact that in 2018, Mr. Holloway asked about

25  revenue and Dr. Lowder responded to him with

1  information.  He didn't say we don't do that,

2  correct?

3      A.    I also don't see where it says, oh, by the

4  way we reimburse them for this trainers and charging

5  them.  See, double billing is when you get money from

6  one pot and then you turn around and you get more

7  money for the same trainer from a different pot.

8  That never -- that is not the information he is

9  sharing.

10      Q.    Well, if all -- and like I said, I'm not

11  going to get too in-depth with it.  I'll leave it

12  with you and we can certainly mark it as an exhibit

13  if you've like.

14                  MR. WOODRUFF:  Absolutely.

15      Q.    (Mr. Sparks)  But when the comment says the

16  colleges can obtain additional funds.

17      A.    Uh-huh (Indicating yes).

18      Q.    To me that's the question that's being

19  asked.  But if you don't see it that way, that's

20  fine.  I'll let Mr. Holloway explain it.

21      A.    We can obtain different funds.  We can hire

22  on a work agreement a consult and charge the company

23  $100 an hour.  And consulting doesn't qualify for any

24  reimbursement.  So it will not be double billing.

25  And we can send that person and that person can

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 221

1    generate a lot of money for the college and still get

2    paid.  But it will not be double billing, because

3    consulting is not part of training and we cannot draw

4    money from MCCB plus bill the company for this

5    service.

6        Q.    Well, I understand that's your

7    characterization of shared cost.  Other people may

8    have a different definition of shared cost.  As far

9    as -- I'm going to try to wrap up.

10                   (Exhibit No. 4 -- E-mail chain --

11   marked and may be found attached to the back of the

12   transcript.)

13       Q.    (Mr. Sparks)  As it relates to the state

14   auditors, did you give any recorded interviews with

15   the state auditors about what you're calling

16   impropriety at ICC?

17       A.    I'm trying to remember.  I believe when

18   they came with a search warrant everyone was

19   recorded.

20       Q.    Okay.  Outside of when they came to the

21   campus, do you ever recall giving a recorded

22   statement?

23       A.    I do not recall.

24       Q.    Do you recall giving a recorded statement

25   to MCCB?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 222

1    A.   No, I didn't do it.  I didn't have an
2  interview with them.
3    Q.   DO you recall giving a recorded statement
4  to the district attorney, John Weddle?
5    A.   I sure do.
6    Q.   In that interview, do you recall telling
7  him that Emily Lawrence sent all of her e-mails to
8  you?
9    A.   Yes.
10    Q.   Can you tell me what e-mails she sent to
11  you and why?
12    A.   She sent them to me because I didn't have
13  all records when I left ICC and I wanted records for
14  my file.
15    Q.   So you were already departed from ICC when
16  she sent these to you?
17    A.   Yes.
18    Q.   Do you remember answering earlier that you
19  didn't talk to anybody about this case?
20         MR. WOODRUFF:  Objection.  Talking and
21  e-mailing is not the same thing in some people's
22  book.
23    A.   No.
24    Q.   (Mr. Sparks)  Did you request documents
25  from Emily Lawrence?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1    A.   I think I said if you have something, yes,
2  it will help me.
3    Q.   Did you instruct at any time Emily Lawrence
4  how to reply to people?
5    A.   Absolutely not.
6    Q.   And I don't have the recording handy, but I
7  recalled you saying that Emily Lawrence sent all of
8  her e-mails to me.  Were you referring to e-mails
9  that pertain to you?
10    A.   I believe it had -- yes, with me.  The
11  e-mails that applied to me, yes.
12    Q.   Have you ever loaned Emily Lawrence money?
13    A.   Absolutely not.
14    Q.   Paid any kind of loan payments on her
15  behalf?
16    A.   I gave her $100 one time because I saw her
17  crying in the office.  That was years ago.  And she
18  was behind on her house payment.
19    Q.   So you gave her $100 --
20    A.   To help her out.
21    Q.   -- to help her.  Okay.  Would you tell me
22  briefly -- and I'll try to wrap up.  You've tried to
23  tell me a couple different times about this $28,000
24  deal.  I told you I'd let you tell me.  Would you
25  educate me on this food?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 224

1      A.   ICC Food Program?

2      Q.   Yes, please.  Thank you.

3      A.   Yes.  So the program was 100 percent funded

4 by the grant through Family First.  That was a

5 federal grant.  We had one instructor, one program

6 coordinator hired, and the grant paid for all

7 salaries, all food expenses, and even use of

8 facility, use of the kitchen and things like that.

