```
 1               IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF MISSISSIPPI
 2                        ABERDEEN DIVISION

 3
   TATIANA (TANYA) SHERMAN                      PLAINTIFF
 4
   VS.                           NO. 1:21-CV-190-GHD-DAS
 5
   ITAWAMBA COMMUNITY COLLEGE,
 6 JOE LOWDER, TZER NAN WATERS,
   AND DR. JAY ALLEN                           DEFENDANTS
 7

 8

 9
   *************************************************************
10
                 DEPOSITION OF TZER NAN WATERS
11
   *************************************************************
12

13

14             TAKEN AT THE INSTANCE OF THE PLAINTIFF
                IN THE LAW OFFICES OF PHELPS DUNBAR, LLP
15              105 EAST MAIN STREET, TUPELO, MISSISSIPPI
              ON DECEMBER 15, 2022, BEGINNING AT 2:35 P.M.
16

17

18                 APPEARANCES NOTED HEREIN

19

20

21

22 Reported by:  PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235

23 _____
                    ADVANCED COURT REPORTING
24                      P.O. BOX 761
                     TUPELO, MS 38802-0761
25                     (662) 690-1500
```

EXHIBIT "F"

Deposition of Tzer Waters, taken December 15, 2022

Page 2

```
 1    APPEARANCES:
 2    For the Plaintiff:
 3                    RON L. WOODRUFF, ESQUIRE
                      Waide & Associates, P.A.
 4                    Post Office Box 1357
                      Tupelo, MS  38802-1357
 5                    (662) 842-7324
                      rlw@waidelaw.com
 6
 7    For the Defendants Itawamba Community College,
      Tzer Nan Waters, and Dr. Jay Allen:
 8
                      BENJAMIN E. GRIFFITH, ESQUIRE
 9                    Griffith Law Firm
                      Post Office Box 2248
10                    Oxford, MS  38655-2248
                      (662) 238-7727
11                    ben@glawms.com
12
      For the Defendant Itawamba Community College:
13
                      MARK N. HALBERT, ESQUIRE
14                    Phelps Dunbar, LLP
                      105 East Main Street
15                    Suite 201
                      Tupelo, MS  38804
16                    (662) 842-7907
                      mark.halbert@phelps.com
17
18    For the Defendant Joe Lowder:
19                    DANIEL H. SPARKS, ESQUIRE
                      Sparks Law Firm, PLLC
20                    Post Office Box 2610
                      Oxford, MS  38655-2610
21                    (662) 234-4600
                      daniel@sparkslawpllc.com
22
23    Also Present:
24                    TATIANA SHERMAN
                      JOE LOWDER, Appearing Via Zoom
25
```

Deposition of Tzer Waters, taken December 15, 2022

Page 3

TABLE OF CONTENTS

WITNESS                                                      PAGE
TZER NAN WATERS

    Examination by Mr. Woodruff.......................  5

EXHIBIT
  NO.                        DESCRIPTION                   PAGE

  21    Bates Numbered Documents TS-62 Through
       TS-160, Attachment to the PIP...............  42

Deposition of Tzer Waters, taken December 15, 2022

Page 4

```
1                    STIPULATIONS

2

3    1.   It is hereby stipulated by and between counsel

4    that the deposition of Tzer Nan Waters may be taken on

5    behalf of the Plaintiff at the time and place set forth

6    herein and be reported by Phyllis K. McLarty, RMR, FCRR,

7    CCR #1235.

8    2.   That all objections as to the notice of the time

9    and place of the taking of this deposition are hereby

10   waived.

11   3.   That all objections except as to the form of the

12   questions are reserved until the time of the trial.

13   4.   That the reading of the testimony to or by the

14   witness and signing thereof by the witness are not hereby

15   expressly waived.

16

17

18

19

20

21

22

23

24

25
```

Deposition of Tzer Waters, taken December 15, 2022

1              TZER NAN WATERS, AFTER BEING DULY SWORN,

2              WAS EXAMINED AND TESTIFIED AS FOLLOWS:

3                         EXAMINATION

4    BY MR. WOODRUFF:

5         Q.    Please state your full name for the record.

6         A.    Tzer Nan Waters.

7         Q.    And I've seen a lot of people call you TZ; is

8    that correct?

9         A.    That's correct.

10        Q.    What is your current home address?

11        A.    1104 Dogwood Drive; Tupelo, Mississippi 38801.

12        Q.    And your phone number?

13        A.    Cell phone number is 662-213-4500.

14        Q.    Are you currently employed?

15        A.    Yes.

16        Q.    Where do you work?

17        A.    Itawamba Community College.

18        Q.    How long have you worked at Itawamba Community

19   College?

20        A.    Since 2005.

21        Q.    What is your current job or title?

22        A.    Director of Workforce Education.

23        Q.    How long have you had that position or title?

24        A.    October 2018.

25        Q.    October 2018 --

**Deposition of Tzer Waters, taken December 15, 2022**

1    A.    Yes.

2    Q.    -- is that correct?

3    A.    That's correct.

4    Q.    And who -- what was your title or position prior

5  to October of 2018?

6    A.    Lead Workforce trainer.

7    Q.    Lead Workforce trainer?

8    A.    (Nods head up and down.)

9    Q.    Was that full or part-time?

10   A.    Full-time for two years.  I started 2016 to

11  2018.  Before that, yeah, when I was part-time.

12   Q.    So, 2016 to 2018, you were full-time.  Were you

13  part-time before that?

14   A.    Yes, sir.

15   Q.    How long were you part-time?

16   A.    2005 to 2015.  About ten years maybe.  Yeah.

17   Q.    When you were part-time, did you have other

18  duties or job at ICC, or was that your -- just -- you

19  were just a part-time employee?

20   A.    That is my part-time --

21   Q.    I know.

22   A.    -- at ICC.

23   Q.    I understand you were part-time as a trainer,

24  but did you have other duties at ICC, or that was -- you

25  were just a part-time employee total?

**Deposition of Tzer Waters, taken December 15, 2022**

```
 1        A.   That's correct.

 2        Q.   Okay.  Got you.  What is your education?

 3        A.   I have a bachelor degree in biological

 4   engineering and a master's in industrial engineering.

 5        Q.   What did you do before, I believe, 2005 when you

 6   went to work for ICC?

 7        A.   Okay.  I worked at Lane Furniture.

 8        Q.   I'm sorry?

 9        A.   Lane.  Lane Furniture for a few years.

10        Q.   From when to when?

11        A.   2002 or 2003 to 2005.  I don't exactly remember.

12        Q.   And what was your title or position?

13        A.   Project engineer.

14        Q.   Why did you leave working for Lane?

15        A.   I was laid off.

16        Q.   I'm sorry.  What did you say you had your

17   master's in?

18        A.   Mississippi State University.

19        Q.   In what?

20        A.   Oh.  In industrial engineering.

21        Q.   Industrial engineering.  What year did you get

22   your master's in industrial engineering?

23        A.   Say that again, please.

24        Q.   What year did you get your master's degree?

25        A.   Master's degree is 1990 -- gosh -- '96 or '95.
```

1  I don't remember.  It's '96.

2      Q.   What year did you get your biological

3  engineering degree?

4      A.   '94.  '94.

5      Q.   You were probably there when my brother was

6  there.  He's an industrial engineer from Mississippi

7  State.

8      A.   Oh, yeah?

9      Q.   Graduated from Mississippi State back in about

10  '93 or '94.

11      A.   Uh-huh.

12      Q.   Let's talk about this case here.  When -- before

13  you became the Director of Workforce Management, did you

14  have dealings with Ms. Sherman?

15      A.   Yes.

16      Q.   And what -- how would you interact with her?  In

17  what capacity would y'all interact?  Would your jobs

18  overlap before you became her boss?

19      A.   When we had company that reach out for -- to

20  request for training, then I would -- Ms. Sherman and I

21  would communicate as far as the type of training, the

22  hours of training, and the dates of training.

23      Q.   Who was your -- when you were -- and let's just

24  say, like, when you went full-time -- I think you said

25  you went full-time in 2016?

Deposition of Tzer Waters, taken December 15, 2022

1    A.    Right about there.

2    Q.    Who was your -- who did you report to at that

3  time?  Who was your boss?

4    A.    I think it was Leigh Oswalt maybe.  There might

5  be -- there might be an overlap of Ms. Gillespie and

6  Ms. Oswalt.

7    Q.    And was -- were they -- at the time they were

8  your boss, were they the Director of Workforce --

9    A.    Yes.

10    Q.    Okay.  So your -- you worked -- even though the

11  trainers work in the same department as the Workforce

12  managers like Ms. Sherman; correct?

13    A.    Yes.

14    Q.    With the same boss?

15    A.    Yes.

16    Q.    Got you.  During the time -- you were full-time

17  between -- I believe you said before you -- between 2016

18  and 2018, before you became the director, did you have

19  any issues working with Ms. Sherman?