9      Q.   Okay.  And you were talking about a

10 reimbursement request that you thought was improper?

11      A.   Yes.  So the first year ICC -- so the

12 program kind of started towards the end of the year

13 of 2018 -- FY18.  And I didn't even know ICC drew

14 $12,000 for the program.  So when I overheard a

15 conversation between Waters and Lowder -- I mean,

16 Spradlin that they received documentation for the

17 next reimbursement, I saw in the system that they

18 were about to ask for $28,000.  And that was in the

19 fall of 2018.  It was -- the conversation took place

20 about November.

21      Q.   Okay.

22      A.   To my best knowledge, yes.

23      Q.   Did they request the $28,000?

24      A.   They let the money sit on the account for

25 several months, and then they sent the money back.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 225

1    And when I spoke with TZ in front of Jason Spradlin,
2    she was visibly upset.  And she actually told me that
3    there were other expenses and the $28,000 was written
4    specifically to cover the expenses that the federal
5    grant was not covering.
6         Q.   But you felt it would be problematic
7    because you were getting federal money from two
8    sources?
9         A.   Yes.  I told them it was fraud.
10        Q.   And they sent the money back?
11        A.   Eventually.
12        Q.   So they listened to you?
13                  MR. WOODRUFF:  Objection.
14        A.   I don't know what they did.
15        Q.   (Mr. Sparks)  They followed your
16   instruction?
17        A.   I don't know if it was instruction.
18        Q.   Well, did you suggest that if they kept it
19   it would be a problem?
20        A.   Yeah.  I told them it was fraud.  I told
21   them it was fraud and money laundering.
22        Q.   And they sent it back?
23        A.   Eventually.
24        Q.   Okay.  Was that your project?  I'm sorry.
25        A.   It was not.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 226

1      Q.   Okay.  Who was over Families First in this

2   area?

3      A.   Kristi -- Kristi.  I don't remember.

4   Kristi Webb.

5      Q.   Kristi Webb.  Okay.  So she would have

6   knowledge of that?

7      A.   Yes.

8      Q.   And was she the top person at Families

9   First on the north end?

10      A.   From my understanding she was the

11   executive, yes.  Yeah.

12      Q.   Was Dr. Cole involved with Families First?

13      A.   At some point he was, but I do not know his

14   role or title.  I do not know what kind of job he

15   did.

16             MR. SPARKS:  Okay.  I thank you for

17   your patience and I do believe that's everything I

18   have.

19             MR. WOODRUFF:  You tender the witness?

20             MR. SPARKS:  I will, yes.

21             MR. WOODRUFF:  I'm next up.

22                  EXAMINATION

23   BY MR. WOODRUFF:

24      Q.   First question.  You mentioned -- you

25   talked about it a little bit, about the director's

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1  account, when Mr. Lowder came in and he assigned you

2  the director's account.  I believe you said there

3  were five of them?

4      A.  There were five projects that were in the

5  folder, shared drive, under director's projects.

6  They were previously always handled by other

7  directors, such as Denise Gillespie and then Lee

8  Oswalt.  So when Joe Lowder came on board, he came in

9  the middle of the year.  So I walked him through

10  those projects and then he told me that I needed to

11  take over and manage them.

12      Q.  And you did?

13      A.  And I did.

14      Q.  And in March of 2019 you were put on a

15  Performance Improvement Plan because he claims you

16  were doing a poor job and he took those five

17  director's accounts away from you then, right?

18            MR. GRIFFITH:  Objection to leading.

19  We'd like to have a continuing objection.

20            MR. WOODRUFF:  No.  That was

21  sarcastic.  That wasn't leading.  That was sarcastic.

22            MR. GRIFFITH:  I'm just asking so we

23  probably won't interrupt you.

24            MR. WOODRUFF:  There you go.  All

25  right.  Go ahead and put it on the record.

Page 228

1          MR. GRIFFITH:  With respect to any

2     leading questions.