20    A.    No, not that I can remember at this point.

21    Q.    Let me show you what's been introduced --

22        MR. WOODRUFF:  Off the record.

23        (AFTER A DISCUSSION OFF THE RECORD, THE

24    DEPOSITION CONTINUED AS FOLLOWS:)

25  BY MR. WOODRUFF:

Deposition of Tzer Waters, taken December 15, 2022

1     Q.   All right.  Are you aware that Ms. Sherman got a
2  poor evaluation in early 2019?

3     A.   I was made aware of.

4     Q.   Let me show you what was introduced as Exhibit
5  Number 2.

6     A.   Yes, sir.

7     Q.   Did you have any role in producing -- or making
8  decisions about this evaluation?

9     A.   This particular?

10    Q.   Yes.

11    A.   No.

12    Q.   It would have been strictly Mr. Lowder --
13  Dr. Lowder?

14    A.   Yes.

15    Q.   Okay.  Did you review it before it was given to
16  Ms. Sherman?

17    A.   No.

18    Q.   Okay.  Let me show you Exhibit Number 1.

19    A.   Okay.

20    Q.   And you know she was put on a PIP March 8 of
21  2019; correct?

22    A.   Yes.  On the date here, yes.

23    Q.   All right.  Did you have any conversation -- did
24  you have any role in putting her on a PIP?

25    A.   No.

Page 11

1     Q.   Did Mr. -- did you have any conversations with

2   Mr. Lowder prior to her being put on a PIP about why she

3   was going to be put on a PIP?

4     A.   No.

5     Q.   So your testimony is that poor evaluation and

6   the Performance Improvement Plan were strictly from Joe

7   Lowder?

8     A.   Yes.

9     Q.   You had no involvement whatsoever in either --

10  in putting -- in putting that together -- those documents

11  together or deciding she would be put on a PIP or for

12  what reason she'd be put on a PIP.  Would that be fair?

13    A.   Yes.

14    Q.   When you became -- and I think you said

15  October 2018 you became the Director of Workforce

16  Management.  Did -- at that time, did -- did Tanya all of

17  a sudden start reporting directly to you?

18    A.   Yes.  Yes.  That's right.

19    Q.   She would have been a direct report to you at

20  that point?

21    A.   That's right.  Yes.

22    Q.   Once she became a direct report of yours, from

23  that time in October up until March of 2019, did you have

24  any issues with her job performance or the way she was

25  doing her job?

1    A.   It's -- there are details that -- you know, I

2  cannot remember everything.

3    Q.   Well, tell me what you do remember.

4    A.   You know, I would give feedback on maybe

5  corrections on quotes or that I can -- you know, that

6  I -- I think would be part of that.

7    Q.   Okay.  Explain that to me.  I'm not sure I

8  understand what you're saying.  Feedback meaning what?

9    A.   Like, you know, if the quote comes to me for

10 review, there's incorrect information or not enough

11 information, I would send it back to her to make those

12 corrections.

13   Q.   All right.  Can you give me a specific example

14 of that between that period of time?  Between the time

15 you became the director and she was issued a PIP, can you

16 give me an example of a quote that came in or a --

17 something she submitted that you had to send back and

18 have some changes made to it?

19   A.   I really cannot remember.  I'm sure there are

20 details and there's documents.  I don't -- I can't give

21 you an example right off the top of my head.

22   Q.   All right.  Can you tell me how many times you

23 had to have her go back and -- and correct or audit or

24 make changes to documentation submitted to you?

25   A.   If you're -- you're talking about the time

1   period between October of 2018 to March?

2      Q.   Yeah.  Until the -- I'm talking about --

3      A.   Okay.  I see.

4      Q.   -- from the time you became her boss until this

5   PIP was issued.  I'm trying to understand exactly what --

6   if you have any criticism --

7      A.   Uh-huh.

8      Q.   -- of her work or any -- you know, I'm trying to

9   understand what your testimony is about her work

10  performance --

11      A.   Right.  Right.

12      Q.   -- during that period of time.

13      A.   I don't -- I mean, I don't -- you know, I just

14  came on board October.  So there may be some quotes, you

15  know, but I don't remember, you know, specifically what

16  they are, what they could be and -- since I just came on

17  board.  So I got to look at those documents to make sure

18  that I can tell you a number.

19      Q.   So, as you sit here today, you can't tell me

20  any -- any particular documentation for any --

21      A.   To match the dates that you're talking about.  I

22  will have to look it up.

23      Q.   But you're claiming -- it's your testimony under

24  oath that there were submissions made by Tanya during

25  that period of time that you had to -- you had to have

1  her get corrected.  Is that your testimony?

2      A.   Between October and March, I cannot tell you

3  specifically.  I have to look at the documents.

4      Q.   So, as you sit here today, you can't tell me

5  that you --

6      A.   Right.

7      Q.   -- during that period of time you had to have --

8      A.   Right.

9      Q.   -- any of her paperwork corrected?

10     A.   Right.  During that time, I cannot tell you

11  specifically.  Correct.

12         MR. GRIFFITH:  Objection, Counsel.  If you've

13     got specific documentation -- and there are thousands

14     of pages that have been produced, 7,000 of them, by

15     your client -- then present her with the

16     documentation.  Give her a fair chance to respond to

17     your question.

18         MR. WOODRUFF:  I'm asking her questions.

19         MR. GRIFFITH:  This is not a game of 60

20     questions.

21         MR. WOODRUFF:  I'm --

22         MR. GRIFFITH:  Present her with a document

23     that's relevant to what you're asking.

24         MR. WOODRUFF:  This is totally improper.  First

25     of all, I'm doing the deposition the way I do the

**Deposition of Tzer Waters, taken December 15, 2022**

1    depositions.  If you don't like it, you can object to

2    the form, but I'm going to do my deposition the way I

3    do the depositions.  And if you don't like it, then

4    you can object, but you can't make speaking

5    objections, as you know.

6  BY MR. WOODRUFF:

7    Q.   So, as I -- as you sit here today, you can't

8  tell me any -- you can't tell me any particular company

9  that submitted documents -- she submitted documentation

10  for that was improper?

11    A.   I cannot for that time period that you listed.

12    Q.   Fair enough.  All right.  Are you aware -- when

13  you became the -- the director in October, how many

14  people -- how many Workforce managers were working under

15  you at that time?

16    A.   Ms. Sherman and -- two.  Two -- Jason Spradlin.

17    Q.   Just two?

18    A.   Yes.

19    Q.   How many different companies was Jason

20  responsible for?

21    A.   Maybe ten.  Maybe -- maybe ten.  Round about ten

22  maybe.

23    Q.   How many was Ms. Sherman responsible for?

24    A.   Probably 20 -- 15, 20.

25    Q.   Why was she doing twice as many as Jason?

**Deposition of Tzer Waters, taken December 15, 2022**

1      A.   In -- I can speak from when I started it.  That

2  was -- as project manager -- she had been a project

3  manager for a long time.  So she has those companies that

4  she already has that she's working with, and so that --

5  that explains why she has more.

6      Q.   What are executive accounts?

7      A.   I don't -- I've never heard of that word --

8  term -- that term you used, executive account, unless you

9  are referring to a director's project.

10      Q.   I'm sorry.  I'm sorry.  Director's projects.

11      A.   Director's project?

12      Q.   Yeah.  Let's call -- yeah, I misstated.  Tell me

13  what a director's project is.

14      A.   From what I understand when I started the

15  position, director's project include the Toyota project,

16  the Toyota company.  Those are the kind of projects that

17  director -- that I can -- that I can remember when I

18  assumed --

19      Q.   Do you still have --

20      A.   -- that position.

21      Q.   I'm sorry.  I didn't mean to interrupt.  Do you

22  still have director's projects?

23      A.   Currently?

24      Q.   Yes.

25      A.   No.  We only have just me right now.  There's

Deposition of Tzer Waters, taken December 15, 2022

Page 17

1   not a project manager.

2      Q.   You have no project managers?

3      A.   Not currently.

4      Q.   What's happened to all those projects that they

5   used to have with the training?  They just don't do it

6   anymore?  The college don't do it anymore?

7      A.   We're doing more of the college led training.

8      Q.   College?

9      A.   College led.  Meaning we have instructors that

10  do the training.

11     Q.   Uh-huh.

12     A.   So that's what happened.  We do more of those.

13     Q.   So you don't have any project managers

14  currently?

15     A.   Correct.

16     Q.   When was the last time you had a project

17  manager?  Who was the last one who was working under you?

18     A.   Mr. Spradlin.  I think he --

19     Q.   Does he still work for ICC?

20     A.   He is still as an adjunct online instructor.

21     Q.   He's working as an instructor now?

22     A.   On line --

23     Q.   On line?

24     A.   -- for ICC part-time.  He has a full-time job.

25     Q.   Is he in the military or National Guard or

Deposition of Tzer Waters, taken December 15, 2022

1   something?

2       A.   Yes.

3       Q.   Is he still in that or --

4       A.   I don't know.

5       Q.   I know about -- he had to take some leave

6   periodically?

7       A.   Right.  Right.

8       Q.   But is he still in military, or do you know?

9       A.   I don't know.

10      Q.   You don't know?  When you became the Director of

11  Workforce Development, had you ever been a Workforce

12  Development -- had you ever worked in Workforce

13  Development in any other capacity other than as an

14  instructor?