3          Q.   (Mr. Woodruff)  So did he or -- let me go

4     back to law school.  So did he or did he not take

5     away those five executive accounts after he put you

6     on the PIP?

7          A.   He did not.  As a matter of fact, I was

8     given more work and more projects, such as MEP

9     program was given to me, I believe in July of 2018.

10    And later on after I was placed on the Performance

11    Improvement Plan, I also received federal grant for

12    Legacy Boats, federal grant for Sutter Street, which

13    is a furniture company under William Sonoma.  And

14    there was another project that was within workforce

15    enhancement training funds, but it was an exception

16    that required extremely -- very time consuming and

17    required a lot of attention, and it's called

18    entrepreneurship -- I'm sorry.  Internship project

19    for F. L. Crane and Sons.

20         Q.   Did he ever take away any of those

21    executive accounts?  Did he or did he not take away

22    any of those executive accounts prior to your

23    termination?

24         A.   I believe sometime in the fall of 2020, of

25    2020, he e-mailed me and said that TZ Waters was

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 229

1    finally ready to take Toyota.  Since it's always a

2    director's project she was finally ready after she

3    was on the job for a year as the director.

4         Q.   So that was like a year, year and a half

5    after you were put on a Performance Improvement Plan?

6         A.   It was a good year after, yes.

7         Q.   And you said the MEP program.  Let me show

8    you what has been introduced -- I'm sorry.

9              MR. WOODRUFF:  Let me introduce this

10   as Exhibit Number -- this is attached, I believe, as

11   Exhibit A to our First Amended Complaint.  This will

12   be Exhibit 5.

13             (Exhibit No. 5 -- Job Description --

14   marked and may be found attached to the back of the

15   transcript.)

16        Q.   (Mr. Woodruff)  It's a job description with

17   the date of July 12, 2018, correct?

18        A.   Correct.

19        Q.   And it says -- does it or does it not say

20   workforce development/innovative MEP project?

21        A.   It does.

22        Q.   And this is when, I believe, you testified

23   they added another job?

24        A.   They added another job to my duty.

25        Q.   And you can see this is almost a year

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 230

1    before you were put on the PIP, correct?

2          A.   Well, seven months.  Seven months before.

3          Q.   Right.  And did -- when he put you on --

4    when he put you on the PIP in March of 2019, did he

5    take away you running the innovative MEP project?

6          A.   No, he did not.

7          Q.   So you continued to do that up until the

8    time you were terminated?  Yes or no?

9          A.   That's correct.  Yes.

10          Q.   And have you read this work -- I'm sorry --

11    job description?

12          A.   Yes.

13          Q.   Is there anything in there that says

14    anything about you're responsible to report illegal

15    activity to your bosses?

16          A.   No, it doesn't.

17          Q.   Is there anything in there that says you're

18    responsible to report illegal activity to the state

19    auditor?

20          A.   No, it doesn't.

21          Q.   Are you a lawyer?

22          A.   No, I'm not.

23          Q.   Have you ever been to law school?

24          A.   No.

25          Q.   So have you ever read the Mississippi Code

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 231

```
 1   statute to find out exactly what Mississippi Code
 2   number is fraud?
 3        A.    No.
 4        Q.    But do you know that fraud is illegal?
 5        A.    I know that state funds and
 6   misappropriation is illegal.
 7        Q.    Misappropriation of funds?
 8        A.    Yes.
 9        Q.    And you're talking about funds that were
10   from the federal government?
11        A.    Yes.
12        Q.    And the state government?
13        A.    The funds generate as tax, federal tax, and
14   then the money comes back to all states and each
15   state makes the decision on how to distribute money
16   for workforce development and training.
17        Q.    And is it your understanding that these
18   funds that you claim that there was fraud and
19   misrepresentation concerning them, do you know
20   whether those were taxpayer funds?
21        A.    They are taxpayers funds.
22        Q.    Did that bother you?
23        A.    Yes, it did.
24             MR. WOODRUFF:  All right.  Let's me go
25   ahead and introduce --
```

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 232

1              (Exhibit No. 6 -- Response to

2    Performance Evaluation dated 4-5-19 -- marked and may

3    be found attached to the back of the transcript.)

4         Q.   (Mr. Woodruff)  This is a 20-page document

5    and you've already talked about this, your response

6    to the performance evaluation.