15      A.   No.

16      Q.   How did you find out what the Workforce policies

17  and procedures were?

18      A.   After I assumed the position or --

19      Q.   Before.  After.  I mean, how did you -- how did

20  you read and understand the MCCB and the ICC Workforce

21  policies and procedures when you became the director?

22  What did you do to learn those?

23      A.   We have copies of those.  When I became the

24  director, we have copies of those policies.

25      Q.   Got you.  Were you ever over the -- Southern

Deposition of Tzer Waters, taken December 15, 2022

1    Motion, like a project manager for Southern Motion?

2         A.   During Jason's absence, yes.

3         Q.   Were you aware of a complaint back around 2016

4    from workers at Southern Motion that they were -- that

5    they were -- that the company was claiming they were

6    getting trained -- training that they were never

7    receiving?

8         A.   I heard about it.

9         Q.   Did you go to Southern Motion with Ms. Sherman

10   to discuss that issue at one time?

11        A.   I believe -- yes, that's correct.

12        Q.   Tell me what you recall about that.

13        A.   There was -- there were two trips that I

14   remember.  One of them, it was with Dr. David Cole, Liz

15   Owens, and myself.  I don't remember if Ms. Sherman was

16   there or not.

17        Q.   Okay.  Tell me about that trip.

18        A.   That was that one meeting.  And then I believe I

19   went another trip with Ms. Sherman as well.

20             As for the first trip, we talk about the

21   training.  Liz -- Liz Owens, which was the project

22   manager at the time, she did the most talking.  And when

23   we -- and then -- this is all I can remember.  It's been

24   so long ago.  And then Dr. David Cole then asked us to

25   leave the room so he could speak with the plant manager

**Deposition of Tzer Waters, taken December 15, 2022**

1   there.  That much I remember.

2          And I don't know -- in the span of maybe a few

3   days or during the meeting -- I don't remember -- I was

4   tasked with working with them on the training outlines.

5      Q.   Tell me about the trip with -- the visit you did

6   there with Ms. Sherman, what you recall about that.

7      A.   I really don't remember the details.  I remember

8   going with her, but I -- I -- I can't remember if she --

9   she talk.  She -- I -- that -- I don't know the specifics

10  of it.

11     Q.   Did Mr. Lowder become the director shortly

12  thereafter?

13     A.   Yes.

14     Q.   Somewhere around then?

15     A.   Yes.  Somewhere around that time, yes.

16     Q.   Do you recall whether or not he changed the

17  forms for Southern Motion so there would be -- there was

18  no sign-in or sign-out times on their forms that they

19  submitted?

20     A.   I'm not aware of it, and I don't remember

21  being --

22     Q.   You don't remember that?

23     A.   No.

24     Q.   You weren't aware, or you don't remember?

25     A.   I don't remember.  Because I was -- I was just

**Deposition of Tzer Waters, taken December 15, 2022**

Page 21

1    tasked with the outline.  So I don't know anything

2    about -- I would say I do not know anything about the --

3    whatever that you just mentioned.

4        Q.   Tell me what you mean "tasked with the outline."

5    What does that mean?

6        A.   Dr. -- Dr. Cole had asked me to work with them

7    on the training outlines, you know, really asking what

8    they will be trained on and then the hours that --

9    that -- required for that training to be completed.

10        Q.   Who was responsible -- the project manager for

11    Franklin Corporation?

12        A.   Franklin Corporation.  That would be Liz Owens

13    at that time.

14        Q.   But later on it would have been Spradlin and

15    then you?

16        A.   Yes.  Yes.

17        Q.   It would have been Spradlin except when he was

18    called up to active service; is that correct?

19        A.   That is correct.

20        Q.   Or when he was gone for his military service.

21    I'm not sure.  I haven't had a chance to depose him yet

22    so I'm not really sure what his -- whether it's National

23    Guard or Army or whatever, but we'll find out when we

24    depose him.

25            Were you aware of Franklin Corporation

1  submitting training logs without consistently documenting

2  start times and end times?

3      A.   Yes.  I -- yes.

4      Q.   Did money have to be paid back to the State

5  because of that?

6      A.   Yes.

7      Q.   Was that done at a time when you were the

8  project manager responsible for the Franklin Corporation?

9      A.   It would be hard for me to say yes because I --

10  I -- you have to look at the timeline --

11     Q.   Uh-huh.

12     A.   -- when Jason is gone and when I -- when I was

13  in -- the project manager for that project.

14     Q.   How about Chapter 3?  Were you aware of them

15  fraudulently collecting reimbursement for fake classes?

16  Around $400,000?

17     A.   I mean, I'm not going to say it's fraudulently

18  because I'm not sure at this point but --

19     Q.   But -- I'm sorry.  Go ahead.  I didn't mean to

20  interrupt you.

21     A.   No.  No.  We did find an issue with the

22  paperwork.

23     Q.   Uh-huh.

24     A.   Ms. Loden had just came on board, and so she was

25  reviewing the paperwork and brought to my attention there

**Deposition of Tzer Waters, taken December 15, 2022**

Page 23

1  were, what we call, duplicates, you know.  And so we

2  addressed the problem with -- with MCCB and with the

3  company as well.

4      Q.  What do you mean duplicates?

5      A.  It -- the way -- it looks like the trainer was

6  signing in as a trainee in one class and also as -- as

7  another trainee in another class.

8      Q.  So it was like double billing?  Would that be a

9  fair characterization of what was going on?

10      A.  No.

11      Q.  No?  For a period of time, was the -- you --

12  were you over the ICC food program?

13      A.  No.

14      Q.  You never were over that?

15      A.  Not when it first started.

16      Q.  I didn't ask when it first started.

17      A.  Yeah.

18      Q.  Was there a period of time you were over the ICC

19  food program?

20      A.  Yes.

21      Q.  And that was -- isn't it true that Southern

22  Motion, Chapter 3, and the ICC food program were all

23  programs that Mr. Spradlin was responsible for when he

24  was there, but when he left, when he was off on military

25  duties, you would take over those?

Deposition of Tzer Waters, taken December 15, 2022

1      A.    Correct.  Except for the food program was really

2   under another director.  So the role that Mr. Spradlin

3   did was the reimbursing part -- reimbursement part of it.

4      Q.    Got you.  And who was that other director?

5      A.    Scott Blackley at that time.

6      Q.    And were there big compliance issues with all

7   three of those companies?  When the audits came -- the

8   MCCB audits came, were there major compliance issues with

9   those three programs?

10     A.    With -- this is MCCB; right?

11     Q.    Yeah.

12     A.    Okay.  I'm going to have to kind of explain a

13  little bit.  So --

14     Q.    Please do.

15     A.    Yes.  So when I became the director -- so

16  compliance issue.  When MCCB came to do audit that I was

17  a part of, there was no audit of Southern Motion

18  paperwork.

19     Q.    There was no --

20     A.    There was no audit of Southern Motion paperwork.

21     Q.    I don't understand the word.  There was no --

22     A.    The paper was not there for them to audit.  So

23  there was no --

24     Q.    No audit?

25     A.    Yeah.

Deposition of Tzer Waters, taken December 15, 2022

1      Q.   Got you.

2      A.   MCCB audit.

3      Q.   Got you.

4      A.   Neither was Chapter 3 paperwork.

5      Q.   Got you.  Why wasn't there any paperwork?

6      A.   The State Auditor's Office has those.

7      Q.   Were you aware of whether or not the ICC Food

8 Pathway Program was fully funded by federal grants?

9      A.   I was not aware.

10     Q.   Did Ms. Sherman ever complain to you that ICC

11 was not compliant with government regulations and

12 policies?

13     A.   I don't remember specifically.

14     Q.   You don't remember?

15     A.   No.

16     Q.   If she testified that she did, would you --

17 would you deny that or say you just don't remember?

18     A.   I don't remember.  I don't remember.

19     Q.   Okay.  Do you recall whether or not Ms. Sherman

20 ever told you that ICC would have to repay the money it

21 was caused to be illegally paid to these furniture

22 companies?

23     A.   No.

24     Q.   You don't recall that?

25     A.   No.

1     Q.   Are you denying she said that, or are you just

2  saying you don't recall?

3     A.   I don't recall that.

4     Q.   Do you recall in November of 2018 Ms. Sherman

5  asking you and Jason Spradlin why they were using State

6  reimbursement for a project that was 100 percent funded

7  by federal grants?

8     A.   I don't remember.

9     Q.   Do you deny her asking you that, or are you

10 saying you don't remember?

11    A.   I don't remember.

12    Q.   Do you recall telling Ms. Sherman that they had

13 other expenses?

14    A.   I may have said that.  I just -- I may have.

15    Q.   Do you recall Ms. Sherman telling you and

16 Mr. Spradlin that that was fraud and money laundering?

17    A.   I don't remember.

18    Q.   Do you deny her saying that, or do you -- are

19 you just saying you don't recall?

20    A.   I don't -- I don't remember.  Yes.

21    Q.   After she was put on a Performance Improvement

22 Plan, at some point, did you take over monitoring her

23 progress on this Performance Improvement Plan?