7         A.   Yes.

8         Q.   I'm sure you've very familiar with this.

9         A.   Yes.

10        Q.   Is that correct?

11        A.   That's correct.

12        Q.   And it's dated April 5th.  So within a

13   month of receiving the PIP, this was your response to

14   it?

15        A.   That's correct.

16        Q.   Did you respond -- did you or did you not

17   respond to it item by item and explain to them why

18   you thought his criticism was unfounded?

19        A.   I responded for every line to show that

20   that particular argument was not factual or my rating

21   was not factual.

22        Q.   And I'm not going to attach them as an

23   exhibit, but how many pages of documentation did you

24   attached to this response in support of your

25   response?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 233

1      A.    Well, I see that the response itself is
2  20 pages and then I provided all files for the last
3  three years, all quotes, e-mails, things like that.
4  So it was a very -- I'll say close to 100 pages,
5  something like that.
6                  MR. WOODRUFF:   And we provided them in
7  discovery.  I'm not going to burden the record here
8  today with those.
9      Q.    (Mr. Woodruff)  You talked about this
10 letter you wrote.  Let me show you what was attached
11 as Exhibit, I believe, C to the First Amended
12 Complaint.  Have you ever seen this letter here?
13     A.    Yes.  Yes, I have.
14     Q.    And who was that letter sent to?
15     A.    It was sent to the state auditor, also it
16 was sent to President Jay Allen, Tim Senter, human
17 resource director, and Joe Lowder, Dean of Economic
18 and Community Services, and it was cc'd to TZ Waters.
19     Q.    Is this the letter you're referring to that
20 you talked about during your deposition?
21     A.    Yes.  That's the letter.
22     Q.    But as you see in here, this was sent by
23 Jim Waide.
24     A.    Yes.
25     Q.    Your attorney.

1      A.   Yes.

2           MR. WOODRUFF:   Let's introduce it as

3   Exhibit 7.

4           (Exhibit No. 7 -- Letter from Tatiana

5   Sherman to Tim Senter dated 9-5-19 -- marked and may

6   be found attached to the back of the transcript.)

7      Q.   (Mr. Woodruff)   This is 7.   Do you

8   recognize this document right here?

9      A.   Yes, I do.

10     Q.   And was this the first update that you got

11  concerning the Performance Improvement Plan?

12     A.   So when I submitted my rebuttal to the PIP,

13  we had, I think, one little meeting when I asked for

14  my questions to be answered.   And then we met again

15  and I received the letter from Dean Lowder at that

16  time that the improvement was made but my -- the PIP

17  was extended and given to TZ Waters.

18          MR. WOODRUFF:   All right.   Let me

19  introduce as Exhibit 7, and tell me what this is --

20  I'm sorry, Exhibit 8.

21          (Exhibit No. 8 -- Performance

22  Improvement Plan Review dated 12-18-19 -- marked and

23  may be found attached to the back of the transcript.)

24     Q.   (Mr. Woodruff)   Tell me what this is.

25     A.   This is what Waters gave me in December of

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 235

1     2019.  That is her feedback.

2          Q.   And what was your -- when you read her

3     feedback, what was your impression of that feedback?

4          A.   When I received this document -- the

5     meeting actually took place a couple of days later.

6     So I responded to the comments in the document where

7     sometimes I would ask for an example or an e-mail or

8     a quote that she was describing in her comments.  But

9     she refused to provide any explanation.  And Tim

10    Senter was present in the meeting and he said that

11    she didn't have time to review -- to give me the

12    answers.  But she also never followed up to give me

13    the answers.

14         Q.   But Tim Senter was at the meeting?

15         A.   HR Manager.  Yes.

16         Q.   HR manager.  And he said that she don't

17    have time to give you answers to --

18         A.   She didn't have time to prepare to give me

19    answers.

20         Q.   And did she give you any answers to your

21    questions at that December '19 meeting?

22         A.   No, she didn't.

23              MR. WOODRUFF:  Okay.  And let me

24    introduce this as Exhibit Number 9.

25                   (Exhibit No. 9 -- Memo from TZ Waters

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 236

1  to Tim Senter dated 3-4-20 -- marked and may be found

2  attached to the back of the transcript.)