24    A.   Yes.

25    Q.   Tell me about that.  Why did -- why were you --

Deposition of Tzer Waters, taken December 15, 2022

1   why did Mr. Lowder -- strike that.  Did Mr. Lowder tell

2   you why he wanted you to monitor the Performance

3   Improvement Plan?

4       A.   She was -- she was put on the PIP, Work

5   Performance Improvement Plan.  So, when I assumed the

6   director's position --

7       Q.   Uh-huh.

8       A.   -- I have to make an assessment on whether she

9   make progress or not.

10      Q.   I understand.  But you assumed the position

11  before she was put on -- you became the director in

12  October of 2018.  She was --

13      A.   Yes.

14      Q.   -- put on a Performance Improvement Plan in

15  March of 2019.  So you had already been her director for

16  five months.

17      A.   Right.  Right.  Well, I was not aware of the

18  PIP.  I was not aware she was on the PIP when I assumed

19  that position --

20      Q.   And --

21      A.   -- at that time.

22      Q.   But I -- and you may have answered, and I

23  apologize if you did.  But did he tell you why -- did he

24  tell you why he wanted you to monitor it?  Was it because

25  you were the director -- was that it --

Deposition of Tzer Waters, taken December 15, 2022

Page 28

```
 1       A.   Yeah.
 2       Q.   -- and he was the dean now?
 3       A.   Yes.  He was transitioning that responsibility
 4   to me.
 5       Q.   Got you.  Fair enough.  Have you ever looked
 6   at -- did you ever look at Ms. Sherman's response to the
 7   Performance Improvement Plan, her 20-page response?
 8       A.   Yes, at some point.  Yes.
 9       Q.   Let me show you what's been introduced as
10   Exhibit Number 6.  Did you review this?
11       A.   I've looked through it a while back.
12       Q.   Well, I know, but at the time it was submitted
13   back in April of 2019, did you review it then or sometime
14   around that period of time?
15       A.   I don't know if I received this during the time
16   period you mentioned.  April.  I don't --
17       Q.   When do you think you received it?
18       A.   Oh, gosh.  You know, I don't remember.  I don't
19   remember.  I -- I don't remember when I saw this.
20       Q.   Have you ever read the entire document?
21       A.   Yes.  Let me think.  Let me think.  I don't -- I
22   have a long time -- a while back.
23       Q.   And were you aware there were 100 pages of
24   documentation backing up her response to this PIP --
25            MR. GRIFFITH:  Object to the form.  Object to
```

Deposition of Tzer Waters, taken December 15, 2022

Page 29

1     the characterization.

2   BY MR. WOODRUFF:

3     Q.   -- that was submitted with this response?  She

4   also attached 100 pages of documentation supporting

5   her -- this response?

6     A.   I heard of it.

7     Q.   Did you ever review that?

8     A.   Oh, gosh.  I don't remember if I did.

9     Q.   Well, wouldn't that be important to review?  If

10  you're the one who now is monitoring her improvement in

11  the PIP, wouldn't it be the first thing -- wouldn't it

12  be -- make sense to first find out what her response to

13  these criticisms is?

14        MR. GRIFFITH:  Object to the form and object to

15     the characterization of the 80 pages of copies of

16     meaningless data.

17        MR. WOODRUFF:  I didn't say 80.

18        MR. GRIFFITH:  That's what it was.  A total of

19     101 pages.  This is 20 pages.

20        MR. WOODRUFF:  Right.

21        MR. GRIFFITH:  The rest is about 80 pages --

22        MR. WOODRUFF:  It's 100 --

23        MR. GRIFFITH:  -- of stick-em notes.

24        MR. WOODRUFF:  I can show you the documents that

25     were produced in discovery, Bates Stamp 61 through

Deposition of Tzer Waters, taken December 15, 2022

1      160 -- it's 100 pages -- if you want me to.

2           MR. GRIFFITH:  However you want to conduct your

3      deposition exam.

4           MR. WOODRUFF:  Well, I'm trying to conduct it,

5      but you --

6           MR. GRIFFITH:  Yeah.

7           MR. WOODRUFF:  -- keep interrupting it.  So. . .

8           MR. GRIFFITH:  No.  I'm making a record,

9      Counsel.

10          MR. WOODRUFF:  Okay.

11          MR. GRIFFITH:  Don't mischaracterize what I'm

12     doing.  I'm making a record --

13          MR. WOODRUFF:  Well, you're --

14          MR. GRIFFITH:  -- which I have a right to do.

15          MR. WOODRUFF:  No, you're testifying, which is

16     not what you have a right to do.

17          MR. GRIFFITH:  No, Counsel, I'm not testifying.

18     I'm making a record with the basis of the objection

19     being specified.  Nothing more.  Nothing less.

20          MR. WOODRUFF:  Okay.  Your objection is that

21     it's not 100 pages.  Is that your objection?

22          MR. GRIFFITH:  The 101-page diatribe that your

23     client submitted has 20 pages at the front, and the

24     rest of it is attachments of documents and records.

25          MR. WOODRUFF:  You're absolutely wrong.  There's

**Deposition of Tzer Waters, taken December 15, 2022**

Page 31

1      a 20-page document, which you called a --

2      slanderously called a diatribe, but there's 100 pages

3      of documents attached to it which back up her

4      response.

5          MR. GRIFFITH:  You need a quick lesson in

6      defamation and slander because you're incorrect,

7      Counsel.  You conduct the deposition the way you want

8      to, the way you feel you need to, but don't

9      misrepresent what's in front of the client, which is

10     Exhibit 6, which is the 20-page response that

11     Ms. Sherman provided.

12         MR. WOODRUFF:  That's correct.

13         MR. GRIFFITH:  That's all it was.

14         MR. WOODRUFF:  Absolutely.

15  BY MR. WOODRUFF:

16     Q.   And were you aware that she provided a hundred

17  pages of documents supporting this -- approximately a

18  hundred pages -- might have been 101 or 99, but right

19  around a hundred pages of documents supporting this

20  20-page response to the PIP?

21     A.   I was told.

22     Q.   You were told.  Did you ever review those

23  approximately a hundred pages of documents?

24     A.   I probably browsed through it.  I looked through

25  it.

**Deposition of Tzer Waters, taken December 15, 2022**

Page 32

```
1        Q.   Looking at this 20-page response to the
2   Performance Improvement Plan, can you tell me anything in
3   there that is incorrect that she states in there?
4        A.   You know, I can't sit here and go through page
5   by page to let you know --
6        Q.   I'm just asking for --
7        A.   -- because --
8        Q.   I'm sorry.  I didn't mean to interrupt.
9        A.   Yeah.  Because some of it is not during -- you
10  know, that is Dr. Lowder's evaluation of her when -- when
11  she reports to him.  So I'm -- you know, for me to sit
12  here to cover this, it will -- and then to point it out
13  to you under oath, that's something -- I don't -- I don't
14  know if I can do that.
15       Q.   Can you tell me anything in there that's not
16  factually accurate that she claims?
17       A.   I can't.  I cannot right now.
18       Q.   Do you recall recommending to Dr. Lowder to
19  charge individuals whatever they can pay for in programs
20  designed to provide training to citizens in order to
21  maintain -- obtain entry-level positions at these
22  factories?
23       A.   Can you repeat your question?
24       Q.   Did you -- and I'll try to shorten it.  Did you
25  ever recommend to Dr. Lowder to charge individuals
```

```
1   whatever they can pay --
2        A.   No.
3        Q.   -- for the programs?
4        A.   No.
5        Q.   You deny that?
6        A.   Yes.
7        Q.   Did you ever advise your staff to treat these
8   programs as your own businesses?
9        A.   Did I advise them?
10       Q.   Yes.
11       A.   No.
12       Q.   Did you ever advise them to charge individuals
13  whatever they can pay?
14       A.   Did I advise them to charge individuals what
15  they can pay?
16       Q.   Yes.
17       A.   Let me -- let me step back on that one.  We
18  asked -- there is a fee for each program; right?  And so,
19  if they can pay -- whatever they can pay, we'll take it.
20  We'll receive their payment.
21       Q.   Uh-huh.
22       A.   And that's what -- that's what we do.  And if
23  they cannot pay, we don't turn them away from the
24  program.  We still let them participate in the program.
25       Q.   Do you put them on a payment plan?
```

Page 34

1       A.   No.

2       Q.   Did you ever put any of these people who needed

3  the Workforce training for entry-level jobs on a payment

4  plan to pay for the training?

5       A.   No.  No.

6       Q.   Okay.  Did you at one point provide Chinese

7  interpretation service to Ashley Furniture?

8       A.   Yes.

9       Q.   And why did you do that?

10       A.   Why do I do that?

11       Q.   Why did you do it?  Did they purchase some --

12  maybe some equipment that was made in China or somewhere

13  where you -- you know -- and, just for the record, you

14  speak Chinese?

15       A.   Yes, I do.

16       Q.   Mandarin or --

17       A.   Mandarin.

18       Q.   That's the most -- the most wide spoken;

19  correct?

20       A.   Uh-huh.

21       Q.   And so my understanding is they needed -- they

22  needed an interpreter to help with this equipment; is

23  that -- is that correct?