3      Q.   (Mr. Woodruff)  This appears to be a memo

4  from Waters to Tim Senter.  Have you ever seen this

5  document?

6      A.   Yes, I have.  It's a recommendation to

7  release me from my duties that was sent -- the memo

8  says March 4th, 2020.  But I understand the date is

9  incorrect on this memo.  That was the comment that

10  was submitted in my personal file.

11     Q.   I'm sorry.  What do you mean?  The

12  incorrect date?

13     A.   Yes.

14     Q.   What date is that supposed to be?

15     A.   They say it's supposed to be 2021.  The

16  only problem I have with it, that in the Word

17  document the date automatically populates in the

18  document, so I don't know why it was incorrect.  I

19  don't know.

20     Q.   In Paragraph 25 of our Complaint, you

21  discuss about being taken from being a contract

22  employee on a yearly contract, correct?

23     A.   Right.

24     Q.   What was your understanding of being a

25  yearly contract if you were terminated in the middle

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 237

1  of that contract?

2       A.   In the middle of the contract, I would have

3  to go through the grievance process, whether it's in

4  the middle or the end of the contract.  So all

5  contract employees would have more, I would say at

6  least, you know, security.  They at least had the

7  right to speak up and go through the grievance.

8       Q.   Well, do you know whether or not they could

9  sue the ICC for breach of contract if they fired you

10 during the middle of a contract without just cause?

11      A.   That's what I understood, yes.

12      Q.   Did anybody tell you why they turned you

13 in -- I think the term they use is called a work

14 agreement.

15      A.   Right.  Which means at-will employee.

16      Q.   Right.  But the term they use in the

17 manual, which we attached the page to it, is called

18 work agreement.  Did anybody tell you why after all

19 of these years of being on a contract all of a sudden

20 you were on a work agreement?

21      A.   Tim Senter sent an e-mail and cc'd Lowder

22 on the e-mail.  And to my best knowledge, it just

23 simply says you are being transitioned from contract

24 to at-will employee.  It was literally two sentences.

25      Q.   But has anybody ever given you an

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 238

1    explanation of why you went from being a contract

2    employee to a, as they call it, a work agreement or

3    an at-will employee?

4         A.    So after I received that e-mail I called

5    Tim Senter and he said that that was the decision

6    that was made.  And in the conversation I said is it

7    because it's easy to terminate me now because I'm an

8    at-will employee?  And he said, "Well, technically,

9    yes."

10                   MR. WOODRUFF:  Next one is 10.

11                   (Exhibit No. 10 -- Letter from Jay

12   Allen to Tatiana Sherman dated 5-24-21 -- marked and

13   may be found attached to the back of the transcript.)

14        Q.   (Mr. Woodruff)  Ten is a letter dated May

15   11(sic), 2021.  It says your employment agreement

16   with Itawamba Community College will not be renewed

17   for 2021 to 2022 fiscal year.  Is that the letter you

18   received that told you you were being terminated?

19        A.    Yes, it is.

20                   MR. SPARKS:  Objection to being

21   terminated.

22                   MR. WOODRUFF:  It says it right here

23   in the letter.

24        A.    Terminate.  It's in the letter.  Last

25   sentence.  Last word.

ADVANCED COURT REPORTING
662-690-1500

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 239

1      Q.   (Mr. Woodruff)  Can you read the last --
2  can you read the last -- effective immediately.
3      A.   Yes.  Effective immediately, you are placed
4  on administrative leave with pay through June 30,
5  2021, at which point your employment with ICC will be
6  terminated -- will terminate.
7      Q.   Will terminate.
8      A.   Yes.
9           (Exhibit No. 11 -- Letter from Mary
10  Ford to Jim Waide dated 4-14-22 -- marked and may be
11  found attached to the back of the transcript.)
12      Q.   (Mr. Woodruff)  And you talked about the
13  7,000 pages from the -- we received from the state
14  auditor.  Have you seen this letter from the state
15  auditor dated April 14th, 2022?
16      A.   I believe I have, yes.
17      Q.   And is it your understanding or not your
18  understanding that we received those 7,000 pages in
19  April of 2022?
20      A.   Yes.
21      Q.   Okay.  And did we forward those documents
22  to you so you could review them at that time?
23      A.   That's correct.  Yes.
24      Q.   Let me show you the First Amended
25  Complaint.  It was filed on 8-23-22?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

1      A.   Uh-huh (Indicating yes).

2      Q.   Correct?

3      A.   That's correct.  Sorry.

4      Q.   And let me show you -- after the

5  Complaint -- do you recognize this signature on what

6  we call a subscription?