24       A.   Right.  That is correct.  Uh-huh.

25       Q.   And they hired you and paid you to do that?

Deposition of Tzer Waters, taken December 15, 2022

1     A.   Yes.

2     Q.   Okay.  Tell me about that experience.

3     A.   They have a technician -- equipment technician

4 from the manufacturers that -- who came and install the

5 system.  And so I was there whenever he was there, the

6 technician, Chinese technician.  So I serve as -- as he

7 go through the instructions and as he sets up.

8     Q.   Uh-huh.

9     A.   So I translate -- interpret -- sorry --

10 interpret between Ashley maintenance technician and

11 operator.

12    Q.   Uh-huh.  Who was the maintenance person -- do

13 you remember who the maintenance manager was at that

14 time?

15    A.   I don't remember.

16    Q.   Did you have any conflicts with the maintenance

17 manager?

18    A.   There was a meeting that I had to interpret.

19    Q.   Uh-huh.

20    A.   And there was -- there was a disagreement

21 between the plant manager -- oh, I'm not sure.  I won't

22 say plant manager because I don't know his title -- and

23 the Chinese technician.  I don't remember all the

24 details.  I just remember the -- I was, you know, trying

25 to interpret both.  There was some disagreement that went

Deposition of Tzer Waters, taken December 15, 2022

Page 36

1  on.

2          So the Chinese technician was not happy because

3  he was not made aware of the issues.  But they went --

4  they -- Ashley contacted his supervisor or his manager,

5  and so -- to talk about the issues that they had, but --

6  but that was not mentioned to the technician.  So

7  technician had a disagreement with that, that they could

8  have gone directly to him instead of to his supervisor.

9      Q.   Do you recall making a comment in front of

10 Ms. Sherman that Ashley Furniture is using shitty

11 materials for their product?

12     A.   I did not make that comment.

13     Q.   You deny -- you deny that?

14     A.   That's correct.

15     Q.   So, if anybody testified to that, they wouldn't

16 be telling the truth?

17     A.   I would -- I would not use the word -- what you

18 just used.  It's not the best system.

19     Q.   Uh-huh.  Got you.  Did you ever have an issue

20 with the time that Emily Lawrence spent with Tanya

21 Sherman?

22     A.   No.

23     Q.   Did you ever -- did you ever tell Emily Lawrence

24 she needs to limit her time she spends with Ms. Sherman?

25     A.   No.

1     Q.   Did you ever tell your staff to split large

2  reimbursement checks into smaller amounts in case the

3  auditor cited the amount and it had to be paid back?

4     A.   I did tell them to split into smaller amounts,

5  but I do not agree to what you said on the latter part.

6     Q.   So why did you tell them to put them into

7  smaller amounts?

8     A.   The checks were so -- their checks will be

9  bigger if we do that and the process -- hang on a second.

10  It will be processed a little bit faster with the smaller

11  batches, internally processed.  And sometimes when we cut

12  the check -- I don't remember.  I just remember that it

13  will be processed a little bit faster.

14         And if -- there will be times where, you know,

15  ICC would sometimes have to -- that's just what I've

16  heard too -- have to float those checks when we wait for

17  the system to approve so that that's not a huge amount

18  that the college has to put up.

19     Q.   Were you aware that -- that -- that Mr. Lowder

20  assigned the five director accounts to Ms. Sherman when

21  he became the director?

22     A.   I don't know what five account you talking

23  about.

24     Q.   Well, you mentioned one of them, I think, was

25  Toyota.

Deposition of Tzer Waters, taken December 15, 2022

```
 1        A.    Right.

 2        Q.    The five big ones -- the five biggest ones.  And

 3   you never heard the term director accounts, accounts that

 4   were so important that a director should handle those

 5   accounts?

 6        A.    No.  I -- I just know of the Toyota.  That used

 7   to be Denise Gillespie, which she was a director at that

 8   time.  So that's why I knew that was a

 9   director's project.

10        Q.    Do you know of any other accounts that she

11   handled when she was a director?

12        A.    I'm not aware.

13        Q.    Were you aware that Ms. -- Ms. Sherman was also

14   put over the MEP project in -- around July of 2018?

15        A.    I was aware of that.

16        Q.    Do you know why she was asked to do that?

17        A.    No.

18        Q.    Who made that decision?

19        A.    Dr. Lowder.

20        Q.    Did he tell you why he made -- made her over

21   that position?

22        A.    No.

23        Q.    Were you aware whether or not -- did you know

24   what the MEP project was?

25        A.    At that time?
```

1     Q.   Yes.

2     A.   Yes, somewhat.

3     Q.   And I believe there's four college -- four

4 community colleges in the state that are part of this MEP

5 program, four or five; is that correct?

6     A.   At that time, I just -- I know ICC is one, CAVS

7 Center at Mississippi State.  That's not a community

8 college.  MPI.  That's not a community college.

9     Q.   But there's only limited -- I might have

10 misspoke as far as being community.  But there's only,

11 like, four.  I think there's a Gulf Coast Community

12 College --

13     A.   Yes, I --

14     Q.   -- which has one too; right?

15     A.   Yes, I heard -- yeah, I heard that.

16     Q.   Okay.  And are you aware of whether or not --

17 directors at these other schools that have this program,

18 whether or not they have a director or not running that

19 program?

20     A.   I'm not -- I'm not aware.

21     Q.   After Ms. Sherman was put on a PIP, was she --

22 did they take away her responsibility of running the MEP

23 project?

24     A.   No.

25     Q.   Why not?

```
 1        A.    I don't know.

 2        Q.    Do you think -- after you became the director of

 3   the Workforce program, do you think that you were -- you

 4   could have been qualified or were capable of being a

 5   Workforce manager?

 6        A.    Yes.

 7        Q.    You knew the job well enough?

 8        A.    Yes.

 9        Q.    But you had never done the job?

10        A.    Right.

11        Q.    Okay.

12        MR. WOODRUFF:  Step outside.

13        (AFTER A RECESS, THE DEPOSITION CONTINUED AS

14   FOLLOWS:)

15   BY MR. WOODRUFF:

16        Q.    All right.  Let me show you what's --

17        MR. WOODRUFF:  Everybody ready?

18        MR. GRIFFITH:  Yeah.

19   BY MR. WOODRUFF:

20        Q.    -- introduced as Exhibit Number 7.  Have you

21   ever seen this document here before?

22        A.    This is the first time I've seen it.

23        Q.    And the reason I was going to ask you about

24   this -- what's the date on this document?

25        A.    September 5th, 2019.
```

1     Q.   Right.  So that would have been about -- it's,

2  like, a six-month follow-up to the PIP; is that correct?

3     A.   To his -- to his PIP that he did?

4     Q.   Yeah.  This is like a -- my understanding, that

5  appears to be a six-month follow-up to the PIP?

6     A.   Yeah.  He said six months.

7     Q.   Okay.  And the only reason I want you to look at

8  it is just for a timeline --

9     A.   Uh-huh.

10     Q.   -- because it's from Joe Lowder --

11     A.   Uh-huh.

12     Q.   -- copied Mr. Senter, and your name is not on

13  it.

14     A.   Right.

15     Q.   And so I just want to confirm.  It sounds like

16  he had turned over you monitoring the PIP at this time.

17  Would that be a fair statement?

18     A.   Yes.

19     Q.   Otherwise, I mean, why would he not at least

20  copy you on this memo if you were involved in monitoring

21  it.  So you would -- would you agree with that?

22     A.   Yes.

23     Q.   Okay.  That's all I -- that's the only reason

24  why I wanted you to look at that.

25          MR. WOODRUFF:  All right.  Let's go ahead and

Deposition of Tzer Waters, taken December 15, 2022

Page 42

1      introduce this as Exhibit Number 21.

2           (DOCUMENT REFERRED TO WAS MARKED AS EXHIBIT

3      NO. 21.)

4  BY MR. WOODRUFF:

5      Q.   This is Bates stamped TS-62 to TS-160, which is

6  what I referred to earlier as the 100-page documentation

7  that supports Tatiana's response to the PIP, the 20-page

8  response that we looked at earlier.  Have you ever gone

9  through these documents before?

10     A.   I browsed through it.

11     Q.   And what was your impression of browsing through

12 it?

13     A.   That there are quotes and there are e-mails.

14     Q.   Did you understand what -- the purpose of why --

15 of why she claims she put those documents -- attached

16 those to her response to the PIP?

17     A.   I see she made some quotes here.  So she's

18 showing the quotes that she's done and the numbers that

19 she reported.

20     Q.   I kind of tried to follow chronologically pretty

21 much.  So I'm going to get them in chronological order.

22          All right.  Let me show you what's been

23 introduced as Exhibit Number 8.  Do you recognize this

24 document here?

25     A.   Yes.

Page 43

1      Q.   Tell me what this is.

2      A.   This is the PIP that I did for Ms. Sherman.

3      Q.   It's a PIP, or is it a follow-up on the initial

4 PIP that --

5      A.   Yeah, it's a follow-up.

6      Q.   It's not a new PIP, is it?  It's just a

7 follow-up?

8      A.   It's a follow-up on the categories that was on

9 there.