7      A.   I do.  That is my signature, yes.

8      Q.   Okay.  And did you understand when you were

9  signing that you were stating under oath that the

10  facts in the First Amended Complaint are true and

11  correct?

12      A.   Yes.

13      Q.   As best you understood?

14      A.   Yes.

15      Q.   And you understood today your testimony

16  today was under oath.  You were sworn in by the court

17  reporter.

18      A.   Yes.

19      Q.   It's under oath, subject to the laws of

20  perjury?

21      A.   Yes.

22              MR. WOODRUFF:  That's all I've got.

23                      EXAMINATION

24  BY MR. GRIFFITH:

25      Q.   Very briefly just to clarify the testimony

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 241

1   you've just given about the state auditor's letter.

2   Was there only one letter that was sent to the office

3   of the state auditor summarizing the events and

4   problems and complaints that you had, and that letter

5   was one sent by your attorney, not by you?

6        A.   I wrote the letter.

7        Q.   Right.

8        A.   And Jim Waide filed the letter.

9        Q.   He basically put it in letter form over his

10  letterhead; is that correct?

11       A.   Yes.

12       Q.   So when you said this morning when we were

13  talking about the letter that you wrote, that's what

14  you were referring to.  There are not two different

15  letters, correct?

16       A.   That's correct.

17       Q.   I just wanted to make sure I understood

18  that.  Did you feel that reporting to the auditor

19  about what was happening would protect your job?

20       A.   Absolutely not.

21       Q.   You did not?

22       A.   No.  It was a very scary thing to do.

23       Q.   Okay.  Did you conceal your identity when

24  this letter -- I think it's called Exhibit 7 -- was

25  sent to the state auditor?  Was your identity

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 242

1    revealed in that letter?

2                    MR. WOODRUFF:  I don't think I

3    attached the exhibit.  I probably should.

4        Q.   (Mr. Griffith)  If you recall.

5        A.   My identity was revealed.

6        Q.   But you didn't reveal it.  It was revealed

7    by your attorney writing the letter, correct?

8        A.   With my -- with my permission, yes.

9        Q.   With your input.  Got it.  Wouldn't it have

10   made more sense to report this anonymously yourself?

11       A.   No.  It's my language.  I cannot lie that I

12   did not send this letter.  It was my language.  I

13   have written everything that was already discussed in

14   the office by me.

15       Q.   And I don't want to get into what Mr. Waide

16   or Mr. Woodruff has said.  That's attorney-client

17   communication.  But what was said was entirely words

18   put on a letter by Mr. Waide and mailed over his

19   letterhead, correct.

20                    MR. WOODRUFF:  Objection.

21       A.   I wrote the letter.

22       Q.   (Mr. Griffith)  Yeah.

23       A.   And I agreed that the letter needs to come

24   from me because the language and the issues that I

25   referred in the letter I discussed in the office in

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 243

1  front of everyone.

2      Q.   Okay.  And your discussion and what you

3  were saying in that letter, I understand you, was

4  done in your capacity as the workforce manager at

5  ICC, correct?

6      A.   No.  Those projects were not my projects.

7      Q.   I didn't ask if they were your projects.

8  Again, we're getting back to I'm asking you what time

9  it is and you tell me how to construct a watch.  All

10  I want to know is, was this sent by you in your role

11  as the workforce manager?

12      A.   It was sent by me because I wanted for my

13  voice to be heard and it was because I wanted to

14  report the state dollar misappropriation.

15      Q.   And your voice was heard in your capacity

16  as an ICC employee over the workforce program,

17  correct?

18      A.   My voice was heard as a citizen of this

19  state and this country.

20      Q.   Yes.  I understand what you're saying.  But

21  you did this only because you were working at ICC,

22  correct?

23          MR. WOODRUFF:  Objection.

24      Q.   (Mr. Griffith)  You can answer that.

25      A.   Only because I was working at ICC.  I don't

1    understand the question.