10     Q.   Got you.

11     A.   Uh-huh.

12     Q.   Can I see that real quick?  Did you meet with

13 Ms. Sherman at the time that you did this?

14     A.   Yes.

15     Q.   And tell me about that.  Who else was there when

16 you met with her about this -- this follow-up?

17     A.   Tim Senter.

18     Q.   Okay.  Did -- tell me about what was discussed

19 at this time, what you recall.

20     A.   There's a lot of details, I'm sure.  I just went

21 through --

22     Q.   Tell me what you recall.

23     A.   Yeah.  I went through each page, each item on

24 there, and I have examples that I -- that I had with me.

25 And then I go through as I go through them.

**Deposition of Tzer Waters, taken December 15, 2022**

Page 44

```
1        Q.   So you had examples?

2        A.   Yeah.  I had -- that I had with me but -- as I

3  went through them -- as I went through each category.

4        Q.   You went through examples?

5        A.   As I go through the narrative that I had, and it

6  was -- it was a few hours' long.

7        Q.   Uh-huh.

8        A.   Ms. Sherman had questions, and we, you know,

9  answer.  You know, she had questions, and I answered it.

10       Q.   Do you recall any of the questions she asked?

11       A.   I cannot remember.  I mean, it's --

12       Q.   And what was her response to your -- your

13  review?  How did she respond to your review?  Was she

14  happy with it?  Did she disagree with it?  What's your

15  recollection?

16       A.   She had questions, and I -- you know, I try to

17  answer those.  She may not accept my answers or my

18  response.

19       Q.   And so this is dated 12/18/2019; correct?

20       A.   Yes.

21       Q.   When did you meet with her next concerning this

22  PIP?

23       A.   Gosh.  July -- sometime in July --

24       Q.   I haven't seen any documentation --

25       A.   -- of '20.
```

1     Q.   -- from that.  Is there -- did you -- is there

2   any documentation from that July meeting?

3     A.   No.  I don't -- I don't remember having

4   documentation.  We basically reviewed, kind of follow up

5   on -- on the same --

6     Q.   Exhibit 8?

7     A.   Yes.  Yes.

8     Q.   All right.  And when's the next time you met

9   with her concerning this PIP?

10     A.   I don't remember if there's another time.

11     Q.   Let me show you what's been marked Exhibit

12   Number 9.

13     A.   Uh-huh.

14     Q.   Do you recognize this document?

15     A.   Yes, I do.

16     Q.   And what is this document?

17     A.   This is a document that I -- I had talked to

18   Mr. Senter as far as -- based on what we covered the

19   first two -- the meeting there and then the meeting in

20   July, that I feel like I could not move forward as a

21   supervisor for her.  And then there's no claim of -- you

22   know, acknowledgement of really full responsibility or

23   accountability.

24          And I just -- you know, then that's when my -- I

25   had recommend that, you know, Ms. Sherman be relieved

**Deposition of Tzer Waters, taken December 15, 2022**

1    from position as -- according to this memo, for project
2    manager.
3        Q.   So you recommended her termination?
4        A.   I recommend her relief from that position.
5        Q.   Okay.  And is that a -- is that a termination if
6    she's relieved from her position?
7        A.   In my mind, I just say relief.  However the
8    college -- this is my recommendation, but however the
9    college deals with -- you know, if they move her.  I
10   don't know what they were doing.  I'm not going to
11   speculate from there.
12       Q.   Did you recommend that she be transferred to
13   another department?
14       A.   I did not.
15       Q.   And, again, there's some discussion about -- you
16   know, I've seen a timeline by Mr. Senter where he claims
17   the date is -- should be '21 instead of --
18       A.   Yes.
19       Q.   Is that correct?
20       A.   That is correct.
21       Q.   Because you refer to -- looks like -- let me
22   have that back real quick.
23       A.   Yes.
24       Q.   All right.  So this is -- concerning this --
25   this PIP that -- was issued in September -- I'm sorry --

Page 47

1  in March 8th of 2019.  Six months later, we've got

2  documentation of a meeting with Mr. Lowder and

3  Ms. Sherman.  And then we've got documentation in

4  December of 2019 between you and Ms. Sherman with

5  Mr. Senter present?

6      A.   Uh-huh.

7      Q.   And then in this letter -- and you mention that

8  December '19; correct?  You said after review with

9  Ms. Sherman December 2019.  We just looked at that.  That

10  was Number 8.

11      A.   Right.  Right.

12      Q.   Right.  And then you say, in our meeting in

13  July 22nd, 2020.  So that would have been almost, what,

14  eight months later?

15      A.   2020.  Nineteen -- July -- yeah, around about.

16      Q.   Okay.  And then this is March 7, 2021, I guess

17  you're claiming.  So it looks like from a -- from a PIP

18  issued in March of 2019, there was a follow-up six months

19  later and then about five months after that -- or four or

20  five months after that.  And then the next one year and

21  four months, you met with her one time --

22      A.   I met with her --

23      Q.   -- about her PIP, and then you --

24      A.   -- twice.

25      Q.   -- recommended her termination?

Deposition of Tzer Waters, taken December 15, 2022

1     A.   I met with her twice.  The December one and then

2 the July.

3     Q.   That's what I said.  Between December --

4     A.   Yeah.

5     Q.   Between December --

6     A.   Uh-huh.

7     Q.   -- Exhibit Number 8 --

8     A.   Uh-huh.

9     Q.   -- and March 4, 2021.  You know, that's, what,

10 16, 17 months?

11     A.   Yeah.  I met her -- with her -- yeah.

12     Q.   You met with her one time.  And then you made a

13 recommendation that she be relieved of her duties;

14 correct?

15     A.   I met with her the -- yeah, the December and

16 then the July.

17     Q.   Were you aware that she had been put on an

18 employment agreement at some point prior to her being

19 terminated?

20     A.   I can't remember.  Somebody told me.  I was told

21 that she was put on there.

22     Q.   Who told you she was put on there?

23     A.   I think it was Dr. Lowder or Tim.  I don't

24 remember.

25     Q.   Did they say why she was put on there?

**Deposition of Tzer Waters, taken December 15, 2022**

Page 49

1    A.    No, sir.

2    Q.    Are you on -- are you on a yearly contract or a

3   work agreement?

4    A.    Yearly contract.

5    Q.    How long have you been on a yearly contract?

6    A.    Oh, wow.  I don't remember.

7    Q.    Well, let me ask you this.  At the time you

8   became the director -- and I think we've established that

9   was October of 2018.

10    A.    Uh-huh.

11    Q.    Prior to that, were you on a yearly contract or

12   an employment agreement?

13    A.    I don't remember.  I think yearly contract.

14    Q.    Okay.  Have you -- have you always been on a

15   yearly contract?

16    A.    No.  No.  No.

17    Q.    Let me show you Exhibit Number 12.  Do you

18   recall this -- have you ever seen this document?

19    A.    Yes.

20    Q.    And you were copied on that; correct?

21    A.    Yes.  Yes.

22    Q.    And what's the date on that -- that letter sent

23   to the AG's office and copied with the other people?

24    A.    March 8 -- oh, hang on.  Sorry.  September 24,

25   2019.

Deposition of Tzer Waters, taken December 15, 2022

1    Q.   2019.  And which is about a year and a half

2    before you were -- she was terminated, correct, or you

3    recommended her be relieved of her duties?

4    A.   A year before?

5    Q.   In March of 2021, you --

6    A.   '21.  Yeah.  Yeah.

7    Q.   Right.  So this -- so, after this letter was

8    sent claiming -- making claims of illegal activities, you

9    recommended she be terminated, right, or relieved of her

10   duty?  I'll use your terms.

11   A.   Uh-huh -- yes.

12   Q.   Do you recall when Dean Lowder changed the forms

13   that Southern Motion filled out for -- for the

14   reimbursement for Workforce training so that they would

15   no longer put the time -- Southern Motion would no longer

16   put the times on them?

17   A.   I'm not.  I don't know anything about that.

18   Q.   Isn't it true that you were the one who would

19   fill in the times?

20   A.   No.

21   Q.   You never did that?

22   A.   No.

23   Q.   Who did fill in the times?

24   A.   Stacey Loden.

25   Q.   Isn't that fraud to fill in times -- for ICC to

1  put in the times that these people were working?

2      A.   Is it fraud?

3      Q.   Yes.

4      A.   I don't think so.

5      Q.   Why not?

6      A.   It's a policy, yes, to put start time/end time

7  on there, on the class roll.

8      Q.   Right.

9      A.   Right.

10     Q.   And --

11     A.   But --

12     Q.   I'm sorry.  Go ahead.  I didn't mean

13  to interrupt.

14     A.   That's okay.  But what I was going to say was,

15  on the class roll, it does have the training hours on

16  there that the company filled in on the class roll.

17     Q.   You're not aware that Lowder redesigned them so

18  that they didn't put the times on them?

19     A.   Not at that time when supposedly he changed the

20  form.  I was not part of that.  I didn't know that.

21     Q.   But you were aware that Stacey Loden was filling

22  in times?