2         Q.   If you were not working at ICC and never

3    had worked there, you never would have sent this

4    letter, correct?

5                   MR. WOODRUFF:  Objection.

6         Q.   (Mr. Griffith)  Is that confusing to you?

7    Do you want me to rephrase that question?

8         A.   Sure.

9         Q.   If you had never worked at ICC you would

10   never have written this letter, correct?

11                  MR. WOODRUFF:  Objection.

12        Q.   (Mr. Griffith)  You want me to rephrase

13   that?

14        A.   I was a state employee.

15        Q.   Yes.

16        A.   I worked at ICC.

17        Q.   Right.

18        A.   I wrote this letter because I wanted to

19   report state tax dollar misappropriation.

20        Q.   Correct.  And that's exactly what you did

21   wearing the cap of ICC workforce manager.  And that's

22   what you were doing.

23                  MR. WOODRUFF:  Objection.

24        Q.   (Mr. Griffith)  Isn't that right?

25                  MR. WOODRUFF:  Asked and answered

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 245

1   about eight times.

2       Q.   (Mr. Griffith)  Well, if it was ever

3   answered.  It hasn't been answered yet, Counsel.

4       A.   No.

5                MR. GRIFFITH:  Okay.  Thank you.

6                MR. WOODRUFF:  Any follow-up?

7                MR. SPARKS:  Just very brief.

8                     EXAMINATION

9   BY MR. SPARKS:

10      Q.   A lot of discussion about Performance

11  Improvement Plan, what was not removed from you.  You

12  can have improvement in a certain area of performance

13  while your performance in other areas is acceptable;

14  would you agree?

15               MR. WOODRUFF:  Objection.

16      Q.   (Mr. Sparks)  A Performance Improvement

17  Plan doesn't mean you're not doing anything correct.

18               MR. WOODRUFF:  Objection.

19      A.   This Performance Improvement Plan says that

20  I was the worst project manager and if I don't

21  improve in six months I will be terminated.

22      Q.   (Mr. Sparks)  Okay.  But yet you continued

23  on your improvement plan in the areas that you were

24  not doing well.  Did you not comment that Dr. Lowder

25  said you had improved in some areas?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 246

1      A.   He sent a letter in six months saying that
2  he had seen some improvement.  He never commented
3  what areas he observed the improvement.
4      Q.   He complimented that he had sent -- or
5  commented that he had seen some improvement; is that
6  correct?
7      A.   Some improvement; yes.
8           MR. SPARKS:  Thank you.  That's all I
9  have.
10           MR. WOODRUFF:  Let's go ahead and
11  introduce -- since I didn't introduce it -- let's go
12  ahead and introduce the letter, which is attached as
13  Exhibit C.  It's going to be Number 12, attached as
14  Exhibit C to the First Amended Complaint.
15           (Exhibit No. 12 -- Letter from Jim
16  Waide to Jay Allen, et al, dated 9-24-19 -- marked
17  and may be found attached to the back of the
18  transcript.)
19           (Off Record Discussion.)
20                EXAMINATION
21  BY MR. WOODRUFF:
22      Q.   Have you read this letter that Jim sent to
23  the -- that was sent to the three people on the
24  front?
25      A.   Yes.

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 247

1    Q.   The first paragraph there, did you write

2   that paragraph?

3    A.   Yes, I did.

4    Q.   Can you read that paragraph?

5    A.   "I am writing you with respect to the March

6   8th, 2019, Performance Improvement Plan given to Dean

7   Joe Lowder to Tatiana Sherman.  This Performance

8   Improvement Plan was to have a review in August, but

9   after that meeting was subsequently extended until

10  June 2019.  It has been handed off to another of Dean

11  Lowder's subordinates who is the director of

12  workforce training."

13   Q.   And number two, did you write this?

14   A.   I believe so.  That my performance was

15  exceptional until then.

16   Q.   Let me ask you about this next -- the third

17  paragraph.  It says, "Almost continually since Dean

18  Lowder assumed the duties of dean of division, he has

19  insisted upon issuing the checks," et cetera, et

20  cetera.  Did you write that paragraph?

21   A.   Yes, I did.

22   Q.   Did you write that next paragraph,

23  "Ms. Sherman's continuous complaints"?