23     A.   When she -- when it was mentioned to me when

24  I -- yes.

25     Q.   Well, when -- and based upon those times, State

Deposition of Tzer Waters, taken December 15, 2022

Page 52

```
1   funds are reimbursed to the employers and to the college;
2   correct?
3        A.   Right.  When Ms. Loden brought it to my
4   attention -- so we did -- you know, we -- that's -- she
5   came on board, and she was doing -- she can speak for
6   herself.  I'm not going to speak for her.  So, when she
7   brought it to my attention, that's when we addressed
8   that.
9        Q.   Tell me what she brought to your attention.
10  What did she say?
11       A.   That was -- you know, there was no time, that
12  she had filled in the times.  So we addressed that with
13  the company and make sure that the company fills out the
14  times.
15       Q.   Did she tell you how she determined what times
16  to fill in?
17       A.   No.  No.
18       Q.   Did you ask her?
19       A.   No.  I mean, when it comes to me, I didn't --
20  you know, I was getting to know the paperwork, and she is
21  too.  So, no.
22       Q.   Was she -- did she think she was doing something
23  wrong by filling in times for these classes?
24       A.   Well, she came to me, and we talk about it.  But
25  she was just doing -- you know, she didn't -- she
```

**Deposition of Tzer Waters, taken December 15, 2022**

1    wasn't -- she was just doing what has been done is what

2    she -- she had mentioned to me.

3        Q.   Uh-huh.  Did she tell you who told her to do

4    that?

5        A.   No.  I mean, she said she got some guidance, but

6    I don't know if she -- you know, she didn't

7    specifically -- she can -- you can ask her.  I mean --

8        Q.   Well, I'm asking you, though.

9        A.   Yeah.

10       Q.   I'll get a chance to ask her at some point.

11       A.   Yeah.

12       Q.   But I'm just asking whether -- you know, did you

13    ask her, you know, "Who told you to do that?"

14       A.   She probably -- she mentioned Jason, and she --

15    you know, that -- that -- you know, that -- that's

16    just -- you know, that's just how -- you know, how it's

17    been done before.  So. . .

18       Q.   Are you aware of any other company -- any other

19    of these businesses that ICC provided training for that

20    were submitting documentation for reimbursement where

21    they didn't list the specific time the training took

22    place?

23       A.   I mean, I don't remember.  I just remember

24    Southern Motion is one.

25       Q.   I mean, didn't you think that was fraud, I mean,

Deposition of Tzer Waters, taken December 15, 2022

Page 54

```
 1   that they're submitting for -- they're submitting
 2   documentation to be reimbursed by the state --
 3        A.   Right.
 4        Q.   -- taxpayer money or the federal government
 5   taxpayer money, and yet ICC is writing in the times that
 6   they're going to be reimbursed?
 7        A.   We reimbursed based on the hours that was on
 8   there.
 9        Q.   Right.
10        A.   We are not compliant if there's missing start
11   time/end time.  Yeah, the policy is that you have to have
12   start time/end time.  But as far as the hours they're
13   reimbursed, there was no changes.  Whatever the company
14   puts on there.
15        Q.   Were you -- were you aware of Lowder charging
16   consortium trainers annual salaries of 100 percent of the
17   WET funds?
18        A.   I'm not aware if it was 100 percent.
19        Q.   Were you also aware that he also was
20   additionally billing companies for the trainers' time
21   besides charging consortium trainers' annual salary of --
22   at 100 percent to the WET Fund?  Were you aware he was
23   doing it from both?
24        A.   We were -- I'm aware we're charging for their
25   time, but I'm not aware at that time if they were
```

**Deposition of Tzer Waters, taken December 15, 2022**

1  100 percent funded, as you said.

2      Q.   Did you hide the fact that trainers were not

3  getting paid $35 an hour but were being reimbursed at $35

4  an hour from the State?

5      A.   Okay.  Say -- can you repeat your question?

6      Q.   Were you -- did you hide the fact that trainers

7  were not getting paid $35 an hour, but ICC was requesting

8  $35 per hour reimbursement from the State?

9      A.   For -- for what program?

10     Q.   Any program.

11     A.   Do I hide the fact?

12     Q.   Yes.  Did you hide the fact?

13     A.   No.

14     Q.   Did you and Stacey Loden go behind project

15  managers and hide information about that?

16     A.   No.

17     Q.   Tell me about the -- the audit of 2020.  You're

18  aware that MCCB does an annual audit; correct?

19     A.   Yes.

20     Q.   And it's usually around October, November --

21     A.   Yes.

22     Q.   -- each year?  And I believe the fiscal year

23  would go from -- the fiscal year would be the same as the

24  college year, which would be July 1st of one year to

25  June 30th of the previous year?

**Deposition of Tzer Waters, taken December 15, 2022**

1      A.    Uh-huh.

2      Q.    So, when they came in October, November of --

3  of, say, 2019, they were looking at what happened between

4  July 1st, 2018, to June 30th, 2019?

5      A.    Yes.

6      Q.    Is that correct?

7      A.    Yes.

8      Q.    Were you aware, the 2020 audit, that people were

9  told to replace the summaries and take the quotes out?

10     A.    Yes.

11     Q.    Who made that decision?

12     A.    Dr. Lowder.

13     Q.    Did you pull any of these quotes out?

14     A.    Yes, I did.

15     Q.    For the zero projects?

16     A.    Yes.

17     Q.    Why did you pull the quotes out?

18     A.    It was not part of what was required in the

19  letter that MCCB sent for monitoring.  It was not part of

20  the items that they wanted to see.

21     Q.    Did -- well, did MCCB indicate there was a

22  problem, that these -- that these files were manipulated

23  prior to the -- prior to the audit?

24     A.    What do you mean by "manipulated"?

25     Q.    Well, you took -- you're taking documents out of

Deposition of Tzer Waters, taken December 15, 2022

1    the file --

2         A.   That was not part of the --

3         Q.   -- so they couldn't see them.

4         A.   But it was not part of what they asked to see,

5    to monitor.

6         Q.   You're taking documents out of a file --

7         A.   That is correct.

8         Q.   -- that's being audited.

9         A.   That is -- those items were not part of the list

10   that they want to see.

11        Q.   Were they part of the file?

12        A.   They're part of the file but not part of the

13   monitoring process.

14        Q.   And so you -- you didn't get any -- you didn't

15   have any problem because of that?

16        A.   Not that I'm aware of.

17        Q.   Do you know why Mr. Lowder is no longer working

18   there?

19        A.   Pardon me?

20        Q.   Do you know why Mr. Lowder is no longer working

21   there?

22        A.   He has -- he moved to -- his wife got a job in

23   Nashville.  So they moved.

24        Q.   Do you know whether he voluntarily left or was

25   terminated or asked to leave?

Deposition of Tzer Waters, taken December 15, 2022

```
 1        A.    I don't know.  I mean, I just know that he --
 2    his wife got a job.  I mean, I can't answer that.
 3        Q.    Got you.  That's fine.  All I'm asking is what
 4    you -- what you know.  Do you recall in 2019 there was a
 5    100 percent audit by MCCB?
 6        A.    '20 -- the fiscal year -- 100 percent fiscal
 7    year '19.
 8        Q.    Right.  And they found a lot of noncompliance;
 9    is that correct?
10        A.    That is correct.
11        Q.    And isn't it true there were only three minor
12    noncompliances in Tanya's -- in her documentation?
13        A.    There were a few.  I don't know the exact
14    numbers.  I mean --
15        Q.    Would you dispute there were three?
16        A.    Probably three or four maybe.
17        Q.    Were you aware that -- are the project
18    managers -- are they -- are they allowed to defend these
19    audits or this -- the claims of noncompliance?
20        A.    Yes, I -- I am aware of it.
21        Q.    Was -- was Ms. -- Ms. Sherman allowed to defend
22    these three claimed deficiencies in her paperwork?
23        A.    During the monitoring, when the MCCB monitor
24    asked me about certain paperwork and when they ask to see
25    the project manager to explain, that's when I go get
```

 1  them.

 2      Q.   All right.  And my question is isn't it true

 3  that Ms. Sherman was not allowed to defend the three

 4  deficiencies -- minor deficiencies they found in her

 5  paperwork that she submitted?

 6      A.   Allowed?  I don't -- I don't know who is

 7  allowing who.  The process --

 8      Q.   Well, you were the boss.

 9      A.   I understand.  I understand that.  The process

10  at that time, we never had -- in my -- as far as I'm

11  aware of, we didn't have a 100 percent audit before.  So,

12  when that happened, it was a different -- you know, we --

13  you know, there were one time -- I remember there was one

14  time during the 100 percent that Ms. Davita from MCCB,

15  she had asked a question that I had asked Ms. Sherman to

16  come in and explain one time on that.

17          Then, the rest of it, it was -- it didn't

18  end until -- because it was 100 percent.  So it didn't

19  end till late at night.  And they -- they didn't -- I

20  asked, "Do you want -- you know, do we need to bring

21  anybody," you know?  She didn't want anybody because

22  there was so much -- so many paperwork.  So that's how

23  that was.