24   A.   About illegal practice.  Yes.

25   Q.   Did you write that?

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 248

1        A.   Yes, I did.

2        Q.   According to the state MCCB workforce

3    policy, did you write that paragraph?

4        A.   Yes, I did.

5        Q.   The dean made an exception in parenthesis

6    for Southern Motion.

7        A.   Southern Motion.

8        Q.   Did you write that?

9        A.   Yes, I did.

10        Q.   Did you write the next paragraph, starts

11    out in 2018?

12        A.   Yes.

13        Q.   And the next paragraph also starts out in

14    2018.  Did you write that paragraph?

15        A.   Yes, I did.

16               MR. WOODRUFF:  That's all I've got.

17               MR. GRIFFITH:  Thank you.

18               (Deposition concluded at 5:11 p.m.)

19

20

21

22

23

24

25

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 249

1              C E R T I F I C A T E

2     STATE OF MISSISSIPPI      )

3     COUNTY OF LEE             )

4     RE:  ORAL DEPOSITION OF TATIANA (TANYA) SHERMAN

5          I, Regina D. Russell, RPR, CCR 1110, a Notary

6     Public within and for the aforesaid county and state,

7     duly commissioned and acting, hereby certify that the

8     foregoing proceedings were taken before me at the

9     time and place set forth above; that the statements

10    were written by me in machine shorthand; that the

11    statements were thereafter transcribed by me, or

12    under my direct supervision, by means of

13    computer-aided transcription, constituting a true and

14    correct transcription of the proceedings; and that

15    the witness was by me duly sworn to testify to the

16    truth and nothing but the truth in this cause.

17         I further certify that I am not a relative or

18    employee of any of the parties, or of counsel, nor am

19    I financially or otherwise interested in the outcome

20    of this action.

21         Witness my hand and seal on this 9th day of

22    January, 2023.

23

24                          _____

      My Commission Expires:  RPR, CCR 1110
25    January 27, 2024         Notary Public

ADVANCED COURT REPORTING
662-690-1500

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 250

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                NORTHERN DISTRICT OF MISSISSIPPI
 2                    ABERDEEN DIVISION

 3   TATIANA (TANYA) SHERMAN                PLAINTIFF

 4   VS.                          NO. 1:21-CV-190-GHD-DAS

 5   ITAWAMBA COMMUNITY COLLEGE;
     JOE LOWDER; TZER NAN WATERS;
 6   AND DR. JAY ALLEN                      DEFENDANTS

 7                       CERTIFICATE

 8        I, TATIANA (TANYA) SHERMAN, have read the

 9   foregoing pages, 1-247, of the transcript of my

10   deposition given on December 12, 2022, and it is

11   true, correct and complete to the best of my

12   knowledge, recollection and belief except for the

13   list of corrections, if any, attached on a separate

14   sheet herewith.  Witness my hand, this the

15   _____ day of _____, 2022.

16

17                      _____
                              TATIANA (TANYA) SHERMAN
18

19                       CERTIFICATE

20        Subscribed and sworn to before me, this the

21   _____ day of _____,

22   2022.

23                      _____
                        Notary Public in and for the
24                      County of _____
     My Commission      State of Mississippi
25   Expires:  _____
```

ADVANCED COURT REPORTING
662-690-1500

Deposition of Tatiana (Tanya) Sherman, taken December 12, 2023

Page 251

```
 1              ADVANCED COURT REPORTING
                     P.O. BOX 761
 2              TUPELO, MISSISSIPPI 38802-0761

 3
                     CORRECTION LIST
 4

 5  TATIANA (TANYA) SHERMAN              PLAINTIFF
    VS.
 6  ITAWAMBA COMMUNITY COLLEGE;
    JOE LOWDER; TZER NAN WATERS;
 7  AND DR. JAY ALLEN                    DEFENDANTS

 8  Federal - No. 1:21-CV-190-GHD-DAS
    _____
 9  CAPTION

10  DECEMBER 12, 2022          TATIANA (TANYA) SHERMAN
    _____
11  DATE OF DEPOSITION          DEPONENT'S NAME

12  PAGE  LINE   CORRECTION                REASON

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23
                              _____
24                            TATIANA (TANYA) SHERMAN

25
```