24          And then they took the paperwork back to

25  Jackson, every single piece of paper back to Jackson,

Deposition of Tzer Waters, taken December 15, 2022

Page 60

1  after -- when they leave the second day.  So it was very

2  unusual -- it was -- it was an unusual process, I would

3  say.  So I don't know -- when you say allow, who allow

4  who, that is basically based on whatever MCCB asks us to

5  do.

6      Q.   In other years, have they -- when somebody has

7  compliance issues with their paperwork, are they allowed

8  to look at that and defend -- the project manager to look

9  at it and explain what the -- explain it or not?

10     A.   I went through -- that was my second since I

11 came on board.  The first one, we didn't have any -- I

12 don't recall any issues.  I just came on board October.

13     Q.   Got you.

14     A.   And then the audit was maybe November.  So I --

15 it -- you know, I was brand -- brand new back then but --

16     Q.   We're talking in 2020.  Is -- was --

17     A.   No.  That's 20 -- yeah, fiscal year --

18     Q.   I'm sorry.  2020 was 100 percent?

19     A.   Yes.  Fiscal year '15 -- '18 was my first audit.

20     Q.   I'm sorry.  What year?

21     A.   The fiscal year '15-'18.

22     Q.   Right.

23     A.   I mean 2018.

24     Q.   Right.

25     A.   Fiscal year 2018.  So that --

**Deposition of Tzer Waters, taken December 15, 2022**

Page 61

1      Q.   And then there was '19?

2      A.   That was 100 percent.  Yeah.

3      Q.   And then there was '20?

4      A.   And then there was '20.

5      Q.   Right.

6      A.   So that was -- the 100 percent is where they

7   found a lot of noncompliance.  The year previously, I

8   don't believe there was any findings.  So to your

9   question you were asking --

10     Q.   So there were no -- there were no noncompliance

11  issues --

12     A.   Not that I can remember.

13     Q.   -- in 2019 to your recollection?

14          MR. SPARKS:  Object.  You have misquoted the

15     date.  I'm sorry.

16          MR. WOODRUFF:  I don't doubt that.  But what did

17     I do wrong?

18          MR. SPARKS:  You said 2020 was 100 percent

19     audit.

20          MR. WOODRUFF:  Right.

21          MR. SPARKS:  It was 2019.  Sorry.

22          THE WITNESS:  2019.

23          MR. SPARKS:  That's been testified to by, I

24     think, everybody.

25          THE WITNESS:  Yeah.

**Deposition of Tzer Waters, taken December 15, 2022**

1        MR. WOODRUFF:  You're right.  Sorry about that.

2   BY MR. WOODRUFF:

3      Q.   2020 was -- you're absolutely right.  Sorry.  I

4   got confused.  2020 was 100 percent audit?

5      A.   No.  2019.

6      Q.   I'm sorry.  2019 was the 100 percent audit?

7      A.   Yes.  Yes.

8      Q.   In 2018, you're saying there was no compliance

9   issues?

10     A.   That I -- I don't remember, but I don't -- I

11  don't remember -- I don't think that -- that 2019, that

12  100 percent, is where the compliance -- the noncompliance

13  were found.  But I do not recall FY18, the year prior.

14     Q.   Do you recall Southern Motion submitting time

15  sheets where they would have two trainers on there?

16     A.   Yes.

17     Q.   And how would you decide which one of those

18  trainers -- and they weren't allowed to be reimbursed for

19  two trainers, were they?

20     A.   That's -- that is correct.  It's just always

21  that one trainer.

22     Q.   So how would you determine which one of the two

23  trainers you would -- you would submit?

24     A.   The trainer that was doing the training.

25     Q.   Well, how do you know?

**Deposition of Tzer Waters, taken December 15, 2022**

1   A.   Well, I don't remember if Jason was back.  That

2   was brought to my attention by Ms. Loden.  And so the

3   instruction for her -- and I don't remember if Jason was

4   there -- to make sure that only the trainers signed the

5   class roll.  So we addressed that.

6   Q.   I understand.  But how did you decide -- of the

7   ones that had already been submitted with two trainers,

8   how did you decide which -- which one to submit as the

9   trainer?

10   A.   When -- that was before I was told that that --

11   there were -- you know, there were two different people

12   on the class roll -- so when I -- when it was brought to

13   my attention.  So I don't know.  They probably had been

14   doing -- I can't speak for them when I say -- you know,

15   accountability or the previous project manager,

16   whichever -- how that was being done.

17   Q.   After you became the director, was Ms. Sherman

18   ever blocked from seeing the Workforce classes on the

19   calendar?

20   A.   Was she blocked from seeing the Workforce

21   classes?

22   Q.   Yes.  Was she blocked from -- she couldn't see

23   the Workforce classes on her computer?

24   A.   No.  No.  We shared that Workforce calendar.  So

25   everybody have access to it.

Deposition of Tzer Waters, taken December 15, 2022

1      Q.    Did you ever have to change the settings on her

2   view for the class schedule?

3      A.    No.   No.

4      Q.    Was Sherman a hard working project manager?

5      A.    Yes, she was.   She's got a lot of projects.

6      Q.    Are you aware of her being habitually late to

7   work?

8      A.    No, not really.

9      Q.    Are you aware of her missing an inordinate

10   amount of time from work?

11      A.    When I was a director?

12      Q.    Yes.

13      A.    No.

14      Q.    Did you ever speak negatively or criticize

15   Ms. Sherman to other coworkers?

16      A.    No.

17      Q.    Did you ever exclude Ms. Sherman from meetings

18   regarding changes in MCCB policies after you became the

19   director?

20      A.    No.

21          MR. WOODRUFF:   I tender the witness.

22          MR. GRIFFITH:   Let's talk a second.

23          (AFTER A RECESS, THE DEPOSITION CONTINUED AS

24      FOLLOWS:)

25          MR. GRIFFITH:   We have no further questions.

Deposition of Tzer Waters, taken December 15, 2022

1          MR. SPARKS:  I have no questions.

2          (CONCLUDED AT 4:40 P.M.)

Deposition of Tzer Waters, taken December 15, 2022

```
 1                    C E R T I F I C A T E

 2   STATE OF MISSISSIPPI      )

 3   COUNTY OF ITAWAMBA        )

 4   RE:  ORAL DEPOSITION OF TZER NAN WATERS

 5        I, Phyllis K. McLarty, RMR, FCRR, CCR #1235, a

 6   Notary Public within and for the aforesaid county and

 7   state, duly commissioned and acting, hereby certify that

 8   the foregoing proceedings were taken before me at the

 9   time and place set forth above; that the statements were

10   written by me in machine shorthand; that the statements

11   were thereafter transcribed by me, or under my direct

12   supervision, by means of computer-aided transcription,

13   constituting a true and correct transcription of the

14   proceedings; and that the witness was by me duly sworn to

15   testify to the truth and nothing but the truth in this

16   cause.

17        I further certify that I am not a relative or

18   employee of any of the parties, or of counsel, nor am I

19   financially or otherwise interested in the outcome of

20   this action.

21        Witness my hand and seal on this 8th day of

22   January, 2023.

23                    _____

                       PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
24
     My Commission Expires:
25   November 10, 2025
```

**ADVANCED COURT REPORTING**
**662-690-1500**

Deposition of Tzer Waters, taken December 15, 2022

Page 67

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF MISSISSIPPI
2                       ABERDEEN DIVISION

3   TATIANA (TANYA) SHERMAN                        PLAINTIFF

4   VS.                              NO. 1:21-CV-190-GHD-DAS

5   ITAWAMBA COMMUNITY COLLEGE,
    JOE LOWDER, TZER NAN WATERS,
6   AND DR. JAY ALLEN                             DEFENDANTS

7
                          CERTIFICATE
8

9        I, Tzer Nan Waters, have read the foregoing pages,

10  1-66, of the transcript of my deposition given on

11  December 15, 2022, and it is true; correct and complete

12  to the best of my knowledge, recollection and belief

13  except for the list of corrections, if any, attached on a

14  separate sheet herewith.  Witness my hand, this the

15  _____ day of _____, 2023.

16

17                       _____
                                  Tzer Nan Waters
18

19                          CERTIFICATE

20       Subscribed and sworn to before me, this the

21  _____ day of _____, 2023.

22

23                       _____
                         Notary Public in and for the
24                       County of _____
    My Commission         State of Mississippi
25  Expires:  _____
```

**ADVANCED COURT REPORTING**
**662-690-1500**

Deposition of Tzer Waters, taken December 15, 2022

Page 68

```
 1                    ADVANCED COURT REPORTING
                             P.O. BOX 761
 2                   TUPELO, MISSISSIPPI 38802-0761

 3

                           CORRECTION LIST
 4

 5    Tatiana (Tanya) Sherman vs. Itawamba Community College,
      Joe Lowder, Tzer Nan Waters, and Dr. Jay Allen
 6    Federal - No. 1:21-CV-190-GHD-DAS
      _____
 7    CAPTION

 8    December 15, 2022                 Tzer Nan Waters
      _____
 9    DATE OF DEPOSITION                DEPONENT'S NAME

10    PAGE  LINE   CORRECTION                   REASON

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24                            _____
                                      Tzer Nan Waters
25
```